| STATE OF MINNESOTA | DISTRICT COURT |
|---|---|
| COUNTY OF OLMSTED | THIRD JUDICIAL DISTRICT |

| | Case Type: Employment |
|---|---|
| Sameh Mahmoud Mohamed Said, MD, | Court File No. 55-CV-19-6382 |
| Plaintiff, | |
| vs. | **PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND** |
| Mayo Clinic, and Joseph Albert Dearani, MD, | |
| Defendants. | |

Plaintiff Dr. Sameh Mahmoud Mohamed Said ("Plaintiff" or "Dr. Said"), by and through counsel, for his First Amended Complaint against Defendants Mayo Clinic ("Defendant Mayo" or "Mayo") and Joseph Albert Dearani, MD ("Defendant Dearani" or "Dr. Dearani"), states and alleges as follows:

## **INTRODUCTION**

1.      Dr. Said was a successful Senior Associate Consultant physician member of Mayo's the Department of Cardiovascular Surgery ("Department") from July 2015 until he was constructively discharged on December 3, 2018.  Dr. Said was forced to resign after Dr. Joseph Dearani, Department Chair, recommended his termination following pretextual allegations of sexual harassment and other alleged misconduct, and a discriminatory and retaliatory investigation into these allegations.

2.      Dr. Dearani harbored a discriminatory bias against Dr. Said from the beginning of Dr. Said's association with Mayo.  Dr. Dearani opposed Mayo's decision to hire Dr. Said in 2015, informing others that Dr. Said was not "Mayo material." Dr. Dearani used the term "mayo material" to describe employees he considers to have desirable qualities, which were invariably not minority physicians.

3.      Dr. Dearani's discriminatory animus towards Dr. Said was based on Dr. Said's race, national origin, and religion. Throughout Dr. Said's tenure at Mayo, Dr. Dearani discriminated against Dr. Said by undermining his professional growth, interfering with his advancement at Mayo, and continuously punishing and threatening him, as described further herein.  Dr. Dearani's far more favorable treatment of a similarly situated white physician represents illegal disparate treatment.

4.      In addition to this discriminatory motive, Dr. Dearani harbored a retaliatory motive toward Dr. Said beginning in December 2017, when Dr. Said complained about Dr. Dearani's breach of his right to patient privacy, as described further herein.   The recommendation for Dr. Said's termination was also expressly based on a retaliatory reaction to a good-faith discrimination claim Dr. Said had raised in the weeks before this recommendation was made.

5.      Dr. Dearani's discriminatory and retaliatory actions against Dr. Said were reinforced by Mayo's Personnel Committee Chair, Dr. Charanjit S. Rihal. Dr. Rihal has a notorious reputation for his animosity towards Muslims. During the investigative process, initiated by Dr. Dearani, Dr. Rihal's treatment of Dr. Said was malicious and discriminatory.

Dr. Rihal acceded to Dr. Dearani's discriminatory and retaliatory animus towards Dr. Said by supporting Dr. Dearani's recommendation to terminate Dr. Said, thus forcing Dr. Said to resign.

6.     In response to Dr. Said's notification of his intent to resign, Dr. Rihal falsely claimed that his resignation triggered mandatory reporting to the Minnesota Board of Medical Practice. Dr. Rihal's claim was malicious and served no legitimate purpose but to further discriminate and retaliate against Dr. Said, and to further damage his reputation and future employment opportunities.

7.     Mayo's conduct has destroyed Dr. Said's promising career at Mayo and adversely affected his professional reputation in the pediatric cardiac surgery field both locally and internationally. He now brings this lawsuit to remedy Mayo's illegal discrimination, retaliation, tortious interference with his future employment opportunities, invasion of privacy, defamation and conversion.

## PARTIES, JURISDICTION, AND VENUE

8.     Plaintiff is a resident of the State of Minnesota, and maintains a residence and now works in Hennepin County.

9.     During all relevant times alleged herein, Plaintiff was an employee of Mayo as that term is defined in Minn. Stat. §363.03, Subd. 15 and 42 U.S.C. § 2000e.

10.     Defendant Mayo Clinic is a Minnesota corporation, with a principal place of business at 200 First St. SW, Rochester, Minnesota 55905.  During all relevant times alleged herein, Mayo was Dr. Said employer as that term is defined in Minn. Stat. §363.03, Subd. 16 and 42 U.S.C. § 2000e.

11.     Defendant Dr. Joseph Albert Dearani ("Dr. Dearani") is a resident of the State of Minnesota and is employed at Mayo.

12.     The present action is timely commenced under Minn. Stat. § 363A.28, subd. 3 and 42 U.S.C. § 2000e-5.

13.     The Court has jurisdiction over the parties and causes of action alleged by Plaintiff because the claims involve violations of Minnesota laws, and the events alleged herein occurred in Minnesota.

14.     Venue is proper in this Court because Plaintiff was employed by Defendant in Olmsted County and Defendant does significant business here.

15.     Plaintiff filed a charge of discrimination with the Minnesota Department of Human Rights on or about December 17, 2018, and he has notified the Department of his decision to proceed with this lawsuit.

## FACTUAL BACKGROUND

16.     Dr. Said is of Egyptian National Origin and completed his medical degree at the University of Alexandria in Egypt.

17.     Dr. Said is of Middle Eastern and Northern African descent and identifies as an African-American.  He is a practicing Muslim.

18.     Dr. Said is a pediatric and adult cardiovascular surgeon. He is Board-certified in General Surgery, Thoracic Surgery, and the Congenital Cardiac Surgery subspecialty.

19.     Dr. Said was employed by Mayo from July 1, 2015 to December 3, 2018.

20.    From October 2005 to June of 2014, prior to his employment with Mayo, Dr. Said completed an advanced cardiovascular surgery fellowship, and residencies in general and thoracic surgeries at Mayo.

21.    From 2013 to 2014, Dr. Said served as the Chief Resident during his last year in Mayo's residency program.

### Dr. Dearani's Bias Toward Dr. Said Manifests Itself from the Beginning of Dr. Said's Residency and Fellowship at Mayo

22.    During his residency and fellowship training at Mayo, Dr. Said was repeatedly exploited and humiliated by Dr. Dearani. At the time, Dr. Said was on a non-resident visa status. In order to continue to support his family and pursue his career aspirations, Dr. Said knew that he needed Dr. Dearani's support and recommendations. Dr. Said tolerated Dr. Dearani's abusive conduct in an effort to gain favor with Dr. Dearani and advance his career.

23.    While training at Mayo, Dr. Said was often assigned to perform miniscule and personal tasks for Dr. Dearani, in direct contrast to Dr. Dearani's more favorable treatment of other non-minority residents. These tasks ranged from preparing Dr. Dearani's presentation slides to installing applications on his mobile phone. Instead of encouraging Dr. Said to thrive in his practice, he often instructed Dr. Said to research and draft manuscripts that Dr. Dearani intended to publish under his name alone. Despite Dr. Said's contributions, Dr. Dearani refused to credit his contributions in the publications.

24.    Dr. Dearani also served on the editorial and review boards of several scientific journals, which required him to review manuscripts. Dr. Dearani often required Dr. Said to edit and review manuscripts that he was assigned as part of his editorial and review responsibilities. Dr. Dearani's position on the editorial and review boards of several scientific journals, as well

as publishing his own manuscripts, served his own personal goals of achieving professional recognition, using the work of Dr. Said.

25.     By assigning Dr. Said to these demeaning, tedious, and time consuming tasks that only served his personal aspirations, Dr. Dearani hindered Dr. Said's opportunities to work on patient-related matters.

26.     Despite Dr. Dearani's efforts to interfere with Dr. Said's training, Dr. Said proved to be a productive and skilled surgeon, and sought to continue to develop his practice at Mayo.

27.     At the conclusion of his training, Dr. Said had an interest in pursuing a career in pediatric heart surgery at Mayo. Dr. Harold Burkhardt, a long-tenured and respected congenital cardiovascular surgeon, was impressed by Dr. Said's performance and was an avid supporter of his continued development at Mayo. Dr. Burkhart was leaving Mayo and suggested that Dr. Said talk to Dr. Dearani about the possibility of enrolling in a prestigious congenital fellowship at Stanford University as a Mayo Scholar, and returning to Mayo at the conclusion of the fellowship, in order to fill the vacancy to be created by Dr. Burkhart's departure.

28.     To enroll in the Stanford fellowship as a Mayo Scholar, Dr. Said needed Dr. Dearani's support and Mayo's commitment to hire him at the conclusion of his fellowship. Dr. Burkhart suggested that Dr. Said pursue the fellowship and return to Mayo because he considered Dr. Said as the best candidate to join the Department after Dr. Burkhart's departure.

29.     Dr. Said thus discussed his objective to enroll in the Stanford fellowship as a Mayo Scholar with Dr. Dearani, and asked that he would be considered for employment with Mayo at the conclusion of the fellowship. Dr. Said also explained that enrolling in the

fellowship would secure future employment opportunities and resolve any potential issues related to his non-resident visa.

30.     Dr. Dearani informed Dr. Said that he would not be offered a position at Mayo because the Department's physicians unanimously agreed to hire a cardiovascular surgeon with at least four to five years of post-residency employment experience.

31.     Dr. Said was disappointed in Dr. Dearani's response and conveyed this rationale to Dr. Burkhardt. Dr. Burkhardt characterized Dr. Dearani's response and rationale as a "lie." According to Dr. Burkhardt, the Department physicians had not discussed the desired skills, experience, or qualifications of the next hire nor had they come to any decision, much less the "unanimous" one described by Dr. Dearani.

32.     Dr. Said thereafter enrolled in the Stanford Fellowship without the Mayo Scholar commitment.

33.     At the conclusion of his Stanford Fellowship, Dr. Said applied for employment at Mayo. The Department had an immediate need for a well-qualified pediatric cardiac surgeon due to the unexpected departure of several cardiac surgeons.

**Dr. Dearani's Discriminatory Efforts to Deny Dr. Said Mayo Employment**

34.     Upon information and belief, Dr. Dearani voiced strong objections to Dr. Said's candidacy and other physicians have informed Dr. Said that Dr. Dearani had described Dr. Said as "not Mayo material." "Mayo material" is a superficial and subjective term that Dr. Dearani often used to describe physicians he sought to advance and train based on their physical appearance and national origin, rather than on their objective qualifications and skills.

35.     Dr. Dearani continued to harbor the same discriminatory animosity towards Dr. Said that he had expressed during Dr. Said's training and in his request for a Mayo's scholarship commitment.

36.     Dr. John Stulak, a Department surgeon, openly opposed hiring Dr. Said. Dr. Stulak's resentment towards Dr. Said developed while they were both undergoing training at Mayo.

37.     Dr. Stulak and Dr. Dearani both harbored a discriminatory animus against Dr. Said on the basis of his race, national origin, and religion, and both actively campaigned against Dr. Said's application to be hired into the Department.

38.     Dr. Dearani, however, upon information and belief was pressured to hire Dr. Said due to the Department's immediate need for a well-qualified cardiac surgeon. The Department's physicians and the former chair who preceded Dr. Dearani, Dr. Hartzell V. Schaff, fully supported Dr. Said's hire. Dr. Said also received support from Mayo's Department of Cardiovascular Anesthesia, which submitted to Dr. Dearani a written letter signed by fourteen anesthesiologists supporting Dr. Said's hire.

**Dr. Dearani Attempts to Limit Dr. Said's Mayo Practice**

39.     Upon Dr. Said commencing employment at Mayo, Dr. Dearani made it clear to him that despite his passion and experience in pediatric heart surgery, he would only be permitted to perform "adult" heart surgery cases. Upon information and belief, Dr. Dearani considers pediatric cardiac surgery his "area of specialty," and did not want to compete for referrals with Dr. Said.

40.     Dr. Said was forced to accept Dr. Dearani's ultimatum that he either exclusively perform adult cases or he would not be offered employment at Mayo. To substantiate this requirement, Dr. Dearani required Dr. Said to meet with Dr. Bassem Mora, pediatric cardiac surgeon, and assure him that he would not perform any pediatric procedures.

41.     Dr. Said has completed a prestigious congenital fellowship prior to his hire and was well-qualified to perform any pediatric heart procedure. There was no legitimate rationale for Dr. Dearani's restriction on the procedures that Dr. Said performed.

42.     Throughout Dr. Said's tenure, Dr. Dearani treated Dr. Said as a second-rate physician which is likely due to the fact that Dr. Said is of Egyptian national origin, of Muslim faith, and was educated in Egypt, which Dr. Dearani has described to Dr. Said as a "third world country."

43.     Dr. Dearani is a Caucasian male. He was born and educated in the United States and is, upon information and belief, a Christian.

44.     Dr. Said was initially hired as a Senior Associate Consultant ("SAC"). The SAC role is generally a three-year appointment. After the initial three- year appointment, the SAC's appointment is either extended for up to two years or the SAC is promoted to a Consultant role. The Mayo follows an "up or out" policy, and it is well understood if the SAC is not ultimately promoted to Consultant, the SAC is terminated.

45.     Dr. Said began his employment as a SAC at Mayo on July 1, 2015.

46.     At the time of Dr. Said's hire, Mayo's congenital cardiac surgery practice was failing. The practice as experiencing high rates of mortality and serious complications related to high rates of reoperation and infections.

47.     The state of Mayo's congenital cardiac surgery practice was not a major concern to Dr. Dearani. Dr. Dearani continued to refuse to allow Dr. Said to perform any operations in the congenital practice despite pressure from pediatric cardiologists.

**Dr. Said Succeeds Despite Obstacles Imposed by Dr. Dearani**

48.     Approximately six months after joining Mayo, Dr. Said had his first opportunity to operate in Mayo's congenital practice.

49.     Mayo's pediatric cardiologists were dissatisfied with Dr. Mora's surgical outcomes and informed Dr. Dearani that they refused to refer any pediatric cases to Dr. Mora. Thus, Dr. Dearani had no choice but to allow Dr. Said to take these cases. Upon information and belief, this expansion of Dr. Said's practice infuriated and threatened Dr. Dearani.

50.     Throughout the remainder of Dr. Said's employment at Mayo, Dr. Dearani intensified his by-then established pattern of hostile and discriminatory treatment toward Dr. Said, including attempting to restrain and undermine Dr. Said's development, growth, and promotion opportunities.

51.     Dr. Said did his best to overcome Dr. Dearani's bias and hostility towards him. Throughout his tenure at Mayo, Dr. Said exceeded all expectations in terms of the quality of the care he provided, the surgical skills he exhibited, and the positive outcomes for his patients. He proved to be a top cardiac surgeon and quickly became the Department's busiest cardiac surgeon with the largest referral pool.

52.     Dr. Said introduced new and innovative neonatal surgical techniques to the Department, wrote and taught extensively on these neonatal surgical techniques. He became

the pediatric surgeon of choice for surgical referrals from both Mayo and non-Mayo cardiologists, further infuriating and threatening Dr. Dearani.

53.    Dr. Said's contributions to the Department were readily apparent after he began performing pediatric congenital surgery. Mayo's volume of pediatric cardiac cases and outstanding surgical outcomes drastically improved due in large part to Dr. Said's involvement in this care and contributions. This exceptional standard of care is further evident from the hundreds of thank you letters and notes Dr. Said received from his patients and their families.

54.    As Dr. Said's practice and strong reputation grew, Dr. Dearani's hostile and discriminatory treatment of him escalated. Dr. Said sought Dr. Dearani's mentorship and support to achieve excellent surgical outcomes, but Dr. Dearani refused to provide any support or guidance to Dr. Said when he performed complex congenital surgery for neonates and infants. Dr. Dearani appeared threatened by Dr. Said's success in pediatric cardiac surgery, despite Dr. Dearani's active attempts at hindering his success.

55.    Dr. Dearani hoped that Dr. Said would fail without his support, and on several occasions, threatened Dr. Said in an effort to preserve his own case load. Dr. Dearani admonished Dr. Said and stated that he shouldn't be performing all of the pediatric cases. Dr. Dearani stated "I don't want anyone to say I don't do these cases anymore," and warned Dr. Said that he was "burning out" the surgical team and exhausting Mayo resources.

56.    In response, Dr. Said stated that he was trying to grow his practice and had no control over the cases that pediatric cardiologists referred to him.

**Dr. Dearani Begins to Foment False Allegations Against Dr. Said**

57.    In October 2017, Dr. Dearani instructed Dr. Said to meet with Steffany Guidinger, Human Resources Director. Dr. Dearani did not attend the meeting between Dr. Said and Ms. Guidinger.

58.    During Dr. Said's meeting with Ms. Guidinger, Ms. Guidinger claimed that several issues had been raised since the beginning of Dr. Said's employment which warranted Mayo's attention. According to Ms. Guidinger, several issues related to Dr. Said's interactions with colleagues and what she claimed as an apparent violation of Mayo's "mutual respect" policy.  Dr. Said was surprised by her allegations as these issues had never been brought to his attention, in any fashion, during his extremely successful first two years at Mayo.

59.    On October 21, 2017, Dr. Said was involved in a severe car accident in which he seriously injured his right hand. Dr. Said's extensive injuries required him to undergo semi-urgent surgery on his right hand at Mayo.  He was forced to take approximately seven weeks of medical leave to recover from the accident and his surgery.

60.    Dr. Said had several patients who were scheduled for surgery the week following his accident. He asked his secretary to contact these patients and their referring cardiologists to explain Dr. Said unavailability and to offer the options of delaying the surgery until Dr. Said was fully recovered or be referred to another surgeon. The majority of Dr. Said's patients elected to delay their operations due his reputation for excellent outcomes and patient care. Dr. Dearani was made aware that several patients elected to delay their procedures and called Dr. Said in the recovery room after Dr. Said's surgery.  Dr. Dearani was enraged in this call and began yelling "why are you controlling the practice?" at Dr. Said.

61.     Dr. Dearani saw Dr. Said's absence as an opportunity to perform more pediatric cases and was infuriated that the patients elected to delay their operations until Dr. Said recovered from his surgery.

### Dr. Said Complains About Dr. Dearani's HIPAA Violation

62.     Dr. Said learned that Dr. Dearani contacted his hand surgeon requesting information regarding the extent of Dr. Said's injuries and his prognosis for recovery.

63.     Dr. Said did not provide consent or authorization for Mayo to disclose to, or for Dr. Dearani to obtain, protected health information regarding his treatment or health care, or to contact Dr. Said's physician directly.

64.     Upon being made aware of this contact by Dr. Dearani, Dr. Said complained to Dr. Charanjit Rihal, Personal Committee Chair, that Dr. Dearani's inquiry violated the Health Insurance Portability & Accountability Act of 1996 ("HIPAA"). *See* 42 U.S.C. § 1320d-2.

65.     The HIPAA privacy rule prohibits any third party from obtaining information about patient's medical condition from a treating physician without first securing the patient's authorization. *See* 45 C.F.R. §§ 164.501, App. V, 164.502(a)(1)(ii), 164.506.

66.     Dr. Dearani immediately responded to Dr. Said after learning of his complaint to Dr. Rihal. Dr. Dearani was upset that Dr. Said complained to his staff.  He berated Dr. Said and stated that as Department Chair he was permitted to seek information regarding Dr. Said's treatment.  Dr. Dearani's statement is false as he was not provided authorization to obtain Dr. Said's protected health information, and his status as Department Chair does not trump this requirement of securing consent.

### Dr. Dearani Forces Dr. Said to Sign a False "Coaching Memo"

67.     When Dr. Said returned to work on December 5, 2017, Dr. Dearani's negative treatment of him continued to escalate. Not only did Dr. Dearani continue to discriminate against Dr. Said based on his race, national origin, and religion, but he was now retaliating against Dr. Said for complaining about the HIPAA violation.

68.     Upon Dr. Said's return to work, Dr. Dearani began a campaign to undermine Dr. Said's candidacy for Consultant, thereby threatening his continued employment at Mayo.

69.     On December 5, 2017, Dr. Said was summoned to a meeting with Dr. Dearani and Renee Jones, Cardiovascular Surgery Operations Manager. Dr. Dearani provided Dr. Said with a two-page memo entitled "Coaching."

70.     In the Coaching Memo, Dr. Dearani falsely claimed that "[s]everal issues have been raised with you over the last year related to your behavior and interactions with your colleagues.  Recently, there were several discussions with you related to your performance."

71.     The Coaching Memo falsely alleged that Dr. Dearani provided Dr. Said with feedback from a December 2016 360° review in which he claimed that Dr. Said could be "accusatory of peers and angry."  This statement was false. First, Dr. Said was not provided with any information or feedback from the 360° review until December 2017. Second, Dr. Dearani had never had any discussions or coaching sessions with Dr. Said regarding this feedback.

72.     The Coaching Memo also made reference to "professional boundaries being crossed with two female anesthesia colleagues with repeated attempts to invite to lunch/dinner and personal outings."  This was based on Dr. Dearani's claim that two female anesthesia staff members had allegedly complained that Dr. Said sent them personal text messages, gave them

gifts, and, for one of these women, sought to explore her interest in a personal relationship. This matter had been previously investigated by Human Resources Director Steffany Guidinger, was resolved in Dr. Said's favor and had been considered "closed."

73.    This investigation determined that the allegations were the result of a misunderstanding of Dr. Said's intentions. Dr. Said regularly provided gifts to his colleagues as a way to express his gratitude. He also sought to establish friendships with colleagues whom he worked closely with in surgery as a means of establishing effective communication in a very demanding and high stress work setting. The investigation concluded that Dr. Said's intentions and conduct were neither sexual in nature nor inappropriate.

74.    Despite the investigation concluding in Dr. Said's favor, the Coaching Memo instructed Dr. Said to "cease pursuing female colleagues by sending text messages and/or inquiries for lunch/dinner or personal outings and limit your interactions with peers to be professional and work related." The sole purpose of including this matter in the Coaching Memo was to undermine Dr. Said's performance and undermine his promotional opportunities, which were due to be considered at that time period.

75.    Dr. Said protested the contents of the Coaching Memo and initially was hesitant to sign the document. Dr. Said begrudgingly signed the Coaching Memo only after Dr. Dearani stated that he would be prohibited from practice and would not be considered for a Consultant role if he did not sign the Memo.

76.    Dr. Dearani thereafter assured Dr. Said that he would solicit feedback regarding Dr. Said's performance and complete a follow up 360° evaluation by March 2018.  Dr. Dearani

further assured Dr. Said that he would be promoted to Consultant so long as he successfully followed by the Coaching Memo's recommendations.

77.     Mayo policy requires that the performance of physicians in the SAC role is to be formally evaluated, in writing, at least annually, and places the responsibility to ensure this occurs on the department chair. This review requires the department chair to solicit input from management, peers and subordinates, referred to as a 360° feedback, and review this feedback with the physician.

78.     Dr. Said was not informed of any such review by Dr. Dearani until December 2017, after he had been employed at the Mayo for over two years, and only after Dr. Said asked him about his future and prospects for a prompt promotion after his return from medical leave.

79.     Dr. Said received the required 360° review feedback from Dr. Dearani in December 2017. The feedback contained in the review appeared to be solicited from twenty-four individuals in December 2016, a full year before this feedback was belatedly shared with Dr. Said.  All twenty-four individuals evaluated Dr. Said as meeting or exceeding expectations. Dr. Dearani did not provide Dr. Said with an explanation for the delay in producing the 360° review feedback obtained in December 2016, nor did he explain the delay in promoting Dr. Said to Consultant as he has achieved outstanding results in pediatric and adult cardiac surgery.

80.     The 360° review contained almost uniformly positive feedback reports regarding Dr. Said's performance. Dr. Said was thus dismayed when Dr. Dearani stated that there were nonetheless "significant concerns" about his performance and potential for promotion, as this negative information was not reflected in any manner by this extensive written feedback.

81.    Dr. Dearani then failed to provide Dr. Said with a follow-up 360° review in March 2018 as promised.

82.    In April 2018, Dr. Said asked Dr. Dearani about the 360° review he expected to receive in March 2018, and the status of his candidacy for promotion to Consultant. Dr. Dearani denied that he ever committed to completing the follow-up 360° review or promptly reviewing Dr. Said's candidacy for promotion to Consultant.

**Dr. Said Complaints Internally Regarding Dr. Dearani**

83.    On April 3, 2018, Dr. Said met with Dr. Rihal to discuss his concerns regarding Dr. Dearani. Dr. Said specifically addressed his concerns about the lack of support and mentorship from Dr. Dearani, including his resistance to his hire as a Mayo physician, his prior reference to him as "not Mayo material," his HIPAA violation in November 2017 by contacting Dr. Said's treating physician, and his imposition of the unwarranted Coaching Memo on December 5, 2017, immediately upon Dr. Said's return from leave.

84.    During this meeting, Dr. Said clearly conveyed to Dr. Rihal that he felt unfairly singled out by Dr. Dearani. Dr. Said further described his belief that he had earned the promotion to Consultant based on his exceptional productivity and surgical outcomes, and that Dr. Dearani was actively interfering with that opportunity by doing everything in his power to undermine Dr. Said.  Dr. Said explained that Dr. Dearani promised to complete a 360° review by March 2018, that Dr. Dearani failed to fulfill that promise, and Dr. Dearani's claims that no such promise was ever made.

85.    Dr. Said also expressed his concerns about Dr. John Stulak's role in supporting Dr. Dearani in interfering with Dr. Said's opportunities at Mayo and promotion to Consultant.

55-CV-19-6382

Filed in District Court
State of Minnesota
4/6/2020 3:32 PM

He explained that Dr. Stulak began bullying him and treating him with hostility while they were both undergoing training at Mayo. Dr. Said further explained that Dr. Stulak served as the Residency/Fellowship Program Assistant Director, and was abusing his position by encouraging residents, fellows, and trainees to submit written complaints about Dr. Said whenever the opportunity arose. Through this conduct, Dr. Stulak maliciously solicited negative feedback regarding Dr. Said with the sole purpose of jeopardizing Dr. Said's continued employment at Mayo and promotion to Consultant.

86.     Dr. Said is not aware of whether Dr. Rihal or the Personnel Committee investigated his complaints. Dr. Said was never informed of any investigation or any corrective action involving Dr. Dearani and/or Dr. Stulak.

**Dr. Dearani Denies and Then Delays Dr. Said's Promotion to Consultant**

87.     On May 22, 2018, Dr. Dearani denied Dr. Said the Consultant promotion by submitting a written request to the Personnel Committee for Dr. Said's SAC appointment to be extended through the end of 2018. In supporting this request, Dr. Dearani stated: "While Dr. Said's clinical outcomes are strong and he has been productive from a research standpoint . . . he has received coaching related to his interpersonal skills, professional relationships, and communications in the workplace. Dr. Said has shown some improvement in this area and I am optimistic that this additional time will better position him to be successful as a Consultant."

88.     On June 6, 2018, Dr. Rihal informed Dr. Said in writing that his SAC appointment was extended through December 25, 2018.

89.     On August 13, 2018 Dr. Said received an e-mail from Ms. Jones, in which Dr. Dearani was copied, regarding the results of a "workplace cultural assessment" allegedly

conducted in July 2018.  Mayo claims that the assessment was conducted in response to complaints about surgeons' behavior received from employees in the Critical Care and consulting services.

90.     The assessment was conducted by Dr. Dearani and Ms. Jones with a number of physicians and employees in the Cardiovascular Surgery Department and anesthesiologists, nurses and other employees in the ICU.

91.     The negative feedback provided to Dr. Said from the assessment was very similar to the feedback that Dr. Dearani provided in the December 5, 2017 Coaching Memo, and appeared to simply re-hash false conclusory allegations, and repeat prior discussions in which Dr. Dearani informed Dr. Said that his promotion to Consultant was delayed through the end of 2018.

92.     The assessment repeated the long-ago closed inquiry into the allegation that Dr. Said sent inappropriate personal text messages, provided gifts, and sought to explore a personal relationship with a female anesthesia staff member. Although the assessment noted that "these allegations were vetted appropriately through HR, PC Exec, and Legal.  This issue is closed, but it's noted here as there is still a perceived impact to the work unit due to lingering discussion amongst employees."  Upon information and belief, the sole purpose of including this matter into the assessment was to continue documenting an incident in which Dr. Said's conduct was investigated and the matter was resolved in Dr. Said's favor.

93.     On August 15, 2018, Dr. Said met with Dr. Dearani and Kevin Hennessey, Operations Administrator, to discuss feedback Dr. Dearani had claimed he received from the assessment and to prepare for a formal meeting with Dr. Rihal, Personnel Committee Chair.

55-CV-19-6382

Filed in District Court
State of Minnesota
4/6/2020 3:32 PM

Although Dr. Said was instructed to provide his perspective regarding the Department's concerns, Dr. Dearani and Mr. Hennessey refused to discuss the underlying facts and threatened to terminate Dr. Said's employment if he did not concede to the findings of the assessment and their decision to further delay his promotion. They refused to inform Dr. Said of any specifics regarding this alleged negative feedback.

94.     On August 29, 2018, Dr. Said met with Dr. Dearani, Dr. Rihal, and Stephanie Wendorff, Personnel Committee Secretary, to discuss the results of the assessment and the unwarranted extension of his Dr. Said's SAC appointment. During this meeting, Dr. Said expressed his frustration regarding his continued punishment for the allegations made against him which were previously investigated and resolved in his favor. Dr. Said was not provided with an opportunity to respond to or discuss the findings of the assessment, and was informed that his SAC appointment was to again be extended to June 2019, further delaying his promotion to Consultant.

### Dr. Dearani Involuntarily Suspends Dr. Said and a Biased and Retaliatory Investigation Ensures

95.     On October 9, 2018, Dr. Dearani summoned Dr. Said to a meeting with one half hour notice prior to the meeting time and without providing him with any information regarding the purpose of the meeting. When Dr. Said asked, Dr. Dearani falsely stated he did not know the purpose of the meeting.

96.     When he arrived for this meeting, Dr. Said was surprised to that find Ms. Jones and Ms. Guidinger were there. Dr. Dearani informed Dr. Said that he was placed on administrative leave, "effective immediately." According to Dr. Dearani, this administrative leave was "standard operating procedure" to allow for an investigation into a "complaint" which

had arisen. Dr. Dearani falsely stated that he was not involved in the investigation or the decision to place Dr. Said on leave.

97.    Dr. Said requested details regarding the complaint and the decision to place him on immediate leave. Although initially hesitant to provide any details, Ms. Guidinger eventually described an internal complaint alleging that Dr. Said had made his Physician Assistant (PA), Rebecca Reid, "uncomfortable" by, apparently, trying to "pursue a relationship with her."

98.    Dr. Said expressed his disbelief that PA Reid would make such a complaint, and asked that they disclose PA Reid's alleged statement so that he could better understand the nature of the complaint. Dr. Dearani and Ms. Guidinger refused to provide Dr. Said with the requested information and stated that they would not disclose the complaining party.  At the conclusion of the meeting Dr. Dearani stressed the need for the sensitive matters discussed to be kept strictly confidential, and that the nature of the meeting not be discussed with anyone outside of the meeting.

99.    Dr. Said attempted to discuss the matter with Dr. Dearani after the meeting to better understand the next steps.  Dr. Dearani refused to engage with him and claimed that he would not be involved in the investigation or decision making process moving forward.

100.    Immediately after the meeting Dr. Said received an abundance of text messages, emails, and phone calls from his colleagues at Mayo asking why he was placed on leave. Dr. Said was shocked that his colleagues throughout Mayo had received this information shortly after Dr. Dearani confirmed that the matters discussed at the meeting were confidential and that the nature of the meeting was not to be discussed with anyone.

101.    Immediately after the meeting, Dr. Dearani had sent an email to dozens of recipients, including the entire Department of Cardiovascular Surgery staff and physicians, physician assistants and the anesthesiologist group who works with this team, and most of the Mayo surgery leadership, informing this vast group that effective immediately Dr. Said was placed "on an unexpected leave for an undetermined duration," and *encouraging these recipients to forward the email* at their discretion.

102.    Not surprisingly, Dr. Said has learned that many physicians, including those he depends upon for referrals, believe that Dr. Said committed some grave infraction requiring this harsh and punitive announcement of his "unexpected leave for an undetermined duration."

103.    On October 15, 2018, Dr. Said discovered that his access to his Mayo e-mail account had been disabled. He also learned from reliable sources that Dr. Dearani had widely stated to third parties, prior to the conclusion of the investigation, that Dr. Said was not expected to return to Mayo employment.   These statements have devastated Dr. Said's professional relationship with physicians throughout the medical community.

104.    One of Dr. Said's best referral sources, Dr. Carlos Miranda of the Sanford Health System, was immediately informed, upon information and belief by Dr. Dearani and/or Dr. Stulak, that Dr. Said was placed on involuntary administrative leave and unlikely to return to Mayo. This damaging information was further disseminated by Dr. Miranda to other third parties outside the Mayo, which resulted in further damage to Dr. Said's reputation.

105.    Dr. Said also learned that Nurse Managers in the cardiac surgical ICU announced to employees, including Dr. Said's surgical team, that Dr. Said would not be returning to his Mayo practice. This announcement was made while the investigation was

ongoing, suggesting that Mayo had already determined that Dr. Said would not return to Mayo without providing him with an opportunity to respond to the allegations or be involved in the investigation.

106.    In November 2018, Dr. Dearani contacted Dr. Mike Monge, a cardiovascular congenital surgeon at Northwestern University, to inquire about his potential interest in a soon-to-be created opening at the Mayo.  Dr. Dearani explained to Dr. Monge that Dr. Said would soon be terminated, and Mayo was seeking candidates to replace him.

**Dr. Said Retains Legal Counsel and Escalates His Complaints**

107.    During the time Dr. Said was on administrative leave, he expected that Mayo conduct a proper internal investigation, and expected that when this occurred, he would be cleared of any allegation of improper conduct.    When placed on this leave, Dr. Said thus retained the undersigned legal counsel to attempt to ensure that this occur, to alert Mayo leadership to and enforce his right to be free from discrimination and retaliation, and to again raise the complaints described above to in-house Mayo attorneys.  Toward that end, Dr. Said's legal counsel sent letters to Mayo counsel as the internal investigation and additional adverse acts occurred on October 15, 17, 23, 30, November 6, December 3, 5, 11, 19, January 4, 17, February 6, 14, 18.

108.    These *fourteen* letters specifically communicated the discrimination and retaliation concerns raised above, the repeated defamatory statements and invasion of Dr. Said's privacy as described above, and invited an effort to resolve these issues by a mutually agreeable negotiated resolution, which Mayo rejected.

Filed in District Court
State of Minnesota
4/6/2020 3:32 PM

109.    Dr. Said attempted to meet with Dr. Rihal to solicit his advice on the best approach to fully participate in this investigation and resolve the matter.  Despite initially inviting this meeting, Dr. Rihal refused to meet with Dr. Said, explaining that because Dr. Said had retained legal counsel, he had been instructed not to meet with him.  Dr. Rihal also declared that he did not believe Dr. Said had been discriminated against.

110.    On November 2, 2018, Dr. Said participated in a four-hour investigative interview conducted by Ms. Jones and Human Resources Advisor Chad Johnson regarding the alleged complaint involving PA Reid. Despite Mayo's indication that Dr. Said's administrative leave was related to PA Reid's supposed allegation that working with Dr. Said made her "uncomfortable," the investigative interview was in large part dedicated to understanding Dr. Said's complaints about Dr. Dearani.

111.    During the interview, Dr. Said explained that in August of 2018, PA Reid initiated communications regarding the potential for a personal relationship, and that his communications with PA Reid confirmed his mutual interest in exploring a personal relationship, as Dr. Said was separated from his wife at the time, and was interested in at least exploring this possibility, given PA Reid's apparent interest.  He also explained several times that his relationship with PA Reid consisted of text messages, invitations for lunches and dinner, and a few personal gifts.

112.    Dr. Said confirmed that his relationship with PA Reid never involved any inappropriate or intimate physical contact of any kind.  Dr. Said further explained that during the relevant time period he was separated from his wife, Hend Mohamed, who had returned to Egypt that summer with their children, and that they were discussing the possibility of divorce.

24

113.   Dr. Said also complained that Mayo's treatment of him as compared to Dr. Simon Maltais, a white cardiovascular surgeon of Canadian descent, was evidence of discrimination.  Dr. Said explained that Dr. Maltais had been found to have actually committed sexual harassment, had sexual relations with at least two Mayo employees, and had engaged in other wholly inappropriate behavior, including, upon information and belief, excessive alcohol consumption and drug use in the workplace.

114.   Dr. Said explained that a Department cardiac surgeon, Dr. Alberto Pochettino, made a written complaint to human resources describing Dr. Maltais' in appropriate behavior. However, no actions were taken against Dr. Maltais. Mayo permitted Dr. Maltais to continue his employment without placing him on administrative leave, intensely scrutinizing his behavior, or conducting a formal investigation similar to that which Dr. Dearani initiated regarding Dr. Said.  Although Mayo, upon information and belief, eventually asked Dr. Maltais to resign, he was allowed to do so on his own terms. Dr. Maltais was given the opportunity to find his next professional opportunity before resigning, allowing him to avoid any damage to his reputation.   Mayo  treated  Mr.  Maltais  considerably  more  favorably  compared  to  its treatment of Dr. Said, despite his far more egregious conduct.

115.   Dr. Said also identified a number of supportive witnesses, and encouraged the investigator to contact them. Dr. Said suggested that the investigator contact his former PA, Ms. Corissa Hebb, with whom he maintained a very close and entirely professional working relationship, and who witnessed witnesses Dr. Dearani's retaliatory, abusive, non-supportive behavior toward Dr. Said.

116.    Dr. Said was also asked about a page that was removed from his personal journal which was kept in his desk drawer. Dr. Said explained that the journal's contents included his personal musings and his initial attempts to document events for the purpose of a memoir, that he kept it privately in his desk, and that he had never shared its contents with anyone. Dr. Said further expressed his concerns about this invasion of privacy and the fact that someone had rifled through his office and desk to obtain his personal journal.

117.    After the investigative interview Dr. Said expressed, through legal counsel, that the investigation appeared to be designed to revisit issues previously raised and closed, with only cursory limited questioning into what Dr. Said understood to be the reason for his placement on involuntary administrative leave – a baseless complaint that he made PA Reid, "uncomfortable."  He also raised, through legal counsel, the details in support of his national origin, race and religious discrimination claims, again describing the inexplicably more favorable treatment of Dr. Maltais as strong evidence of disparate treatment.

118.    During this process, Dr. Dearani directed Dr. Said not to contact any Mayo employees and prohibited him from entering his office to collect his personal property including, his operative notebook illustrating his surgical techniques and preferences, his personal journal, and thousands of files containing documents, photos, videos, and presentations stored in his former H: drive. This further inhibited Dr. Said's ability to search for future employment opportunities as he could not access relevant documents such as his resume and case log.

119.    His inability to obtain access to his email also devastated his reputation and future employment opportunities. Dr. Said's membership in various scientific societies,

associations, and medical journals were tied to his Mayo Clinic e-mail account. Dr. Said's inability to access his associates through these associations hindered his ability to search for promising opportunities and maintain his reputation within the scientific and medical communities.

### Dr. Dearani Recommends Termination of Dr. Said's Mayo Employment, Forcing Dr. Said's Resignation

120.    On November 19, 2018, Dr. Said received a letter signed by Dr. Rihal, Dr. Dearani, and Mr. Hennessey stating that the investigation was completed and resulted in a recommendation by the Cardiovascular Surgery Department, supported by the Personnel Committee, that Dr. Said's Mayo employment be terminated. Among items cited as the basis for the termination recommendation, the letter stated that Dr. Said's statement that he was being discriminated against was "demonstrably false," with no indication whatsoever that this allegation was ever investigated in any manner, including the inexplicable contrast between Mayo's treatment of Dr. Said and Dr. Maltais.

121.    Dr. Dearani signed the letter despite the continued concerns that Dr. Said raised regarding Dr. Dearani's retaliation and discrimination against him. Dr. Dearani's retaliatory and discriminatory bias against Dr. Said can be further inferred from this letter as several points were made that were never discussed during the investigation, which suggests that the letter was written prior to the investigative interview without regard for any legitimate findings.

122.    The letter further stated that a "Termination Review Committee" would be assembled and was scheduled to convene on December 4, 2018, to "review all relevant evidence and determine if the recommendation for termination of appointment is appropriate and warranted or not."

123.    At the time that Dr. Said received the letter, Dr. Said had been informed by a number of Department physician members that the Department had not yet convened to discuss or make a determination regarding whether to recommend Dr. Said's termination. Rather, upon information and belief, the "Department" decision to recommend Dr. Said's termination was made exclusively by Dr. Dearani.

124.    Dr. Said suffered continued discrimination and retaliation from Dr. Dearani throughout his tenure at Mayo, and believed that Dr. Dearani would pressure the Termination Review Committee to confirm his recommendation for Dr. Said's termination.  Moreover, in the unlikely event that this did not occur, Dr. Said understood he had no chance to be evaluated fairly by June 2019, for his promotion to Consultant.  Thus, he was forced to and did resign on December 3, 2018.

### The Defamation, Invasion of Privacy and Other Illegal Conduct Continues Post Constructive Discharge

125.    Mayo continued to retaliate against Dr. Said after he resigned when Dr. Rihal informed Dr. Said that his resignation triggered a mandatory statutory obligation to report his resignation "in lieu of discipline," to the Minnesota Board of Medical Practice. Dr. Rihal's claim was demonstrably false and was not supported by law, as the allegations against Dr. Said were not related to patient care. Further, Mayo's recommendation for termination was to have been reviewed by three independent physician members of the to-be-formed Termination Committee on December 4, 2018. This independent committee could well have rejected this recommendation and imposed no discipline.

126.    Mayo's threat to report Dr. Said's resignation to the Minnesota Board of Medical Practice is further evidence of discrimination as Mayo allowed Dr. Maltais to resign under far

more egregious circumstances, and, upon information and belief, did not report his resignation to the Minnesota Board of Medical Practice. Mayo also allowed Dr. Axel Grothey to resign and did not report his resignation to the Minnesota Board of Medical Practice after it became aware that Dr. Grothey had sexual relations with his Mayo subordinate on Mayo property. Dr. Grothey continues to maintain an active Minnesota medical license.

127.    Dr. Rihal's continued retaliation against Dr. Said took the form of attempting to dissuade Dr. Said from pursuing any legal actions against Mayo and the personnel who discrimination against him and forced his resignation, including Dr. Dearani, Dr. Rihal, and Dr. Stulak.

128.    Mayo's discrimination and retaliation against Dr. Said continued as he sought his next professional opportunity.  Dr. Dearani and Dr. John Stulak defamed Dr. Said by informing third-parties that Dr. Said had been "terminated" for misconduct and by disclosing false details of the employment investigation.  Numerous promising potential job opportunities were destroyed by these false disclosures.

129.    In February 2019, Dr. Said received an offer of employment, conditioned on securing privileges through the credentialing process. During the ensuing credentialing process, Mayo disclosed the details of the investigation and recommendation for termination as described above, to Dr. Said's future employer and claimed that Dr. Said resigned "in lieu of termination."   Mayo disclosed the existence of the November 19, 2018, termination recommendation letter in this process, and as a direct result Dr. Said was forced to share this letter with his prospective employer, and attempt to place the false statements contained therein in the proper context.

55-CV-19-6382

CASE 0:20-cv-00927-ECT-JFD    Doc. 1-1    Filed 04/13/20    Page 30 of 46    Filed in District Court
State of Minnesota
4/6/2020 3:32 PM

130.    As a result of these false statements and these improper disclosures, Dr. Said's credentialing process and the opportunity to begin his new practice was significantly threatened and significantly delayed, causing further financial and psychological stress on Dr. Said and his family.

131.    On February 1, 2019 Mayo published "Congenital heart disease: The first 50 years … the next 50 years" on its website.[1] This article was also published in Mayo's Cardiovascular Update.[2] Dr. Said co-authored this article with Dr. Alexander Egbe. Prior to Dr. Said's departure from Mayo, the article was completed and ready to be published in the Cardiovascular Update, which is a periodical magazine distributed to all Mayo alumni. Dr. Said and Dr. Egbe were photographed together as part of the publication process.

132.    Dr. Said was shocked when the article was published and he was cropped out of the photo with Dr. Egbe. In addition to removing Dr. Said's photo, Mayo deliberately excluded Dr. Said as an author. Instead, Mayo published the article with photos of Dr. Egbe, Dr. Dearani, and Dr. Johnson, and credited them as authors.

133.    Defendants Mayo and Dr. Dearani's conduct in excluding Dr. Said from the article constitutes further discrimination and retaliation, and conversion of Dr. Said's property rights in the article that he co-authored.

---

[1] Congenital heart disease: The first 50 years … the next 50 years, Mayo Clinic (Feb. 1, 2019) https://www.mayoclinic.org/medical-professionals/cardiovascular-diseases/news/congenital-heart-disease-the-first-50-years-the-next-50-years/MAC-20453657.

[2] Alexander Egbe, MBBS, MPH, Joseph A. Dearani, MD, & Jonathan N. Johnson, MD, Congenital Heart Disease: The First Fifty Years … the Next Fifty Years, 16 Mayo Clinic Cardiovascular Update, no. 3, 2018, at 5, https://www.mayo.edu/pmts/mc5200-mc5299/mc5234-1218.pdf?_ga=2.156484603.130504175.1554151994-2071277658.1553371140.

134.    In March 2019, Dr. Said was appointed to the Medical Staff of the University of Minnesota Medical Center, subject to conditions which were directly caused by the illegal disclosures and false statements referred to above.  Since this appointment, he has learned that Dr. Dearani continues to defame him by spreading false statements that the Minnesota Medical Association is currently investigating Dr. Said's medical license, which Dr. Dearani has claimed "may be revoked." Dr. Said has further threatened Dr. Said's allies and former colleagues by suggesting that their medical licenses and/or certifications are subject to investigation and revocation due to their professional association with Dr. Said.

## LEGAL CLAIMS

### COUNT I

**Race Discrimination in Violation of the MHRA**
**(Against Defendant Mayo)**

135.    Plaintiff hereby restates and re-alleges the allegations contained within the preceding paragraphs as though fully stated herein.

136.    Plaintiff was an employee of Defendant and Defendant the employer of Plaintiff within the meaning of the Minnesota Human Rights Act, Minn. Stat. § 363A *et seq*. ("MHRA").

137.    Plaintiff was discriminated against with respect to the terms and/or conditions and/or privileges of his employment and, ultimately, was forced to resign because of his race in violation of Minn. State. § 363A.08, subd. 2.

138.    Defendant knew or should have known of the aforesaid conduct.

139.    The unlawful employment practices set forth above were intentional.

140.    As a result of the above, Plaintiff suffered damages, including loss of income, mental anguish or suffering, and other damages in an amount to be proven at trial, but believed to be in excess of $50,000. By reason of the above-alleged conduct, Plaintiff is entitled to judgment against Defendant in a reasonable amount in excess of $50,000, which should be trebled, and to civil fines and his reasonable costs and attorney's fees pursuant to Minn. Stat. §§ 363A.33 and 363A.29.

## COUNT II

### Race Discrimination in Violation of Title VII

### (Against Defendant Mayo)

141.    Plaintiff hereby restates and re-alleges the allegations contained within the preceding paragraphs as though fully stated herein.

142.    Plaintiff was an employee of Defendant and Defendant the employer of Plaintiff within the meaning of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e ("Title VII").

143.    Plaintiff was discriminated against with respect to the terms and/or conditions and/or privileges of his employment and, ultimately, was forced to resign because of his race in violation of 42 U.S.C. § 2000e-2.

144.    Defendant knew or should have known of the aforesaid conduct.

145.    The unlawful employment practices set forth above were intentional.

146.    As a result of the above, Plaintiff suffered damages, including loss of income, mental anguish or suffering, and other damages in an amount to be proven at trial, but believed to be in excess of $50,000. By reason of the above-alleged conduct, Plaintiff is entitled to judgment against Defendant in a reasonable amount in excess of $50,000 and his reasonable costs and attorney's fees pursuant to 42 U.S.C. § 2000e-5.

Filed in District Court
State of Minnesota
4/6/2020 3:32 PM

## COUNT III

**Religious Discrimination in Violation of the MHRA**
**(Against Defendant Mayo)**

147.   Plaintiff hereby restates and re-alleges the allegations contained within the preceding paragraphs as though fully stated herein.

148.   Plaintiff was an employee of Defendant and Defendant was the employer of Plaintiff within the meaning of the Minnesota Human Rights Act, Minn. Stat. § 363A *et seq*. ("MHRA").

149.   Plaintiff was discriminated against with respect to the terms and/or conditions and/or privileges of his employment and, ultimately, was terminated because of his religion in violation of Minn. State. § 363A.08, subd. 2.

150.   Defendant knew or should have known of the aforesaid conduct.

151.   The unlawful employment practices set forth above were intentional.

152.   As a result of the above, Plaintiff suffered damages, including loss of income, mental anguish or suffering, and other damages in an amount to be proven at trial, but believed to be in excess of $50,000. By reason of the above-alleged conduct, Plaintiff is entitled to judgment against Defendant in a reasonable amount in excess of $50,000, which should be trebled, and to civil fines and his reasonable costs and attorney's fees pursuant to Minn. Stat. §§ 363A.33 and 363A.29.

## COUNT IV

### Religious Discrimination in Violation of the Title VII

### (Against Defendant Mayo)

154.    Plaintiff hereby restates and re-alleges the allegations contained within the preceding paragraphs as though fully stated herein.

155.    Plaintiff was an employee of Defendant and Defendant the employer of Plaintiff within the meaning of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e ("Title VII").

156.    Plaintiff was discriminated against with respect to the terms and/or conditions and/or privileges of his employment and, ultimately, was forced to resign because of his religion in violation of 42 U.S.C. § 2000e-2.

157.    Defendant knew or should have known of the aforesaid conduct.

158.    The unlawful employment practices set forth above were intentional.

159.    As a result of the above, Plaintiff suffered damages, including loss of income, mental anguish or suffering, and other damages in an amount to be proven at trial, but believed to be in excess of $50,000. By reason of the above-alleged conduct, Plaintiff is entitled to judgment against Defendant in a reasonable amount in excess of $50,000 and his reasonable costs and attorney's fees pursuant to 42 U.S.C. § 2000e-5.

## COUNT V

### National Origin Discrimination in Violation of the MHRA
### (Against Defendant Mayo)

160.    Plaintiff hereby restates and re-alleges the allegations contained within the preceding paragraphs as though fully stated herein.

161.    Plaintiff was an employee of Defendant and Defendant was the employer of Plaintiff within the meaning of the Minnesota Human Rights Act, Minn. Stat. § 363A *et seq*. ("MHRA").

162.    Plaintiff was discriminated against with respect to the terms and/or conditions and/or privileges of his employment and, ultimately, was terminated because of his national origin in violation of Minn. State. § 363A.08, subd. 2.

163.    Defendant knew or should have known of the aforesaid conduct.

164.    The unlawful employment practices set forth above were intentional.

165.    As a result of the above, Plaintiff suffered damages, including loss of income, mental anguish or suffering, and other damages in an amount to be proven at trial, but believed to be in excess of $50,000. By reason of the above-alleged conduct, Plaintiff is entitled to judgment against Defendant in a reasonable amount in excess of $50,000, which should be trebled, and to civil fines and his reasonable costs and attorney's fees pursuant to Minn. Stat. §§ 363A.33 and 363A.29.

## <u>COUNT VI</u>

### National Origin Discrimination in Violation of Title VII

### (Against Defendant Mayo)

166.    Plaintiff hereby restates and re-alleges the allegations contained within the preceding paragraphs as though fully stated herein.

167.    Plaintiff was an employee \of Defendant and Defendant the employer of Plaintiff within the meaning of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e ("Title VII").

168.     Plaintiff was discriminated against with respect to the terms and/or conditions and/or privileges of his employment and, ultimately, was forced to resign because of his national origin in violation of 42 U.S.C. § 2000e-2.

169.     Defendant knew or should have known of the aforesaid conduct.

170.     The unlawful employment practices set forth above were intentional.

171.     As a result of the above, Plaintiff suffered damages, including loss of income, mental anguish or suffering, and other damages in an amount to be proven at trial, but believed to be in excess of $50,000. By reason of the above-alleged conduct, Plaintiff is entitled to judgment against Defendant in a reasonable amount in excess of $50,000 and his reasonable costs and attorney's fees pursuant to 42 U.S.C. § 2000e-5.

## COUNT VII

### Reprisal in Violation of the MHRA
### (Against Defendant Mayo)

172.     Plaintiff hereby restates and re-alleges the allegations contained within the preceding paragraphs as though fully stated herein.

173.     Plaintiff was an employee of Defendant and Defendant was the employer of Plaintiff within the meaning of the Minnesota Human Rights Act, Minn. Stat. § 363A *et seq*. ("MHRA").

174.     As stated above, Plaintiff complained that he was being treated unfairly because of his race, national origin, and religion, and faced retaliation for his complaints.

175.     In response, Defendant took adverse and retaliatory action against Plaintiff by (1) placing him on involuntary administrative leave; (2) terminating his employment; and (3)

threatening to and actually reporting his resignation to the Minnesota Board of Medical Practice.

176.     All of the foregoing misconduct of Defendant constitutes unlawful retaliation in violation of Minn. Stat. § 363A.15.

177.     As a result of the above, Plaintiff suffered damages, including loss of income, mental anguish or suffering, and other damages in an amount to be proven at trial, but believed to be in excess of $50,000. By reason of the above-alleged conduct, Plaintiff is entitled to judgment against Defendant in a reasonable amount in excess of $50,000, which should be trebled, and to civil fines and his reasonable costs and attorney's fees pursuant to Minn. Stat. §§ 363A.33 and 363A.29.

## COUNT VIII

### Violation of the Minnesota Whistleblower Act
### (Against Defendant Mayo)

178.     Plaintiff hereby restates and re-alleges the allegations contained within the preceding paragraphs as though fully stated herein.

179.     The Minnesota Whistleblower Act (MWA) prohibits, among other things, retaliation against employees for reporting violations, suspected violations and/or planned violations of law.  Minn. Stat. § 181.932.

180.     Defendant is an "employer" and Plaintiff is an "employee" within the meaning of Minn. Stat. § 181.931.

181.     Plaintiff reported to Defendant, in good faith, suspected violations of law by Defendant, including violations of statutory and common law. Plaintiff reported what he

reasonably and in good faith believed to be conduct that would constitute violations of state laws or common laws or rules adopted pursuant to law.

182.     Defendant retaliated against Plaintiff because of his reports to Defendant by continuing to discriminate against Plaintiff, placing Plaintiff on involuntary administrative leave, forcing the termination of Plaintiff's employment, threatening to report Plaintiff's resignation to the Minnesota Board of Medical Practice, and other adverse actions as described above.

183.     Defendant's retaliation against Plaintiff violated the MWA.

184.     By its conduct, Defendant intentionally violated Minn. Stat. § 181.932.

185.     The unlawful employment practices complained of above were intentional and were performed by Defendant with malice and/or with reckless indifference to the MWA, which protects Plaintiff.   As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered, and continues to suffer, emotional distress, humiliation, mental anguish, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and has incurred attorneys' fees and expenses and other serious damages.

186.     By reason of the foregoing, Plaintiff is entitled to judgment against Mayo for all damages proximately caused by its illegal conduct, which exceed $50,000, the precise amount of which will be proven at trial, and reasonable costs, as well as further relief as is deemed appropriate.

## COUNT IX

### Tortious Interference with Future Employment
### (Against Defendants Mayo and Dr. Dearani)

187.    Plaintiff hereby restates and re-alleges the allegations contained within the preceding paragraphs as though fully stated herein.

188.    Plaintiff had an offer of employment which Defendants were aware of.

189.    Without justification, Defendants intentionally sought to interfere with Plaintiff's future employment by falsely claiming that Plaintiff was terminated, and by divulging the details of Plaintiff's employment investigation.

190.    Defendants' interference caused Plaintiff significant monetary and non-monetary damages.

191.    As a result of the foregoing, Plaintiff is entitled to judgment against Defendant for all damages proximately caused by Defendants' interference with Plaintiff's future employment opportunities, in an amount exceeding $50,000.

## COUNT X

### Defamation
### (Against Defendants Mayo and Dr. Dearani)

192.    Plaintiff hereby restates and re-alleges the allegations contained within the preceding paragraphs as though fully stated herein.

193.    On information and belief, Defendant's employees Dr. Dearani and Dr. Stulak have made a number of false statements about Plaintiff within the medical community.

194.    These false statements include, but are not limited to, their statement that Plaintiff was terminated from his Mayo employment.

195.    Dr. Dearani and Dr. Stulak made these statements knowing they were untrue. These statements constitute defamation.

196.    Dr. Dearani and Dr. Stulak communicated these statements to third-parties.

197.    Dr. Dearani and Dr. Stulak made these statements with malice and without any business purpose. Dr. Dearani and Dr. Stulak knew or should have known these statements would harm and damage Plaintiff's professional reputation, which the statements did.

198.    The statements were not qualifiedly privileged because they were not made in good faith, upon a proper occasion, nor from a proper motive, and were not based on reasonable cause.

199.    Defendant Mayo is liable for the intentional torts of its management/employees that take place within the scope of their employment. Dr. Dearani and Dr. Stulak made these statements while acting on behalf of Defendant.

200.    By reason of the foregoing, Plaintiff is entitled to judgment against Defendant for all damages proximately caused by the defamatory statements, which exceed $50,000, the precise amount of which will be proven at trial, and reasonable costs, as well as further relief as is deemed appropriate.

## COUNT XI

**Invasion of Privacy**
**(Against Defendants Mayo and Dr. Dearani)**

201.    Plaintiff hereby restates and re-alleges the allegations contained within the preceding paragraphs as though fully stated herein.

202.    Defendants Mayo and Dr. Dearani invaded Plaintiff's privacy by intruding upon his seclusion and by publicizing private facts.

203.    Defendants' intrusion was highly offensive to Plaintiff, and would be considered highly offensive to a reasonable person.

204.    Defendants publicized private information to the public at large that was not a legitimate public concern.

205.    Defendant Dr. Dearani intentionally and deliberately invaded Plaintiff's protected privacy by acquiring medical information regarding his treatment and prognosis.

206.    Defendant Dearani's conduct constitutes unreasonable intrusion upon Plaintiff's right to seclusion constituting an invasion of his privacy.

207.    Defendant Mayo further invaded Dr. Said's protected privacy by publicizing his alleged relationship with PA Reid, and by acquiring his private journal and publicizing its contents.

208.    Defendant Mayo's conduct constitutes unreasonable publication of Plaintiff's private facts constituting an invasion of his privacy.

209.    Defendants' conduct caused Plaintiff humiliation, frustration, anxiety, emotional distress, mental anguish, and suffering.

210.    By reason of the foregoing, Plaintiff is entitled to judgment against Defendants Mayo and Dr. Dearani for all damages proximately caused by the invasion of privacy, which exceed $50,000, the precise amount of which will be proven at trial, and reasonable costs, as well as further relief as is deemed appropriate.

## COUNT XII

### Common Law Conversion
### (Against Defendants Mayo and Dr. Dearani)

211.    Plaintiff hereby restates and re-alleges the allegations contained within the preceding paragraphs as though fully stated herein.

212.    Plaintiff has property rights in the documents, photos, videos, and presentations stored in his former H: drive, his operative notebook, and in the article titled "Congenital Heart Disease:  The First Fifty Years … The Next Fifty Years" that he co-authored with Alexander Egbe MBBS, MPH.

213.    Plaintiff has requested that Defendant Mayo return the documents, photos, videos, and presentations that Mayo has retained following the termination of his employment, but Mayo has refused to return this property to Plaintiff.

214.    Defendant Mayo published "Congenital Heart Disease Interventions:  The First Fifty Years … The Next Fifty Years" in its Cardiovascular Update and on its website, and failed to acknowledge Plaintiff as an author, thus depriving Plaintiff of his property rights in his authored work.

215.    Defendant Mayo's continued possession of Plaintiff's property constitutes wrongful interference with Plaintiff's property rights and, therefore, constitutes a conversion of Plaintiff's property rights.

216.    Defendants' Mayo and Dr. Dearani willful interference deprived Plaintiff of the property in question and was done without lawful justification.

217.    Defendant Mayo has converted this property by failing to return the property to Plaintiff in a timely and adequate fashion.

218.    Defendant Dr. Dearani converted Plaintiff's property by maintaining possession of Dr. Said' operative notebook, and by wrongfully removing Dr. Said as including himself as co-author of "Congenital Heart Disease Interventions:  The First Fifty Years … The Next Fifty Years."

219.    As a result of Defendants' Mayo and Dr. Dearani willful interference with Plaintiff's property, Plaintiff has been damaged in an amount to be determined at trial.

220.    By reason of the foregoing, Plaintiff is entitled to judgment against Defendants Mayo and Dr. Dearani for all damages proximately caused by the unlawful conversion, which exceed $50,000, the precise amount of which will be proven at trial, and reasonable costs, as well as further relief as is deemed appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court award the following types of relief:

1.    Judgment against Defendants, in an amount to be determined at trial, but believed to be *significantly* in excess of $50,000 for each Defendant with regard to each of the causes of action enumerated above;

2.    Treble damages where appropriate;

3.    Statutory penalties where appropriate;

4.    Punitive damages where appropriate, in part pursuant to a motion to be filed upon the close of discovery pursuant to Minn. Stat. §549.191 *et seq.* and 42 U.S.C. § 1981a.

5.    Attorneys' fees pursuant to claims under the applicable provisions of the statues cited above;

6.     And any other further relief deemed just and equitable by the Court.

7.     As soon as reasonable, upon Plaintiffs' motion pursuant to Minn. Stat. § 549.191, leave for Plaintiffs to assert a claim for punitive damages pursuant to Minn. Stat. § 549.20.

## JURY TRIAL DEMAND

Plaintiff requests a jury trial on all questions of fact raised by his Complaint.

Dated: April 6, 2020                    **SCHAEFER HALLEEN, LLC**

 _s/ *Lawrence P. Schaefer*_
Lawrence P. Schaefer (#195583)
Jacob R. Colling (#0398683)
412 South Fourth Street, Suite 1050
Minneapolis, MN 55415
Tel. 612.294.2600
Fax. 612.294.2640
lschaefer@schaeferhalleen.com
jcolling@schaeferhalleen.com

Filed in District Court
State of Minnesota
4/6/2020 3:32 PM

## ACKNOWLEDGMENT

Plaintiff, by its attorneys, hereby acknowledges that costs, disbursements and reasonable attorneys' and witness fees may be awarded to the opposing parties if Minn. Stat. § 549.211 is found to apply.

Dated: April 6, 2020                    **SCHAEFER HALLEEN, LLC**

  s/ *Lawrence P. Schaefer*
Lawrence P. Schaefer (#195583)
Jacob R. Colling (#0398683)
412 South Fourth Street, Suite 1050
Minneapolis, MN 55415
Tel. 612.294.2600
Fax. 612.294.2640
lschaefer@schaeferhalleen.com
jcolling@schaeferhalleen.com