UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Sameh Mahmoud Mohamed Said, MD, | Court File No. 20-cv-00927-ECT-TNL |
| Plaintiff, | |
| v. | **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Mayo Clinic, and Joseph Albert Dearani, MD, | |
| Defendants. | |

## INTRODUCTION

Defendant Mayo Clinic hired Plaintiff Sameh Said in 2015 to work as a Senior Associate Consultant (SAC) performing cardiovascular surgery. Mayo had every expectation Plaintiff would be a successful SAC and ready for promotion to Consultant in three years. During his employment, however, multiple women reported concerns about Plaintiff's behavior that implicated Mayo's sexual harassment and other policies. Mayo investigated and counseled Plaintiff in December 2017.

In 2018, Mayo received a troubling complaint Plaintiff pursued a co-worker who rejected his romantic overtures. Investigation revealed inappropriate emails and texts, mistreatment of subordinates, and generally bad behavior. Plaintiff's behavior violated Mayo's core values, and as a result, Mayo's Personnel Committee recommended termination. Plaintiff resigned on December 3, 2018 – the day before Mayo's Termination Review Committee was to consider the termination recommendation.

Plaintiff asserts multiple legal theories. But Plaintiff was not the victim of discrimination or retaliation, nor did Mayo violate his rights under state law. Mayo recommended termination after a good faith investigation into Plaintiff's conduct

concluded his disrespectful misbehavior could no longer be tolerated. Plaintiff's lawsuit should be dismissed.

## UNDISPUTED FACTS[1]

## I.    THE PARTIES.

Mayo is an equal employment opportunity employer, complying with laws prohibiting discrimination, harassment and retaliation. (Guidinger Dep. 32-33; Guidinger Ex. 1.) All employees, including Plaintiff, are advised of these core values. (*Id.*; Said Dep. 113.)

Dearani is a pediatric and adult congenital cardiovascular surgeon. (Dearani Decl. ¶ 2.) Dearani was Chair of the Department of Cardiovascular Surgery ("CVS Department"), and Plaintiff's supervisor. (*Id.*) Plaintiff is an Egyptian National and practicing Muslim, identifying as African-American. (Said Dep. 53, 59; Compl. ¶ 17).

## II.    PLAINTIFF'S EMPLOYMENT.

### A.    July 1, 2015: Dearani Hires Plaintiff.

From 2005 through 2014, Plaintiff completed residencies at Mayo. (*Id.* ¶ 20). As Chair, Dearani supported hiring Plaintiff; it was ultimately his decision. (Said Dep. 306; Said Ex. 26; Dearani Decl. ¶ 3.) Dearani was then aware of Plaintiff's race, religion, and national origin. (*Id.*) In July 2015, Plaintiff began as a SAC in the CVS Department under Dearani; he understood he could be considered for promotion to Consultant in three years (June 2018). (Said Dep. 27, 109, 119; Dearani Decl. ¶ 4; Jones Dep. 37, 184; Jones Ex. 7).

---

[1] Defendants do not concede Plaintiff's facts are accurate, but rely on his testimony to demonstrate a lack of any genuine issue of material fact and show Plaintiff's admissions made inconsistent with his claims.

Plaintiff signed an Intellectual Property Agreement, assigning to Mayo "all right, title and interest" in all "inventions," defined to include "works of authorship" that: result from any work performed for Mayo; are developed using equipment, supplies, facility, know-how or confidential information of Mayo; or are developed on Mayo time. (Said Dep. 308; Said Ex. 28.)

**B.      Plaintiff's Performance.**

Plaintiff received performance reviews, including a "360 review" conducted in late 2016. (Said Dep. 314; Said Ex. 34.) These allow colleagues to share feedback; SACs typically undergo at least one 360.[2] (Rihal Dep. 43-45; Jones Dep. 187; Jones Ex. 38; Stulak Dep. 15-17.) While Plaintiff received an overall rating of "meets expectations," the feedback raised red flags regarding his treatment of staff. (Rihal Dep. 53; Said Ex. 34.) He also regularly received feedback from Dearani. (Dearani Dep. 225, 233, 237-238; Dearani Exs. 43, 47; Guidinger Dep. 150-151; Guidinger Ex. 11.)

**C.      October 2017: Mayo Investigates Plaintiff's Behavior.**

In October 2017, two anesthesiologists working with Plaintiff, Elena Ashikhmina and Maria Fritock, complained about him. (Said Dep. 77; Guidinger Dep. 123-124; Guidinger Ex. 9; Said Ex. 6). Mayo HR investigated. (Guidinger Decl. ¶ 4.) Ashikhmina provided texts from Plaintiff, and reported he knew she was in a relationship, but

---

[2] Mayo requires one documented performance evaluation per calendar year, and the optional 360-degree obtains additional input. (Jones Dep. 32-33; Jones Ex. 5.) Plaintiff received reviews in February 2016 and May 2017; in late 2017, Plaintiff reviewed results of the December 2016 360-review. (Dearani Dep. 187-189, 197, 211-213; Dearani Exs. 31-34; Said Dep. 314; Said Ex. 34.)

persistently pursued her. (Guidinger Dep. 123-124; Said Dep. 89, 91-93; Said Ex. 6; Guidinger Decl. Ex. B.) Fritock reported several lunch and dinner invitations. (Guidinger Decl. Ex. B.) She was disturbed Plaintiff was texting her late at night. (*Id.*) She elaborated that by early 2017, Plaintiff was making derogatory comments about Ashikhmina's work commitment. (*Id.*) Both Ashikhmina and Fritock raised fears of retaliation. (*Id.*)

HR Partner Steffany Guidinger met with Plaintiff on October 20, 2017. (Said Dep. 78–79.) They reviewed Plaintiff's texts; he admitted they were a mistake. (Said Dep. 87; Guidinger Dep. 123-125.) Guidinger told Plaintiff his personal interest in these women was unwelcome, and he needed to stop. (Said Dep. 81.)

Mayo ultimately concluded Plaintiff crossed boundaries with Ashikhmina and Fritock in violation of Mayo's policies. (Guidinger Dep. 137-138; Said Ex. 7.) While the plan was to address Plaintiff's conduct with him in October 2017, he was in a car accident the day after meeting with Guidinger and was off work for 6-7 weeks. (Said Dep. 101; Dearani Dep. 189-190; Jones Ex. 36.) Dearani delivered a Coaching Memo to Plaintiff upon his return, in December 2017. (Said Dep. 102–103; Dearani Dep. 199; Said Ex. 7.) Plaintiff was instructed to cease pursuing female colleagues and keep interactions professional and work-related. (*Id.*)[3] Further, Plaintiff's eligibility for promotion to Consultant in June 2018 was deferred. (*Id*; Rihal Dep. 68-69). Charanjit Rihal chairs

---

[3] Fritock departed Mayo in early 2018, citing Plaintiff's conduct as a major reason. (Rihal Dep. 61-62.)

Mayo's Personnel Committee; he approved this deferral. (Rihal Dep. 68-70.)[4]

One week after his accident, Plaintiff underwent hand surgery. (Said Dep. 105.) Subsequently, Dearani encountered Plaintiff's surgeon, Moran: he asked if Plaintiff would be okay, and Moran responded yes, noting Plaintiff would probably be unable to perform surgeries for several months. (Dearani Ans. To Rog. 10; Dearani Dep. 146.) Dearani did not seek details or review medical records. (*Id.*; Guidinger Dep. 106-108.)[5]

### D.   June 6, 2018: Mayo Extends SAC; Additional Concerns Surface.

Consistent with the December 2017 coaching, Mayo confirmed in June 2018 that Plaintiff's promotional consideration was extended to December 25, 2018. (Rihal Dep. 70; Dearani Dep. 216-218; Dearani Exs. 36-37; Said Ex. 7.)

During Spring and Summer 2018, the CVS Department received complaints about several individuals, including Plaintiff. (Jones Dep. 127; Jones Ex. 21.) A workplace assessment revealed concerns about Plaintiff yelling and cursing, openly complaining about anesthesia staff, scheduling too many cases off-hours, and that there was a lingering negative impact from Plaintiff's pursuit of relationships. (Said Dep. 145–146; Jones Dep. 135-143; Jones Exs. 22-24, 26.) On August 14, 2018, Plaintiff was informed in light of feedback and the assessment, his promotion to Consultant was again deferred, to June 2019 (Said Dep. 146; Jones Dep. 143-146; Jones Exs. 26-27; Rihal Dep. 80-81.)

---

[4] Within the Personnel Committee, an Executive team ("PC Exec") is responsible for working with departments on Consultant performance management and corrective action. (Rihal Decl. ¶ 3.)

[5] Plaintiff alleges he reported to Rihal and Dearani that the surgeons' conversation violated HIPAA. (Compl. ¶ 64; Said Dep. 106; Dearani Dep. 146-149, 190.))

Plaintiff is not the only SAC whose Consultancy promotion was deferred. Lyle Joyce (White, Protestant, and English/German), was delayed in 2012. (Rihal Dep. 82; Lyle Joyce Dep. 42-43, 47.) Dearani supervised Joyce. (Lyle Joyce Dep. 45.) Additionally, when Plaintiff received the second deferral of his SAC appointment, surgeon Simon Maltais (White/Canadian) was told he had six months to continue as a SAC, at the end of which his employment would terminate. (Rihal Dep. 85-88; Jones Dep. 82-83, 100; Jones Exs. 14, 16; Dearani Dep. 15, 28-30; Dearani Exs. 1-2; Maltais Dep. 13, 37-38.) Rihal and Dearani decided this because the complaints then known to them about Maltais were about rude or disrespectful behavior; they did not consider Maltais in violation of Mayo's sexual harassment policies or to have engaged in conduct of the nature/severity they ultimately considered Plaintiff's to be. (Rihal Decl. ¶ 11; Rihal Dep. 89-90, 93-94, 97, 100-103, 109-110, 148; Jones Dep. 241; Jones Ex. 15, 47-55, 57, 60-61; Dearani Dep. 63-64, 72, 74-81, 83, 85-88, 90, 93-95; Dearani Exs. 9-16; Dearani Decl. ¶ 11; Maltais Dep. 33-34.)

### E. October 8, 2018: PA Complains About Plaintiff.

Plaintiff's inappropriate conduct continued. On October 8, 2018, Rebecca Reid, a Physician's Assistant (PA) working on Plaintiff's service, reported to CVS NPPA Supervisor Marci Newcome and NPPA Assistant Supervisor Melissa Erdman that Plaintiff sexually harassed her. (Jones Dep. 43-44; Said Ex. 10.) Newcome and Erdman paged Jones to join Reid and them. (*Id.*)

Reid reported Plaintiff made unwanted advances and provided gifts, including perfume, a keychain with an engraved picture of her dog, and a ring with rubies and diamonds. (Said Dep. 149, 194-195.) Plaintiff sent her inappropriate communications and

6

engaged in emotional manipulation -- even *after* she indicated she was not interested in a relationship. (Jones Dep. 44-45; Said Ex. 11.) Plaintiff told Reid he loved her, was unhappy in his marriage, his life "would be nothing" without her, and made similar propositions. (*Id.*; Jones Dep. 56-61; Said Dep. 154-155, 185-186; Said Exs. 11-12.)

To communicate her discomfort and stop his advances, Reid met with Plaintiff on August 5, 2018, outside of work. (*Id.*) Plaintiff broke down and made suicidal comments, insisting they should be together (pleading "there's nothing left for me here"). (*Id.*) Disturbingly, Reid reported being in his office around this time when Plaintiff sat with his legs open facing her, his groin area appearing wet. (*Id.*)

Despite rejection, Plaintiff continued sending unwanted messages. After one text on September 16, 2018, Reid returned Plaintiff's gifts on September 18, 2018, saying she was not interested, and if he did not stop, she would quit. (*Id.*; Said Dep. 159.) Reporting Plaintiff, Reid also identified possible physical evidence: Plaintiff had offered to show her a journal in his office which described his feelings for her. (*Id.*; Said Dep. 154, 223-225; Said Exs. 17-18). Thereafter, Dearani and Jones went into Plaintiff's office, found the journal, and photographed some pages. (Jones Dep. 44-45; Said Ex. 11.) The journal confirmed Reid had returned Plaintiff's gifts. (Said Dep. 147, 224-225; Said Ex. 18 at Mayo_000968.) Plaintiff's journal noted that day was the "worst day of [his] life." (*Id.*)

During the HR interview with Reid, it appeared Plaintiff called her phone five times. (Jones Dep. 44-45; Said Ex. 11.) Reid feared Plaintiff; when the meeting ended, Newcome assisted her in contacting security, escorting her to her car. (*Id.*; Jones Dep. 64; Jones Ex. 9.)

7

Upon further review of Reid's information, Mayo determined a privileged investigation should be directed by counsel. (Johnson Decl. ¶ 4; Johnson Dep. 13-16.)

## F.   October 9, 2018: Mayo Places Plaintiff on Leave and Investigates.

On October 9, 2018, Dearani, Guidinger, and Jones met with Plaintiff, informed him of the allegations, and placed him on paid administrative leave. (Said Dep. 147, 169; Said Ex. 10.) Plaintiff denied doing anything inappropriate toward Reid, insisting she never conveyed concerns. (*Id.*) When questioned about the journal, Plaintiff denied it existed. (*Id.*). Dearani cautioned Plaintiff to be honest. (*Id.*). Because of the sensitive concerns raised, non-uniformed security officers followed Plaintiff out, ensuring he departed Mayo. (Jones Dep. 64, Jones Ex. 9.) Furthermore, to ensure patient coverage, Dearani emailed the CVS Department that Plaintiff was on an unexpected leave for an undetermined time, providing contacts for patient referrals and care questions. (Jones Dep. 67; Jones Ex. 10; Dearani Dep. 116; Dearani Ex. 19.)

While on leave, Plaintiff emailed Rihal: "I've learned the lesson and I promise you'll see a dramatic change." (Said Dep. 201; Said Ex. 13.) Plaintiff acknowledges: "I did cross some professional boundaries" (Said Dep. 201), adding, "there are several lessons I learned for sure", admitting he should have communicated differently with Reid. (Said Dep. 202.)

## G.   October 18, 2018: Mayo Collects Additional Documentation and Interviews Reid.

Reid submitted additional documents on October 11, and on October 18, Jones and Johnson interviewed Reid. (Johnson Decl. ¶ 6, Ex. A; Jones Dep. 56-57; Said Ex. 12;

Johnson Dep. 37-40.) The documentation included a timeline, emails, texts and photographs. (Said Ex. 12 at Mayo_1014, 1017, 1123; Said Dep. 184; Johnson Decl. ¶ 6, Ex. A.) Reid also submitted a video Plaintiff sent after he included her in a rare surgery. (Jones Dep. 56-57; Said Ex. 12 at Mayo_1021.) Set to music, it showed Plaintiff and Reid's hands overlapping on a patient's heart during surgery. (*Id.* at Mayo_1021.)

When interviewed, Reid described Plaintiff's efforts to be together, offering to pay for her conference attendance (promising "no one would find out"), and to help her boyfriend get a job at Mayo if it meant she would stay. (Jones Dep. 56-57; Said Ex. 12; Said Dep. 184.) Reid explained she was afraid of losing her job for reporting Plaintiff, given the power differential -- basing this concern on Plaintiff telling her Ashikhmina had previously reported him to HR, which he described as stabbing him in the back. (Johnson Decl. ¶ 14.)

### H.    November 2, 2018: Plaintiff's Interview.

On November 2, Johnson and Jones interviewed Plaintiff for approximately four hours. (Said Dep. 205; Johnson Decl. ¶ 15.) Plaintiff claimed Dearani orchestrated the allegations because of professional jealousy. (*Id.*; Rihal Dep. 115.) Plaintiff raised no concerns of discrimination. (Rihal Dep. 112-113; Johnson Dep. 28-31.)

Contradicting previous statements, on November 2, Plaintiff told Mayo he had feelings for Reid, had expressed them to her and confided he was considering ending his marriage, and believed she had invited him to do so. (Johnson Decl. ¶ 16.) Plaintiff admitted Reid never proclaimed romantic feelings, and acknowledged she was already in

a serious relationship. (*Id.*) Plaintiff admitted giving her gifts, denying this was inappropriate. (*Id.*; Said Dep. 149-151, 195.)

Plaintiff also brought his journal. (Johnson Decl. ¶ 17; Said Dep. 222-223; Said Ex. 17.) When asked why he initially denied its existence, Plaintiff offered no coherent explanation. (*Id.*) The previously-photographed page (dated "September 18", describing the day Reid returned Plaintiff's gifts) was missing, and Jones questioned why. (*Id.*) Plaintiff refused to answer, accusing Mayo of "setting him up". (*Id.*)

Plaintiff also was asked about the surgery video. (*Id.* ¶ 18.) He denied it inappropriate to include Reid in the procedure, but admitted PAs typically do not attend surgeries. (*Id.*) He had no additional defense for the video. (*Id.*)

Investigation further revealed Plaintiff inappropriately emailed his medical secretary, Rachel Johnson, and others. Plaintiff used vulgar profanity, making vicious references to Dearani. (Said Dep. 11-14, 226, 229–230; Said Exs. 19-20; Johnson Decl. ¶ 23, Exs. H, J, K, L, N.) Plaintiff acknowledges these were inappropriate. (Said Dep. 25, 229).[6] Plaintiff also misused his Mayo travel card for personal purposes. (Johnson Decl. ¶ 19, Exs. D-E.) During investigation, Erdman revealed she, too, had experienced Plaintiff's unwanted advances. (*Id.* ¶ 26.)

---

[6] Plaintiff produced a text he wrote stating, "If I had a gun with two bullets and I'm in a room with Hitler, Bin Laden and Dearani, I'll shoot Dearani twice." He defends it, claiming it was a joke. (Said Dep. 36; Said Ex. 16 at PL_1478.)

### I.       November 19, 2018: Mayo Recommends Termination.

Mayo's PC Exec Committee reviewed the investigative evidence. (*Id.* ¶ 27; Rihal Dep. 143-145, 150-153.) By letter dated November 19, Rihal notified Plaintiff that Mayo's Personnel Committee concluded he violated Mayo's policies, and supported the CVS Department's termination recommendation. (Said Dep. 207; Said Exs. 10, 14; Rihal Dep. 143-145, 150-153; Jones Dep. 43-44; Johnson Dep. 51-74.)[7] Rihal explained Mayo's Termination Review Committee would review the recommendation on December 4. (Said Dep. 207; Said Ex. 14; Jones Dep. 25-26; Jones Ex. 2; Rihal Decl. ¶ 8.)

Plaintiff responded, telling Rihal he was "hoping for a less severe penalty," asking whether Mayo would need to report him to the Board of Medical Practice. (Said Dep. 215, 217; Said Ex. 15.) Rihal told Plaintiff regardless of resignation or termination, Mayo was legally obligated to report him, but would clarify there were not clinical care or patient-related issues. (*Id.*; Rihal Dep. 154.) Plaintiff admits he "made some mistakes" and "got too friendly" with colleagues. (Said Dep. 114.) Plaintiff resigned effective December 3, 2018, before the Termination Review Committee convened. (Said Dep. 17; Rihal Dep. 84-85; Rihal Ex. 16.)

### J.       Plaintiff's Post-Mayo Employment.

On December 19, 2018, Plaintiff received an employment offer from Minnesota's UMPhysicians, beginning March 31, 2019. (Said Dep. 239-240; Said Exs. 21-22.) Plaintiff

---

[7] Rihal was born in Africa, grew up in Canada, and identifies as Sikh American. (Rihal Dep. 14.)

was told credentialing could take up to three months. (Said Dep. 247.) He began employment on March 31, 2019, and remains there today. (*Id.*)

Plaintiff now claims Dearani and Rihal made defamatory statements to his prospective employers; he further claims Stulak and other Mayo employees made defamatory comments about his Mayo status. What follows are the only statements Plaintiff arguably pleads as "defamatory" in his Amended Complaint or Interrogatory Answers (identified as Statements 1-7 below):

1. "Mayo disclosed the existence of the November 19, 2018 termination recommendation letter" and "as a direct result Said was forced to share this letter with his prospective employer, and attempt to place the false statements contained therein in the proper context." (Compl. ¶ 129.);

2. "On information and belief", a referral source, Miranda, was informed Plaintiff was placed on administrative leave and unlikely to return to Mayo. (Compl. ¶ 104.) (Notably, however, Miranda affirms he was only told Plaintiff was on leave, without further information. (Miranda Decl. ¶ 3.));

3. Dearani and Stulak stated "Plaintiff was terminated from his Mayo employment." (Compl. ¶ 194.);

4. Dearani and Stulak "defamed Said by informing third-parties that Said had been 'terminated' for misconduct and by disclosing false details of the employment investigation." (Compl. ¶ 128.);

5. "Dearani continues to defame him by spreading false statements that the Minnesota Medical Association is currently investigating Said's medical license, which Dearani has claimed 'may be revoked'." (Compl. ¶ 134.);

6. "Dearani communicated to Monge [who works for Northwestern] Plaintiff would not be returning to Mayo Clinic before the investigation was concluded." (Ans. to Interrogatory No. 6.); and

7. "Parekh [chair of Cardiovascular Surgery at Iowa] initially offered Plaintiff an interview, however, he called Plaintiff back and told him that they had heard from Mayo Clinic that he received a disciplinary action." (Ans. to Interrogatory No. 2.) (Plaintiff concedes it is his belief someone at Mayo communicated with Parekh, noting he accepted a position with

UMPhysicians in the meantime, and withdrew his candidacy. (Said Dep. 259-261.; Parekh Decl. ¶¶ 3-5.)).

In deposition, Plaintiff claimed the additional, unpleaded "statements" are defamatory (identified as Statements 8-17 below):

8. He speculates Rihal *or* Dearani spoke to unidentified prospective employers after he sent his CV and no one called him back. (Said Dep. 258);

9. He speculates Rihal told Ikramuddin at UMPhysicians to ask about the "summary of investigations" (Said Dep. 262);

10. He claims Dearani spoke to someone at Detroit Medical Center about him. (Said Dep. 269-270);

11. He believes Dearani communicates with Griselli at UMPhysicians, and has told him Plaintiff is unhappy there (Said Dep. 270-271). (He concedes that is actually a correct statement, "because I did apply recently to a job in Maryland, and I did apply to a job in UCLA." (Said Dep. 271.));

12. He claims former coworker, Abdelsattar, relayed statements others made, including Stulak saying he would quit if Plaintiff returned, because he could not work with people who behaved like Plaintiff; Stulak mentioning issues of sexual harassment; a nurse manager saying Plaintiff was not returning to Mayo during the investigation; and Abdelsattar hearing Plaintiff would be deported. (Said Dep. 262-263, 265.);

13. Plaintiff claims former coworker Joan Wobig called and asked if he was ok and if his wife was here, because Stulak said Plaintiff's wife had left him and returned to Egypt. (Said. Dep. 266.);

14. Plaintiff claims former coworker, Stephanie Turner, asked if he was still working at Minnesota, because she heard he got fired. (Said Dep. 284);

15. Plaintiff claims the announcement to his Department stating he was on unspecified leave for an undetermined duration was defamatory. (Said Dep. 278.);

16. Plaintiff claims Lyle Joyce said Monge was told (when Plaintiff was on leave) there would soon be a position at Mayo; he assumes this was akin to telling Monge Plaintiff would be terminated. (Said Dep. 282-283.); and

17. Plaintiff complains Stulak said Plaintiff had security escort when placed on leave, claiming it must be false because he did not see security personnel. (Said Dep. 285.)

Despite Plaintiff's claims, after he left Mayo, neither Dearani nor Rihal, nor anyone else at Mayo, made untruthful or defamatory statements about Plaintiff. (Dearani Decl. ¶ 13; Rihal Decl. ¶ 12.)

### K.    March-May 2020: Plaintiff Stipulates to Minnesota Board of Medical Practice Findings and is Fined.

On March 3, 2020, Plaintiff stipulated with the Minnesota Board of Medical Practice ("Board") that "he pursued romantic relationships with colleagues in 2016 and 2018." Stipulation, https://bmp.hlb.state.mn.us/disc/SAID,%20Sameh%20M%20M%20(PY53175)/SAID,%20Sameh%20M%20M%205-9-20.pdf (McNee Decl. Ex. 98.)[8] The Board found Plaintiff's practices inappropriate "in such a way as to require Board action under Minn. Stat. § 147.091, subd. 1(g) (engaged in unethical or improper conduct)", and Plaintiff agreed his conduct constituted a reasonable basis in law and fact to justify discipline under Minn. Stat. § 147.091. *Id.* Plaintiff's license was reprimanded, and he was ordered to comply with certain conditions for his employment. *Order*, https://mn.gov/boards/assets/5-9-2020%20Publishable%20Press%20Release_tcm21-432819.pdf (McNee Decl. Ex. 99.)

## III.    PROCEDURAL POSTURE

Plaintiff filed an MDHR Charge on December 17, 2018, which he cross-filed with the EEOC. (Said Dep. 29; Said Ex. 1; McNee Decl. Ex. 100). Plaintiff received EEOC's

---

[8] *Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005) ("[W]e may take judicial notice of judicial opinions and public records.")

Notice of Right to Sue on April 5, 2019. (Said Dep. 305; Said Ex. 25). Plaintiff initiated suit on May 1, 2019. (Dkt. 1). On April 6, 2020, Plaintiff filed his Amended Complaint, alleging for the first time causes of action under Title VII; Defendants removed. (*Id.*).

## ARGUMENT

## I.   SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered" if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[W]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 280 (2007). The non-moving party can only defeat summary judgment with admissible evidence of a *genuine* issue of *material* fact. *Adams v. W. Publ'g Co.*, 25 F.3d 635, 636 (8th Cir. 1996).

## II.   PLAINTIFF'S DISCRIMINATION CLAIMS FAIL (COUNTS I–VI).

Plaintiff's Title VII and MHRA claims allege Mayo took adverse action based on his race, religion, or national origin when it delayed his promotion consideration, placed him on leave, and recommended termination. Plaintiff's Title VII claims are barred because he has not demonstrated he timely amended his Complaint within 90 days after receiving EEOC's Notice of Rights. Plaintiff's MHRA claims are barred to the extent they rely on events more than 365 days before his Charge.

### A.    Title VII Claims Are Untimely (Counts II, IV, VI).

A Title VII plaintiff must commence suit within 90 days of receipt of EEOC's Notice; otherwise claims are subject to dismissal. 42 U.S.C. §2000e-5(f)(1); *Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147 149–50 (1984). Plaintiff received EEOC's Notice of Rights on April 3, 2019 (Said Dep. 305; Said Ex. 25), but did not seek to add his federal claims until March 31, 2020—363 days later. His Title VII claims should be dismissed. *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir. 1994).

### B.    MHRA Claims Based on Events Prior To December 17, 2017,  Are Untimely (Counts I, III, V, VII, VIII).

Plaintiff's MHRA claims are limited to discrete acts on or after December 17, 2017 (365 days prior to his Charge-filing). Minn. Stat. § 363A.28, subd. 3. Plaintiff's Complaint contains allegations back to 2014 (relating to hiring), and the December 5, 2017 Coaching Memo. MHRA claims for events prior to December 17, 2017, are time-barred. *Ordahl v. Toro*, No. 14-1687, 2015 WL 4569161, at *2 (D. Minn. July 28, 2015).

### C.    Discrimination Claims Fail (Counts I–VI).[9]

Absent direct evidence, Plaintiff has the burden of establishing a *prima facie* case. *Hill v. St. Louis Univ.*, 123 F.3d 1114, 1119 (8th Cir. 1997). If successful, the burden shifts to Mayo to articulate a legitimate, nondiscriminatory reason for the adverse action. *Id*. Plaintiff bears the burden of proving the proffered reason is a pretext for discrimination. *Id*.

---

[9] Nor can Plaintiff bring claims under Title VII, the MHRA, or MWA for conduct when he was a student but not an employee of Mayo (e.g., events before July 2015). *Bakhtiari v. Lutz*, 507 F.3d 1132, 1137 (8th Cir. 2007).

### 1.   Plaintiff Has No *Prima Facie* Case.

To establish a Title VII or MHRA *prima facie* case, Plaintiff must establish (1) he is a member of a protected class; (2) he met Mayo's legitimate expectations; (3) he suffered adverse employment action; and (4) circumstances give rise to an inference of discrimination (*e.g.*, a similarly-situated employee not in the protected class was treated more favorably). *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962 (8th Cir. 2012).

Mayo's concerns regarding Plaintiff's shortcomings are well-documented. (*See supra* Section II.) Mayo concluded after investigation Plaintiff violated Mayo's policies. Plaintiff was not meeting Mayo's legitimate expectations. *Putman v. Unity Health Sys.*, 348 F.3d 732 (8th Cir. 2003) ("Our cases have repeatedly held that violation of company policy are legitimate reasons for termination"); *Miner v. Bi-State Dev. Agency*, 943 F.2d 912 (8th Cir. 1991).

Plaintiff also fails to identify a similarly situated employee. To do so, Plaintiff must identify an individual who "dealt with the same supervisor, ha[s] been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Clark v. Runyon*, 218 F.3d 915, 918-19 (8th Cir. 2000); *Philip v. Ford Motor Co.*, 413 F.3d 766 (8th Cir. 2005). Plaintiff "has the burden of proving that he and the disparately treated [employees] were similarly situated in all relevant respects." *Sherman v. Runyon*, 235 F.3d 406, 409 (8th Cir. 2000). This is a "rigorous standard" he cannot meet. *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir. 2004); *McKey v. U.S. Bank Nat'l Ass'n*, 978 F.3d 594 (8th Cir. 2020) (citing *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012).

Plaintiff claims Maltais, a fellow SAC, received preferential treatment. (Said Dep. 31-34.) While Plaintiff testified he thinks this favorable treatment could be based on race and national origin (Maltais is White and Canadian, Maltais Dep. 13), he admits the treatment could equally be based on "favoritism from Dearani." (Said Dep. 32, 52).

The following facts confirm Maltais is not similarly-situated or preferentially treated:

- In August-September 2017, anonymous hotline callers reported an incident involving Maltais and Emily Coldiron, an NP. (Dearani Dep. 72, 81, 85-88; Dearani Exs. 9, 12, 14-15.) Callers stated when Maltais exited a room, he pushed his shoulder into Coldiron. (*Id.*; Maltais Dep. 33-34.) Another contemporaneous hotline complaint claimed Maltais spoke disrespectfully to a vendor. (Dearani Dep. 83; Dearani Ex. 13.) Plaintiff incorrectly alleges no action was taken, but HR investigated, and Maltais was counseled regarding both complaints (just as Plaintiff was coached in December 2017, after he was first investigated). (Said Dep. 33, 102-103; Said Ex. 7; Johnson Dep. 44-45, 260; Jones Exs. 48-55, 57; Guidinger Dep. 210-211; Guidinger Decl. ¶ 7; Jones Decl. ¶ 3, Ex. A.)[10]

- Nearly one year later, another anonymous complaint raised concerns about the Coldiron incident, requesting Maltais be removed as liaison to the NP/PA group. (Dearani Dep. 90; Dearani Ex. 16.) In response, Maltais was removed as liaison. (Jones Decl. ¶ 4.)

- During the 2018 CVS workplace assessment, concerns about Plaintiff as well as Maltais were raised; Dearani recommended a terminal extension for

---

[10] Other hotline complaints regarding patient care were investigated and unsubstantiated. (Jones Exs. 47, 60-61.) Plaintiff was the subject of an unsubstantiated complaint. (Guidinger Decl. ¶ 7, Ex. D.) A handful of hotline complaints were raised about Maltais in August 2017 and March 2018 alleging disrespectful comments involving patient care, (Dearani Exs. 10-11); there was also a claim a staff member answered Maltais' personal phone during surgery and saw a pornographic image on his screen (Dearani Dep. 93; Dearani Ex. 17). Undisputedly, Rihal and Dearani were not aware of these complaints until *after* this lawsuit commenced, nor were Guidinger, Jones, or Johnson - who were all involved in investigations about Plaintiff that led to the termination recommendation. (Dearani Dep. 77-80; Jones Dep. 241; Guidinger Dep. 190; Rihal Dep. 93-94; Johnson Dep. 43-45.)

Maltais, meaning his SAC appointment would be extended six months, but his employment would then end. (*Supra* Section II.D.) Dearani and Rihal did not receive complaints about Maltais engaging in sexually harassing or inappropriate conduct toward co-workers similar in nature or severity to the reports regarding Plaintiff, and they did not know of any pending complaints about Maltais when his employment ended. Because Maltais's employment did not end pending investigation for discipline, Mayo was not required to report him to the Board. (Rihal Decl. ¶ 11; Rihal Dep. 89-90, 93-94, 97, 100-103, 109-110, 148; Jones Ex. 15; Dearani Dep. 63-64, 74-77, 93-95; Dearani Decl. ¶ 11.) *See* Minn. Stat. § 147.111, subd. 2.

It is undisputed Rihal and Dearani were decision-makers involved in delaying Plaintiff's promotion consideration, placing him on leave, and recommending termination. (Rihal Dep. 74.-77, 121-123, 144-145; Guidinger Dep. 52-53; Dearani Dep. 114-116, 141-142, 189-190, 218.) Plaintiff claims Rihal and Dearani discriminated against him because they treated him differently than Maltais. (Said Dep. 48-49.) Plaintiff cannot show Maltais was "similarly-situated in all relevant respects," however, because it is undisputed no matter how hard Plaintiff argues to the contrary, Rihal and Dearani did not conclude Maltais had engaged in the same egregious conduct and policy violations as Plaintiff, nor were the complaints received about Maltais similar. *See Cronquist*, 237 F.3d at 928. (Dearani Dep. 63-65, 77-80; Rihal Dep. 93-94.)[11]

Misconduct that is similar but not identical cannot create a genuine issue of fact. *Wells v. Sci Mgmt. LP*, 469 F.3d 697, 701 (8th Cir. 2006) (plaintiff and proffered comparator differed, in part, because undisputedly, complaints against "comparator" were unsubstantiated, unlike those against plaintiff). Rihal and Dearani found the complaints

---

[11] Moreover, it remains undisputed that Maltais was not treated preferentially where, unlike Plaintiff, when deferred for promotion the first time, he was *not* given the opportunity for retention at Mayo. (Maltais Dep. 13, 37-38.)

regarding Maltais differed significantly from the concerns raised about Plaintiff; undisputedly, they were aware of no substantiated concern that he engaged in similar sexual harassment, inappropriate communications or violations of Mayo's policies: at most, there was an incident of brushing shoulders with a colleague and disrespectful language toward coworkers. By contrast, the complaints about Plaintiff involved repeated unwanted romantic advances, inappropriate and crude communications and gifts, pursuit of unwanted romantic relationships in the workplace and currying favor with women over whom Plaintiff had some degree of employment control. (Said Dep. 177-178; Guidinger Decl. ¶ 4, Ex. B.) Further, Plaintiff's inappropriate behaviors continued and became even more severe after Mayo coached Plaintiff in 2017. (Rihal Dep. 80; Dearani Dep. 105-106.)

Further refuting any inference of discrimination, Plaintiff's *prima facie* case fails because Mayo treated him consistently with its treatment of two similarly-situated comparators: Grothey and Sarano. These two were also investigated for sexual harassment by coworkers; both were accused of similar misconduct, placed on leave and investigated. (Rihal Dep. 163-164, 166-167; Rihal Ex. 20; Guidinger Decl. ¶ 8; Rihal Decl. ¶¶ 9-10.) Ultimately, the Personnel Committee made a recommendation to terminate Grothey; Sarano retired before recommendation was made. (*Id.*) Rihal likewise reported both to the Board. (*Id.*) *They* are proper comparators here; not Maltais. Plaintiff cannot establish his *prima facie* case.

### 2.      Plaintiff Cannot Demonstrate Pretext.

Plaintiff cannot show Mayo's legitimate reasons are pretextual. *Johnson v. Baptist Med. Ctr.*, 97 F.3d 1070, 1073 (8th Cir. 1996). His "evidence must do more than **merely**

**raise doubts about the wisdom and fairness** of the opinions of him held by his superiors. It must create a real issue as to the genuineness of those perceptions." *Edmund*, 299 F.3d at 685-686. Plaintiff must do more than discredit the explanation, and must present evidence "capable of proving that the real reason for his termination was discrimination." *Nelson v. Boatmen's Bancshares, Inc.*, 26 F.3d 796, 801 (8th Cir. 1994). Mere speculation and belief that an asserted reason is pretext is insufficient. Plaintiff fails to identify specific facts from which the Court may infer pretext.

### a.     Plaintiff Engaged in Improper Conduct.

Plaintiff acknowledges being investigated for sexual harassment and unwanted romantic advances; he stipulated to such with the Board and can proffer no evidence that Mayo's reasons for its decisions to defer promotion, place him on leave, and recommend termination are "unworthy of credence" or "more likely motivated" by discriminatory animus. *Id.* Nor can he identify a comparator with similar issues who was treated preferably. *Supra* Section II.C.1. Further, Dearani was aware of Plaintiff's race, religion, and national origin when he hired him. It is incredible to think the same decisionmaker who hired Plaintiff suddenly developed discriminatory animus. *Cf. Lowe v. J.B. Hunt*, 963 F.2d 173, 175 (8th Cir. 1992).

### b.     Mayo Acted in Good Faith.

The "critical inquiry" is not whether the employee actually engaged in conduct at issue, "but whether the employer in good faith believed that the employee was guilty of the conduct." *McCullough v. Univ. of Ark. for Med. Sciences*, 559 F.3d 855 (8th Cir. 2009).

Construing facts most favorably to Plaintiff, Mayo's decisions regarding Plaintiff's employment indisputably were made after Mayo concluded he was warned and still failed to abide by Mayo's policies. Mayo was not looking for an "excuse" to terminate Plaintiff. To the contrary, the multiple extensions of Plaintiff's promotional consideration and placement on leave confirm the termination recommendation resulted after thorough investigation. *See Elsherif v. Mayo Clinic et al.*, No. CV 18-2998, 2021 WL 1634797, at *8, 11 (D. Minn. Apr. 27, 2021). The threshold question when considering pretext is whether Mayo's reasons are "true, not if they are wise, fair or correct." *Dorsey v. Pinnacle Automation Co.*, 278 F.3d 830, 837 (8th Cir. 2002); *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011).

## III.   PLAINTIFF'S MHRA REPRISAL CLAIM (COUNT VI) FAILS.

Plaintiff claims MHRA reprisal in that he was retaliated against for opposing discrimination. (Compl. ¶ 174.) The MHRA requires a *prima facie* showing (1) Plaintiff engaged in protected activity; (2) Mayo took adverse action; and (3) causal connection between them. *Colenburg v. Starcon Int'l, Inc.*, 619 F.3d 986, 993–94 (8th Cir. 2010). Protected activity includes opposing a practice forbidden under the MHRA. Minn. Stat. § 363A.15.

Plaintiff's claim fails. He obtained counsel after being placed on leave. (Said Dep. 7-15.) His lawyer sent a letter dated October 15, 2018, criticizing the leave and Mayo's policies; his letter raised complaints (for the first time) Plaintiff was discriminated against because of race and/or national origin. (Said Dep. 135, 138; Rihal Dep. 111-113; Jones Dep. 18-19; Jones Ex. 1.) Around this time, Mayo received an anonymous complaint

speculating Plaintiff's treatment could be race-based. (Rihal Dep. 117-119; Johnson Dep. 31-33.) Rihal explained he considered these complaints investigated during the investigation already ongoing, as Plaintiff had not yet been interviewed and had not previously ever raised such concerns. (Said Dep. 7-15; Rihal Dep. 112-115, 134-135, Rihal Exs. 12-13; Johnson Dep. 28-33.)

Critically, Plaintiff cannot show causal connection between any protected activity and adverse action; he cannot rely on raising concerns of discrimination after-the-fact to insulate himself from the consequences of earlier misconduct. *McGrath v. TCF Bank Sav., FSB*, 509 N.W.2d 365, 366 (Minn. 1999); *Skalsky v. Indep. Sch. Dist. No. 743*, 772 F.3d 1126, 1131 (8th Cir. 2014). This is particularly true here, where the reason for Plaintiff's postponed promotional considerations, placement on leave, termination recommendation, or Board reporting were the results of investigation that began long before concerns were raised on Plaintiff's behalf: "Evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation." *Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 504 (8th Cir. 2005). Post-hoc complaints alone cannot demonstrate retaliation because the anti-discrimination statutes do not insulate an employee from discipline for rules violations. *Carrington v. City of Des Moines*, 481 F.3d 1046, 1051 (8th Cir. 2007) "Indeed, complaining of discrimination in response to a charge of workplace misconduct is an abuse of the anti-retaliation remedy." *Id.*; *George v. Hennepin Cnty.*, No. 14–2694, 2015 WL 5895304, at *7 (D. Minn. Oct. 8, 2015).

Regarding Plaintiff's deferred promotional consideration and placement on leave, those decisions were made *before* Plaintiff ever raised any complaint, so could not possibly

have been made in reprisal for his complaint. (Said Dep. 135.) *Hervey v. Cty. of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008). As for Plaintiff's claim that Mayo recommended termination in retaliation for any protected activity, it is undisputed the recommendation was based on conduct occurring prior to Plaintiff's lawyer's letter. As for his latest theory that Mayo retaliated against Plaintiff for filing suit by reporting him to the Board, (Said Dep. 204), the reporting obligation was explained to Plaintiff on November 21, 2018 -- well before this lawsuit. (Said Dep. 215, Said Ex. 15.) Minn. Stat. § 147.111, subd. 2. Mayo's report could not possibly reflect retaliation for a non-existent lawsuit. *Infra* Section V.

Plaintiff failed to meet Mayo's legitimate expectations, and he has nothing to show Mayo's decisions are pretextual. *Supra* Section II.C.; *Cronquist v. City of Minneapolis*, 237 F.3d 920, 926 (8th Cir. 2001).

## IV.    PLAINTIFF'S MWA CLAIM FAILS.

Plaintiff claims MWA retaliation by claiming Mayo issued a Coaching Memo in December 2017 because he reported that Dearani violated HIPAA (Said Dep. 105: 10-25.). Plaintiff must prove: (1) protected activity; (2) adverse action; and (3) a causal connection between the two. *Cokley*, 623 N.W.2d at 630. The burden of production then shifts to Mayo to articulate a legitimate, non-retaliatory reason for the Coaching Memo. *Id*. Plaintiff must then prove Mayo's reasons are untrue and pretextual. *Id.*

### 1.    Plaintiff Cannot Establish Causal Connection.

Plaintiff cannot establish a causal connection between his alleged report and receipt of Coaching Memo because the decision was made to issue a Coaching Memo *before* he

complained of a supposed HIPAA violation (his "whistleblower" report). (Dearani Dep. 189-190; Jones Ex. 36.) Undisputedly, Mayo received complaints about Plaintiff's conduct in October 2017 and investigated them before his car accident; logically, this was before he could have made a HIPAA complaint relating to his medical condition following that accident. The timing of the decision regarding coaching defeats this claim. *Obregon v. Cap. Quarries Co., Inc.*, 833 F. App'x 447, 449 (8th Cir. 2021); *Chaney v. New Orleans Pub. Fac. Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999).

### 2. Plaintiff Cannot Establish Pretext Regarding the Coaching Memo.

Plaintiff's MWA retaliation claims also fails because Mayo had a legitimate, non-discriminatory reason for the December 2017 Coaching Memo: the results of investigation regarding his inappropriate behavior (*Supra* Sections II-III.) He has no of pretext for retaliation for reporting a HIPAA violation.

## V. PLAINTIFF'S TORTIOUS INTERFERENCE CLAIM FAILS (COUNT IX).

A tortious interference plaintiff must prove:

1) Existence of a reasonable expectation of economic advantage;
2) Defendants' knowledge of that expectation of economic advantage;
3) Defendants intentionally interfered with his reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation;
4) Absent the wrongful act of defendants, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and
5) Damages.

*Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014). A plaintiff must establish actions that were unjustified (or a reasonable probability he would have realized an expectation absent defendants' alleged conduct), and

damages. *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 816 (D. Minn. 2018); *Daum v. Planit Sols., Inc.*, 619 F. Supp. 2d 652, 658 (D. Minn. 2009).

Plaintiff claims Mayo (through Dearani and Rihal) tortiously interfered with his ability to become re-employed after he quit. (Said Dep. 237, 248-249, Compl. ¶ 189.) He claims his start date at UMPhysicians was delayed because of Dearani's or Rihal's alleged communications with them. (Said Dep. 240-241, 243.) Undisputedly, however, the Chair responsible for hiring Plaintiff at UMPhysicians denies such communications, and denies Plaintiff's start date was delayed. (Ikramuddin Decl. ¶¶ 3-4; Dearani Decl. ¶ 13; Rihal Decl. ¶ 12.) Plaintiff cannot create a genuine issue of material fact where there is no fact in dispute. *Lindgren v. Harmon Glass Co.*, 489 N.W.2d 804, 811 (Minn. Ct. App. 1992).[12]

Plaintiff also complains Mayo reported him to the Board. (Compl. ¶¶ 126, 189.) Defendants are entitled to judgment because (1) Minnesota's credentialing law insulates them; (2) Plaintiff released Defendants to disclose information about his employment, including discipline; and (3) there is no unlawful interference or damages.

First, Plaintiff's claim fails because there is civil immunity for such reports. Because the primary responsibility of the Board is to protect the public, Minnesota law provides immunity from civil claims against any health care facility or individual for a report under Minn. Stat. § 147.111. Minn. Stat. §§ 147.001, 147.121, subd. 1. This immunity applies to

---

[12] Plaintiff's claim is also barred because it relies on the same predicate facts as his defamation claim (Count X, discussed below), and is therefore duplicative. *Wild v. Rarig*, 234 N.W.2d 775 (Minn. 1975); *Dunham v. Opperman*, No. A06-750, 2007 WL 1191599, at *7 (Minn. Ct. App. Apr. 24, 2007) (tortious-interference claim encompassed by defamation claim should be dismissed).

a tortious interference claim. *Woodburn v. St. Paul Pathology, P.A.*, No. C7-93-125, 1993 WL 267495, at *5 (Minn. Ct. App. July 20, 1993) (no liability for defamation or tortious interference could be found on the basis of a Board report).

Plaintiff's claim is also barred by the defense of authorization and release. "A release is an affirmative defense to a cause of action, and the validity of a release is a matter for the [district] court." *Karnes v. Quality Pork Processors*, 532 N.W.2d 560, 563 (Minn. 1995). When Plaintiff's employment ended, he authorized disclosure of disciplinary information and released Defendants from liability. (Said Dep. 311; Said Ex. 31.) This release included "resignation prior to the conclusion of any disciplinary proceedings for [sic] prior to the commencement of formal charge but after I have knowledge that such formal charges are contemplated and/or in preparation." (*Id.*) This bars his claim.

Further, because Plaintiff voluntarily resigned, he has no cause of action for tortious interference. *Sherr*, 416 F. Supp. 3d at 845 (dismissing tortious interference claim where physician voluntarily resigned); *Hawkins v. DeRuyter*, No. A03-1176, 2004 WL 1328008, at *2 (Minn. Ct. App. Jun. 15, 2004).

Finally, Plaintiff can show no unlawful interference by Defendants regarding any other alleged opportunities. *Marty H. Segelbaum, Inc. v. MW Capital, LLC*, 673 F.Supp.2d 875, 881 (D. Minn. 2009); *Elsherif*, 2021 WL 1634797, at *16-17. Plaintiff is employed at UMPhysicians: he undisputedly started on time, per his offer letter, and as confirmed by them. Plaintiff has no evidence Defendants interfered with any other opportunities. While he speculates Defendants interfered with a potential opportunity at Detroit Medical Center, undisputed evidence shows he was not hired based on experience, but remains a viable

candidate for other positions. (Zehr Dep. 35, 75, 77; Zehr Ex. 5.) Plaintiff has no evidence to avoid summary judgment.

## VI.    PLAINTIFF'S DEFAMATION CLAIM FAILS (COUNT X).[13]

Defamation requires a false statement, communicated to a third-party, and damages. *Thomas v. UnitedHealth Grp., Inc.*, No. 12–47, 2014 WL 5307579, at *19 (D. Minn. Oct. 16, 2014); *Benson v. Nw. Airlines, Inc.*, 561 N.W.2d 530, 537 (Minn. Ct. App. 1997). True statements, however disparaging, are not actionable. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980); *Walker v. Wanner Engineering, Inc.*, 867 F. Supp. 2d 1050, 1054 (D. Minn. 2012).

Defamation must be pleaded with specificity, including identification of who made the defamatory statements, to whom they were made, and where. *Pinto v. Internationale Set, Inc.*, 650 F. Supp. 306, 309 (D. Minn. 1986); *Asay v. Hallmark Cards*, 594 F.2d 692, 698–99 (8th Cir. 1979); *Thompson v. Campbell*, 845 F. Supp. 665, 679 (D. Minn. 1994) (defamation claim must "adequately identif[y] the false and defamatory statements as well as which defendants made the statements"); *Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 326 (Minn. 2000) ("[I]n defamation suits, the defamatory matter [must] be set out verbatim.").

As noted, Plaintiff only alleged certain statements to be defamatory in his Complaint or Interrogatory Answers. Those are listed in Section II.J. above as Statements 1-7, and are the *only* statements arguably properly raised before the Court. *See Sherr v. HealthEast*

---

[13] Defendants reserve the right to challenge (outside of summary judgment) whether any of the statements were made, were false, or were protected opinions.

*Care Sys.*, 416 F. Supp. 3d 823, 844 (D. Minn. 2019). Defendants have responded to these statements as well as those Plaintiff referenced in his deposition, even though this brief makes clear none can survive summary judgment. Plaintiff's claim fails because (1) Plaintiff's statements are not pleaded with specificity and Plaintiff did not seek to amend his Complaint to add allegedly defamatory statements subsequently raised during his deposition (*see* Section II.J. Statements 8-17 above), (2) Plaintiff relies on inadmissible hearsay or speculation, and/or (3) the statements are not defamatory.   Plaintiff's reliance upon the 17 "Statements" identified in Section II.J. above fails for the additional reasons, below:

### A.   Plaintiff Released Defendants to Communicate With UMPhysicians (Section II.J. Statements 1, 3-5, 9, 11).

Plaintiff's claim regarding communications made to UMPhysicians (including Ikramuddin or Griselli), is barred by the defense of release, which bars his claim concerning communications with UMPhysicians. (Said Dep. 311; Said Ex. 31.) While Plaintiff fails to identify to whom the statements he complains about were allegedly made (these are identified in Section II.J. above as Statements 1,3, 5, 9 and 11), Defendants believe these are the statements Plaintiff alleges to have been made to UMPhysicians -- all of which should be dismissed from this lawsuit. His claim also fails because there is no *genuine* dispute that any communications occurred. *Supra* Section V. *Lindgren*, 489 N.W.2d at 811 (plaintiff cannot rely on speculation that defamatory statements were made).

## B.     Plaintiff Cannot Rely on Inadmissible Hearsay (Section II.J. Statements 2, 4, 7-9, 12-14, 16), or Inadmissible Speculation (Section II.J. Statements 1-17).

Hearsay is a statement "the declarant does not make while testifying at the current trial or hearing", offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Courts must disregard inadmissible hearsay on summary judgment. *Neff v. World Publishing Co.*, 349 F.2d 235, 253-54 (8th Cir. 1965); *Bersch v. Rgnonti & Assocs.*, 584 N.W.2d 783, 788 (Minn. Ct. App. 1998). Statements identified in Section II. J. above as Statements 2, 4, 7-9, 12-14, 16, are all based on inadmissible hearsay that cannot support Plaintiff's claims; they should be barred as hearsay because it is undisputed Plaintiff was not present when any such allegedly defamatory statement was made. (Said Dep. 277, 293).[14] Plaintiff further lacks evidence to support his speculation and cannot provide details about when the comments identified in Section II.J. as Statements 1-17 allegedly were made, or to whom. (*Id.*) Dismissal is therefore appropriate because these claims rely on inadmissible hearsay and Plaintiff's speculation. *Besett v. Wadena Cnty.*, 890 F. Supp. 2d 1076, 1092-93 (D. Minn. 2012) (dismissing defamation because inadmissible hearsay

---

[14]  Section II.J. Statements 12-14 and 16-17 illustrate Plaintiff's misplaced reliance on hearsay. These consist of statements Plaintiff claims his coworkers attributed to others, such as (1) Plaintiff was not coming back, (2) Plaintiff was being deported, (3) Stulak mentioned his "issues of sexual harassment", (4) Stulak said he could not work with people who behaved like Plaintiff, (5) Plaintiff's wife left him, and (6) he no longer worked at the University of Minnesota. (Said Dep. 162-163, 262-263, 265-266, 274, 279, 284.) These statements are the definition of inadmissible hearsay and fail to state a claim. *Sherr*, 416 F. Supp. 3d at 844.

cannot create fact issue); *LeBaron v. Speedway SuperAmerica LLC*, 2007 WL 107726, at *7 (D. Minn. Jan. 10, 2007); *Elsherif*, 2021 WL 1634797, at *17.[15]

Finally, Plaintiff's effort to make allegations based "on information and belief" fails. He alleges, in Section II.J. Statement 2 above that one of his referral sources, Miranda, was informed he was placed on administrative leave and unlikely to return to Mayo. (Compl. ¶ 104.) This is just another example of an unfounded allegation; Plaintiff's rank speculation does not support a defamation claim here.

### C.    Plaintiff Cannot Rely Upon Nonactionable Opinion (Section II.J. Statements 11-14).

It is well settled that "an opinion amounting to mere vituperation and abuse or rhetorical hyperbole . . . cannot be the basis for a defamation action." *McKee v. Laurion*, 825 N.W.2d 725, 733 (Minn. 2013); *Kapoor v. Brown*, No. 13-1402, 2014 WL 1516589, *4 (Minn. Ct. App. Apr. 21, 2014); *Gacek v. Owens & Minor Distrib., Inc.*, 666 F.3d 1142, 1147 (8th Cir. 2012). Whether a statement is opinion is a question of law. *Thomas v. United Steelworkers Local 1938*, 743 F.3d 1134, 1142 (8th Cir. 2014).

In *Kapoor*, the following were deemed statements of opinion: a doctor did not trust her colleague; a doctor did not want a colleague to read her patients' scans; a statement plaintiff "lost his mind;" and a doctor did not want a colleague involved with her patients'

---

[15] For example, Plaintiff speculates in Section II.J. Statements 7-10 that Rihal or Dearani must have communicated with other institutions where he applied (Detroit and Iowa), because he sent his CV and received no calls. (Said Dep. 258-260, 270.) He has no firsthand knowledge of statements, nor does he identify any made (or how they were defamatory). These claims reflect unfounded belief; Plaintiff cannot rely on guesswork.

care. 2014 WL 1516589, at *10 (Minn. Ct. App. Apr. 21, 2014). The court affirmed dismissal of defamation claims. *Id.*; *French v. Eagle Nursing Home*, 973 F. Supp. 870, 884 (D. Minn. 1997) ("[S]tatements that [plaintiff] was a 'terrible nurse' who 'shouldn't be working' in the nursing field are clearly statements of opinion.").

Like *Kapoor*, statements cited above in Section II.J. (identified as Statements 11-14) reflect opinion as well as hearsay. They are not precise, and at most represent workplace gossip that cannot be the premise for defamation. *Kapoor*, 2014 WL 1516589 at *4.

### D. True Statements Cannot Be Defamatory (Section II.J Statements 1-7, 11, 15-17).

The following statements, listed above in Section II.J. (with specific Statement numbers identified below), reflect statements Plaintiff claims constitute defamation. Even if made, they are true and cannot support his Complaint:

- Stulak said Plaintiff was escorted by security when placed on administrative leave (Statement 17);

- Plaintiff is unhappy at UMPhysicians and has applied for jobs elsewhere (Statement 11);

- Dearani notified the CVS Department that Plaintiff was on leave[16] (Statement 15);

- Plaintiff's referral source, Miranda, was informed Plaintiff was placed on involuntary leave (Statement 2);

- Rihal and Dearani allegedly referred to Plaintiff as terminated and divulged there was an investigation into Plaintiff (Statements 1, 3, 4, 7);

---

[16] Plaintiff admits this announcement was truthful. (Said Dep. 278.)

- Monge was allegedly told Plaintiff would be terminated and/or leaving Mayo[17] (Statements 6, 16);

- Dearani stated that the Medical Board was investigating Plaintiff's license, which could be revoked. (Statement 5)

Discovery confirmed the truth of these statements: i.e., Mayo *did* place Plaintiff on leave and have security follow him out; *did* inform necessary individuals Plaintiff was unavailable for surgery; *did* investigate Plaintiff's conduct; *did* recommend termination; and Plaintiff *did* leave Mayo. (Said Ex. 14; Said Dep. 17, 237, 248-249.) It is likewise true the Board *did* investigate Plaintiff's license and that a form of discipline from the Board can include revocation of a physician's license. (McNee Decl. Exs. 98-99.). Minn. Stat. § 147.141. Plaintiff may not *appreciate* these statements, but even if Plaintiff had non-hearsay evidence that such statements were made, they are true and cannot be defamatory. *Stuempges*, 297 N.W.2d at 255.

### E. Alleged Defamation is Subject to Qualified Privilege; Plaintiff Cannot Show Malice (Section II.J. Statements 1-17).

Plaintiff's defamation claim also fails because all the allegedly defamatory statements (identified in Section II.J. as Statements 1-17) are subject to qualified privilege. *Bol*, 561 N.W.2d at 149. This applies to "communications between an employer's agents made in the course of investigating or punishing an employee for misconduct . . . made to an employee concerning the reasons for his or her discharge [and] to employees about the

---

[17]Though Monge denies he was told Plaintiff was leaving or that Plaintiff would be terminated, an additional reason for dismissal is that Plaintiff cannot create an issue of fact through his own speculation. (*see* Monge Decl. ¶ 4.)

reasons for another's discharge." *Ewald v. Wal-Mart Stores, Inc.*, 139 F.3d 619, 623 (8th Cir. 1998).

To overcome qualified privilege, an employee must establish actual malice. *Strauss v. Thorne*, 490 N.W.2d 908, 912 (Minn. Ct. App. 1992). Plaintiff has no evidence to suggest Dearani or anyone else harbored "actual ill will" or had "a design causelessly and wantonly to injure" Plaintiff. *McClure*, 223 F.3d at 854. Absent malice, this claim fails.

### F.    No Evidence of Reputational Harm (Section II.J. Statements 1-17).

Fatal to his claim, Plaintiff has no evidence of reputational harm to support any of Statements 1-17. *Combs v. R.R. Donnelley & Sons Co.*, 97 Fed. Appx. 685, 687 (8th Cir. 2004); *Cohen v. Beachside Two-I Homeowners' Ass'n*, 2006 WL 1795140, at *8 (D. Minn. June 29, 2016). After receiving an offer on December 19, 2018, Plaintiff began employment with UMPhysicians as planned, on March 31, 2019. (Said Dep. 239-241, 243, 274; Said Exs. 21-22.) Plaintiff suffered no specific harm or damages to his reputation. *Cohen*, 2006 WL 1795140, at *7-8.

## VII.   PLAINTIFF'S PRIVACY CLAIMS FAIL (COUNT XI).

### A.    No Intrusion Upon Seclusion.

Plaintiff claims Defendants invaded his privacy by intruding upon his seclusion and publicizing private facts by acquiring his journal -- though he admits he does not believe it was shared with anyone inappropriately. (Said Dep. 288-289, 294.) Plaintiff must establish: (1) intentional intrusion; (2) that is highly offensive, and (3) that is into some matter in which a person has a legitimate expectation of privacy. *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 233 (Minn. 1998).

Acquiring Plaintiff's journal from Mayo property was not "highly offensive" in the investigative context. *Supra* Section II.E.-H.; *Phillips v. Grenadahl*, 312 F.3d 357, 373 (8th Cir. 2002); *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007); *Potocnik v. Carlson*, 9 F. Supp. 3d 981 (D. Minn. 2014) (information regarding whom plaintiff was dating, where she worked, attended school, and facts surrounding her sister's murder not highly offensive).

### B.     No Publication of Private Facts.

Plaintiff's publication of private facts claim is also based on the fact Mayo acquired his personal journal. (Said Dep. 288). Plaintiff must show (1) public disclosure; (2) of facts concerning his private life; (3) the matter disclosed would be highly offensive and objectionable to a reasonable person; (4) disclosure was intentional; and (5) the matter publicized is not of legitimate concern to the public. *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 233 (Minn. 1998). Publicity means "the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Bodah v. Lakeville Motor Express, Inc.*, 663 N.W.2d 550, 553-54 (Minn. 2003). Publicity differs from publication." *Id.* It is not a privacy invasion to communicate a fact "to a single person or even to a small group of persons." *Id*.

Plaintiff cannot show obtaining his journal as part of investigation constitutes publication of private facts. Defendants did not disclose Plaintiff's journal to the public. It was highly relevant, viewed only by the limited group investigating Plaintiff. Such disclosure was not reasonably likely to become public, nor is it highly offensive to a

35

reasonable person. *Cf. Setzer v. Farmers Ins. Co., Inc.*, 185 Fed. Appx. 748, 755 (10th Cir. 2006) (conduct not "highly offensive to a reasonable person" when insurance company requested medical records).

## VIII.   PLAINTIFF'S CONVERSION CLAIM FAILS (COUNT XII).

Plaintiff claims conversion after being removed as "co-author" of an article published in Mayo's Cardiovascular Update, *Congenital Heart Disease Interventions: The First Fifty Years … The Next Fifty Years*." (Compl. ¶ 218; Said Dep. 297; Said Ex. 30; Dearani Decl. ¶ 12.) Conversion is willful interference with the personal property of another, without lawful justification. *Williamson v. Prasciunas*, 661 N.W.2d 645, 649 (Minn. Ct. App. 2003); *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997). Plaintiff must show both a property interest and deprivation of that interest. *Id*.

Plaintiff does not have a property interest in his name on a newsletter he helped draft while employed, was publicized after he resigned, and was intended to advertise a practice that he had left. (Said Dep. 300.) While there are photographs near the article, no one is identified as "author". (Dearani Decl. ¶ 12; Said Ex. 30.) Moreover, this publication squarely falls within the Intellectual Property Agreement Plaintiff signed; no conversion could therefore occur. *Lassen v. First Bank Eden Prairie*, 514 N.W.2d 831, 838 (Minn. Ct. App. 1994) (lack of enforceable interest in the property is a complete defense); *Noble Sys. Corp. v. Alorica Central, LLC*, 543 F.3d 978 (8th Cir. 2008); *Elsherif*, 2021 WL 1634797, at *18.

## <u>CONCLUSION</u>

There are no disputed genuine issues of material fact, and Defendants are entitled to summary judgment as a matter of law, and costs and fees as the Court deems appropriate.

Dated: May 3, 2021

s/ Emily A. McNee
Kathryn Mrkonich Wilson, Bar No. 283605
kwilson@littler.com
Emily A. McNee, Bar No. 0395228
emcnee@littler.com
LITTLER MENDELSON P.C.
1300 IDS Center
80 South 8th Street
Minneapolis, MN 55402.2136
Telephone: 612.630.1000

Attorneys for Defendants

4839-2826-2631.14