UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Sameh Mahmoud Mohamed Said, MD,<br>Plaintiff,<br>v.<br>Mayo Clinic, and Joseph Albert Dearani, MD,<br>Defendants. | Court File No. 20-cv-00927-ECT-TNL<br><br>**DECLARATION OF CHAD JOHNSON** |

I, Chad Johnson, hereby declare and state as follows:

1. I am over 18 years of age, have personal knowledge of all of the facts contained in this Declaration, and if sworn as a witness in this matter can testify competently to the facts set forth herein.

2. I am employed by Mayo Clinic as an HR Investigation Specialist. I have training and experience in conducting employment investigations, including those involving sexual harassment allegations.[1]

3. On October 8, 2018, Rebecca Reid, a Physician's Assistant (PA) working on Dr. Said's service team, reported she had been subject to sexual harassment by Dr. Said, that he had failed to respect professional boundaries, and that his conduct made her uncomfortable.

---

[1] I am aware through this lawsuit that in March 2018, an anonymous hotline complaint was raised about another SAC, Dr. Simon Maltais, stating that a staff member answered Dr. Maltais' personal phone during surgery and saw a pornographic image. I was not involved in handling that complaint and was not aware of that hotline complaint until after this lawsuit was filed.

4.     Mayo has an Investigation Specialty team directed by Erin Collins, Legal Counsel at Mayo Clinic. Mayo determined that the investigation into Ms. Reid's complaints should be directed by counsel under the attorney-client privilege and/or work product doctrine.

5.     Accordingly, I was engaged by Ms. Collins as an HR Investigation Specialist along with Renee Jones, Operations Manager for the Department of Cardiovascular Surgery, to investigate Ms. Reid's concerns. We made no presumption about what the outcome would be of the investigation, and no decisions are made until the investigation has been completely finished.

6.     Ms. Jones and I interviewed Ms. Reid on October 18, 2018 as part of the ongoing investigation into the concerns that she raised. Part of the interview of Ms. Reid involved reviewing with her a set of documents she had submitted to Ms. Jones and Ms. Guidinger a week earlier, on October 11, 2018, attached as **Exhibit A (also marked as Said Deposition Exhibit 12)**. Ms. Reid's documentation consisted of about 75 pages of a timeline of events, including embedded emails, text messages, and photos.[2] In addition, when Ms. Reid had first raised her complaint on October 8, 2018, she described a journal that Dr. Said had showed her in his office at Mayo that he told her described her and his feelings for her. Ms. Jones told me that she and Dr. Dearani went into Dr. Said's office and found the journal Ms. Reid described. Dr. Dearani and Ms. Jones took photos of some

---

[2] Mayo also engaged its Investigative Legal Discovery team to conduct electronic searches for review and recovery of electronically stored information.

2

pages, which Ms. Jones and I reviewed as part of the investigation, attached as **Exhibit B (also marked as Said Deposition Exhibit 18).**

7. During our investigative interview, Ms. Reid detailed a number of different types of conduct that made her uncomfortable, including unwanted advances and gifts, and inappropriate personal communications that continued to occur even after she made clear to him she was not interested in a relationship with him.

8. She described receiving unwanted gifts from Dr. Said, including perfume, a keychain with an engraved picture of her dog on it with the phrase "My Sweet Luna" on the back, and an expensive gold ring with rubies and diamonds. (**Exhibit A** at Mayo 978.) She told us that she initially assumed the ring that Dr. Said gave her was costume jewelry, but she looked it up on the website for the store listed on the bag and saw that it was listed as costing $800. She further described that Dr. Said started bringing her coffee and breakfast items regularly, as well as asking to take her out to lunch and dinner while they were working together. He began to purchase coffee and breakfast items daily for her in August 2018, and although she would offer to pay, Dr. Said would never accept her payment.

9. She reported that Dr. Said had inappropriate personal communications with her, including after she made clear she was not interested in a relationship and engaged in emotional manipulation. Examples of such communication that Ms. Reid described included:

- Dr. Said confided in her that he was unhappy in his marriage and that he was considering leaving his wife.

3

- Dr. Said told Ms. Reid his life would be nothing without her.

- Dr. Said told Ms. Reid he would do anything for her, including leave his wife and Mayo Clinic and move away with her.

- In early August 2018, Dr. Said offered to drive her to Minneapolis for a wedding (she refused), and told her she would look beautiful in her dress.

10. We also reviewed with Ms. Reid the text messages she had provided that Dr. Said had sent to her, and records discovered by ILD, including:

- Dr. Said's text message to Ms. Reid, stating: "I love you so much and I can't imagine my life without you. I'm so sorry if that makes you confused, but I can't imagine my day without you in it. I can't stop thinking about you day and night but if you choose to be with someone else, I'll never be in the way." (**Exhibit A** at Mayo 1016.)

- In early August 2018, Ms. Reid told Dr. Said she was going swimming with friends; he replied, "Don't get too wet." (**Exhibit A** at Mayo 991.)

- "You're one of the very few people in my life who has this spark in their eyes that pulls me deep inside." (**Exhibit A** at Mayo 1010.)

- "You are the only one I like to talk to." (**Exhibit A** at Mayo 1013.)

- "My heart aches so much because I don't want to lose you and I can't stop thinking about you…" (**Exhibit A** at Mayo 1017.)

- You've rare traits that that don't exist these days and that's what I love about you," in relation to Ms. Reid's work ethic. In a second response, Dr. Said notes to Ms. Reid that he wishes she said, "you are doing a great and I wish I can take you from here." (**Exhibit A** at Mayo 1031.)

11. Ms. Reid described that on August 5, 2018, she asked Dr. Said to meet her outside of work, and they had a three-hour meeting where she explained to him that she did not want a romantic relationship with him, and he needed to stop making advances.[3]

---

[3] She shared that she felt safe meeting outside of work, because she brought pepper spray and has a German Shepherd dog.

4

She stated that he became tearful and made suicidal comments such as "there's nothing left for me here" and continued to try to convince her that he loved her more than her boyfriend, could make her happier, and they could leave together. Ms. Reid also described an incident during the same time period in which Dr. Said asked to meet in his office, closed the door and discussed his feelings for her. He sat with his legs open, and by the end of the conversation, she observed that his groin area appeared wet. Ms. Reid's described how even after she told Dr. Said that she did not want a personal relationship, he kept telling her he loved her in between patient rooms during rounds. She described that he also told her he would marry her tomorrow and leave everything for her, and that he further admitted to her that he often kept her at work late just so he could spend more time with her.

12. Also among the materials Ms. Reid provided was a video clip that Dr. Said created and sent to her on September 10, 2018. (**Exhibit A** at Mayo 1021.) This video, which Dr. Said had set to music, was taken from an actual patient's heart surgery and showed Dr. Said and Ms. Reid's hands overlapping on the patient's heart. (**Exhibit A** at Mayo 1021.) When he sent it to Ms. Reid, he wrote: "I wanted to send you the most beautiful memory we had this year so far. Thank you for being there and to more bright future and more memories…Please watch it alone…see you soon :-)" (**Exhibit A** at Mayo 1024.) Ms. Reid told me and Ms. Jones and it was not typical for a PA to be involved in this type of patient procedure – Ms. Reid had never participated in a procedure previously, other than to observe. She told us that she believed Dr. Said had used her interest in the case to get physically close to her and described being disturbed by the video.

5

13. Ms. Reid further told us that on September 16, 2018, after returning from a trip, Dr. Said had texted her something to the effect of "I very much missed you." At that point, Ms. Reid returned all of the gifts Dr. Said had given her. He told her returning a gift is an insult. In Dr. Said's journal, there was an entry corresponding to the date when Ms. Reid had reported she returned the gifts. Dr. Said noted in his journal that day was, the "worst day of [his] life." (**Exhibit B** at Mayo 968.) In addition, a document was retrieved from Dr. Said's computer summarizing Dr. Said's reaction to Ms. Reid returning his gifts, and criticizing her work performance in a manner that appeared to be retaliatory. (**Exhibit C** [Mayo 1285-1286].)

14. Also during her interview, Ms. Reid described what she believed were manipulative actions Dr. Said had engaged in to spend time with her. For instance, Dr. Said was planning to attend a conference in Toronto, and he offered to pay for Ms. Reid's registration fee to attend. She told him she was uncomfortable with that, and he told her no one would find out. She told me and Ms. Jones that she did not book the conference because she felt uncomfortable. She shared that Dr. Said was persistent in bringing up the conference and told her he was disappointed that she would not attend with him. Additionally, Ms. Reid further reported that her significant other was in medical school at the time, and Dr. Said offered to help get him a residency position at Mayo if it meant that Ms. Reid would stay at Mayo. Ms. Reid ultimately explained her overarching fear that she would lose her job by reporting Dr. Said for having rejected his advances, and given the power differential in their relationship. She based this concern on conversations she had

6

with Dr. Said during which he told her that Dr. Ashikhmina had previously reported him to HR, which he described as stabbing him in the back.

15. Subsequently, Ms. Jones and I interviewed Dr. Said on November 2, 2018. His interview lasted approximately four hours. Dr. Said launched the discussion by stating his firm belief that the allegations had all been orchestrated by Dr. Dearani because of his professional jealousy toward Dr. Said. Dr. Said repeatedly stated throughout the interview that he had never "touched" anyone. Ms. Jones and I had to explain to Dr. Said that Mayo's policy against Sexual and Other Harassment includes unwanted advances as a form of harassment.

16. Contrary to the statements he made on October 9, Dr. Said now said that he had personal feelings for Ms. Reid and had expressed those feelings to her after believing she had invited him to do so. He stated that he had confided in Ms. Reid that he was separated from his wife and that he was considered ending his marriage. He stated his belief that Ms. Reid invited him to pursue a personal relationship, but he admitted she had never directly told him she had romantic feelings for him, and acknowledged she told him she was in a serious relationship with someone else. He also admitted he gave gifts to Ms. Reid, but stated his belief that giving female colleagues expensive gifts was not inappropriate.

17. Further contrary to his initial representations, Dr. Said brought a copy of his journal with him to the interview. It appeared to be the same journal that had been removed from his office and photographed previously. When asked why he initially denied its very existence when asked about it on October 9, Dr. Said offered an excuse that made no sense, stating that because it did not reference any one person, he had not made the connection. I

flipped through the journal, and noted that the page dated "September 18" which had previously been in the journal and photographed was missing. (*See* **Exhibit B** at Mayo 968.) Ms. Jones showed the photo of the September 18 page to Dr. Said, and he admitted that he recognized it as his handwriting. Dr. Said then angrily accused Mayo of "setting him up" and refused to answer questions about the page.

18. Dr. Said was asked about the video file that he sent to Ms. Reid with a slideshow of photos of a procedure set to music, and he stated that he often creates videos like that. He denied there was anything inappropriate about his inclusion of Ms. Reid in the particular procedure photographed, but admitted PA's do not typically work in the operating room. He had no additional defense for the nature of the video he gave her, or the reaction it caused in Ms. Reid.

19. Based on documentation that had been uncovered in the investigation, Dr. Said was asked about his use of Mayo's travel card for personal purposes. Documentation shows that Dr. Said used his travel card for significant personal purchases, including more than $1,700 at a department store and $500 at a jewelry store, and he asked his secretary not to tell his wife about them. (**Exhibit D** [Mayo 884-885, Mayo 903].) Mayo's Travel Card Policy in effect at the time provided that the travel card should not be used for personal expenses, except on a limited basis while on a Mayo Clinic business related trip. (**Exhibit E** [Mayo 3488-3491]) Dr. Said admitted he has used his Mayo travel card for personal purposes, explaining his personal credit cards often did not work internationally, but that he always paid for the purchases after they were processed. Dr. Said had previously been warned about his use of Mayo's travel card, as documentation reviewed in the

8

investigation revealed: after receiving that warning, his response via email to his medical secretary was "What the Fuckkkkkkkkkkk? I don't want to apologize to those assholes. Next time I'll use this card in the nightclub." (**Exhibit F** [(Mayo 906-907)]). He also had Ms. Johnson book personal travel and further engaged in communications where he told Ms. Johnson he did not want his wife to know what he is doing and where he is traveling, and. (**Exhibit G** [Mayo 1139-1140].)

20. Also based on documentation uncovered in the investigation, Dr. Said was asked whether he had downloaded sexually explicit material to a Mayo Clinic computer from his personal cell phone, and he denied doing so. He was also asked if his phone contained pornographic material that may have transferred to a Mayo device, and he denied that as well.

21. Dr. Said was asked but refused to answer questions about Dr. Elena Ashikhmina. Dr. Said stated there was no pattern with the two situations, and claimed the situation with Dr. Ashikhmina had been investigated and not substantiated, despite the fact that he signed a coaching memo regarding the need to cease his prior behavior.

22. Dr. Said was provided every opportunity to present his version of events, including any additional information that could be relevant to the investigation. He was offered the opportunity to provide any supporting materials or identify witnesses who may have relevant information. During his interview, at no point did Dr. Said bring up claims of discrimination. Rather, Dr. Said stated his firm belief that the allegations had all been orchestrated by Dr. Dearani because of his professional jealousy toward Dr. Said. My impression was that Dr. Said was defensive and adversarial at times during our interview.

23. Investigation further revealed a number of emails that Dr. Said exchanged with Rachel Johnson, Dr. Said's medical secretary, and others, that were inappropriate and/or unprofessional. Several significant examples are detailed as follows. In November 2017, after HR had notified Dr. Said of complaints about his professionalism and boundaries in the workplace, he wrote to Ms. Johnson and told her he was planning to buy Secret Santa gifts that year from Victoria's Secret. (**Exhibit H** [Mayo 909-915].) Also in November 2017, Ms. Johnson was booking flights for Dr. Said, and she was told by a coworker that she should not be booking personal flights for Dr. Said. (**Exhibit I** [Mayo 1124-1128].) In response, Dr. Said says "Fuck Melanie," referring to the coworker who counseled Ms. Johnson not to make the arrangements. In January 2018, Ms. Jones communicated with the CVS Department about Mayo's policies addressing sexual harassment, and Dr. Said found it appropriate to forward it to his medical secretary and joke about whether she complained about him. (**Exhibit J** [Mayo 2486-87, 1992-93].)

24. Dr. Said engaged in profanity and vicious descriptions of Dr. Dearani and others. For instance, one email stated: "sounds fishy and I can smell Dearani all over it fuckkkk." (**Exhibit K** [Mayo 908].) Similarly, in September 2018, Dr. Said was scheduling a case with Dr. Ashikhmina, and she told him that Mayo was monitoring his weekend surgical activity closely, so he should think through labeling it as an emergent case to schedule it on a weekend. (**Exhibit L** [Mayo 1259-1261].) Dr. Said forwarded the message to Ms. Johnson, and told her Dr. Ashikhmina was threatening him, and that "[t]his is because of our shitty chair. Made every asshole in this fucking hospital able to look at us and talk to us this way." (*Id.*) Additionally, Dr. Said sent an email to Ms. Johnson, stating:

10

"trust me I'll give you the best service…you just need to get ready for it." (**Exhibit M** [Mayo 1268-1270].) Dr. Said also told Ms. Johnson that he and his wife hated Dr. Dearani, and that Dr. Dearani is jealous and doesn't appreciate what Dr. Said has done for Mayo, and will not find anyone to replace him if he left. (**Exhibit N** [Mayo 2457-2459], **Exhibit O** [Mayo 1869-1873].) Yet another message ended with Ms. Johnson telling Dr. Said they were not in a committed relationship. (**Exhibit P** [Mayo 1141-1143].) Investigation also revealed that Dr. Said used profanity or inappropriate language in connection with certain situations and people, or referred to his hatred for Dr. Dearani, in addition to the examples above. (**Exhibit Q** [Mayo 888]; **Exhibit R** [Mayo 1214-1217]; **Exhibit S** [Mayo 894]; .) These emails were not the type of professional communications that Mayo expects of its employees. In addition, we learned in our investigation that Dr. Said has purchased a snowblower for Ms. Johnson, which is not the type of gift that is typical for a surgeon to provide to his or her medical secretary.

25. Overall, the investigation Ms. Jones and I conducted revealed concerns regarding Dr. Said's professionalism, mutual respect towards colleagues, and inappropriate use of Mayo resources, including Mayo's travel card. Ms. Reid presented credible information that she was subjected to unwanted advances, inappropriate communications, excessive gifts, and emotional manipulation by Dr. Said.

26. Ms. Jones and I also interviewed Rachel Johnson, Dr. Dearani, Dr. Ashikhmina, and Melissa Erdman as part of the investigation.[4] Although Dr. Said provided

---

[4] For her part, Ms. Erdman shared during her interview that she had worked as a Physician Assistant with Dr. Said previously. She described that he was very enjoyable to work with

11

some names of other individuals to interview, we determined they were not likely to have relevant information to bear on the concerns that had been raised by Ms. Reid. For instance, one of the people Dr. Said suggested was Ms. Corissa Hebb, his former Physician Assistant who no longer worked at Mayo. Dr. Said worked with her before he worked with Ms. Reid. It appeared he wanted us to speak with her to confirm he had not engaged in sexual harassment or other inappropriate conduct with her. We did not believe such information was relevant to our investigation, so we did not interview her, or the other witnesses Dr. Said provided.

27. At the conclusion of the investigation, Ms. Jones and I provided Ms. Collins and her team with a report so that she could provide legal analysis and advice. At the conclusion of the investigation, on November 13, 2018, Ms. Collins provided the investigation report to members of the Executive Committee of Mayo Clinic's Personnel Committee ("PC Exec") team, Dr. Charanjarit Rihal, Stephanie Wendorff, and Steffany Guidinger, Dr. Dearani, as well as Joe Copa in order to communicate the privileged results and assessment from the investigation. Ms. Jones and I were included on that communication and we provided factual input about the investigation findings necessary for further legal advice. The Cardiovascular Surgery Department and the Personnel Committee was then responsible for making a decision about disciplinary action for Dr. Said. I was not involved in making that decision, though I provided input regarding the

---

at first, but he then started to engage in behaviors that made her uncomfortable, such as regularly buying her coffee, purchasing gifts for her children, purchasing her a pair of eyeglasses from Egypt, and purchasing her other trinkets and keychains.

investigation and its findings. Based on the investigation Ms. Jones and I conducted, our recommendation was that Dr. Said had violated Mayo's policies and we supported recommending termination of his employment.

28. Prior to signing this Declaration, I was provided with a full opportunity to carefully review this Declaration and freely make any corrections and additions of any kind. I verify that the information I have provided in this Declaration is true and correct.

**PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.**

Signature: _[signature]_    Date: April 29, 2021

4836-1266-7110.2 / 087104-1015

13