UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Sameh Mahmoud Mohamed Said, MD,                    File No. 20-cv-927 (ECT/JFD)

        Plaintiff,

v.                                                                    **OPINION AND ORDER**

Mayo Clinic and Joseph Albert Dearani, MD,

        Defendants.

---

Lawrence P. Schaefer and Makenzie L. Krause, Shaefer Halleen, LLC, Minneapolis, MN, for Plaintiff Sameh Mahmoud Mohamed Said, MD.

Kathryn Mrkonich Wilson, Emily A. McNee, and Stephanie D. Sarantopoulos, Littler Mendelson, PC, Minneapolis, MN, for Defendants Mayo Clinic and Joseph Albert Dearani, MD.

---

In a twelve-count Amended Complaint, Dr. Sameh Mahmoud Mohamed Said alleges that Defendant Mayo Clinic violated federal and state laws—including statutes forbidding discrimination on the basis of race, national origin, and religion—when it took adverse actions against him relating to his employment. Dr. Said also has asserted four of his twelve claims against his former supervisor, Dr. Joseph Dearani. Mayo Clinic and Dr. Dearani seek summary judgment, and their motion will be granted. Dr. Said has not identified record evidence that reasonably would support a jury verdict in his favor on any of his claims.

I[1]

*Plaintiff is a surgeon, and Defendants are his former employer and supervisor.*  Dr. Said is a cardiovascular surgeon who specializes in pediatric and adult congenital heart surgery.  Said Decl. ¶¶ 2, 14–15 [ECF No. 92].  He is an Egyptian national, a practicing Muslim, and he identifies as an African American.  Said Dep. 53, 59 [ECF No. 73-1]; Am. Compl. ¶¶ 16, 17 [ECF No. 1-1].  Mayo is a nonprofit organization headquartered in Rochester, Minnesota, that operates "three major sites and health systems that employ over 4,000 physicians and over 60,000 allied health staff."  Rihal Decl. ¶ 2 [ECF No. 69]; Am. Compl. ¶ 10.  Dr. Dearani is a Mayo-employed cardiovascular surgeon.  Dearani Decl. ¶ 2 [ECF No. 66].  Dr. Dearani shares Dr. Said's specialization in pediatric and adult congenital heart surgery.  *Id.*

*Dr. Said's Mayo employment began in July 2015.*  Dr. Said's relationship with Mayo dates to 2008, when he began a six-year residency in general and cardiovascular surgery.  Said Decl. ¶ 2.  After finishing his Mayo residency, Dr. Said completed a one-year fellowship in pediatric and congenital cardiac surgery at Stanford University.  *Id.*  After his fellowship, Dr. Said hoped to return to Mayo "as a full time Senior Associate Consultant" in Mayo's Department of Cardiovascular Surgery.  *Id.* ¶ 5.  Dr. Said felt confident Mayo would hire him because he had performed well as a resident and because "many" doctors in the Department supported his hire.  *Id.*  Dr. Dearani—who worked with Dr. Said during his residency—was less supportive.  Dr. Dearani told Dr. Said that Mayo preferred to hire

---

[1]    Unless noted otherwise, the facts are either undisputed or described in a light most favorable to Dr. Said.  Fed. R. Civ. P. 56(a).

someone with at least five years' experience post-residency and fellowship.  *Id.* ¶ 6. Regardless, Mayo hired Dr. Said in July 2015, and as Department chair, Dr. Dearani had ultimate decision-making authority over Dr. Said's hire.  Dearani Decl. ¶ 3.  Dr. Said's hiring as a Senior Associate Consultant offered the possibility of promotion to a more permanent "Consultant" position after three years.  Said Dep. 119; Dearani Decl. ¶ 4; ECF No. 91-16.

*Dr. Said's initial job performance received mixed though mostly positive reviews.* Over Dr. Dearani's insistence that he perform only adult surgery, Dr. Said expanded his practice to include pediatric surgery.  Said Decl. ¶¶ 14–15; Said Dep. 70.  Dr. Dearani advised Dr. Said to temper his workload on "multiple occasions."  Said Dep. 71–72.  In one email, Dr. Dearani urged Dr. Said to get his practice "under control" after staff complained he was overbooking surgical procedures and "keeping OR teams into the night for elective cases."  ECF No. 78-5.  In a December 2016 "360 review"—a review process that includes obtaining information from an employee's subordinates, peers, and supervisors, ECF No. 76-3—Dr. Said scored well in patient-facing and skills-based competencies, ECF No. 76-17.  Dr. Said received "below expectations" marks, however, in "interpersonal and communication" and "professionalism" competencies.  *Id.*  Notes from summer and fall 2017 meetings with Dr. Said reflected a similar trend of mostly positive reviews regarding "surgical outcomes" and "productiv[ity] from a clinical standpoint" on the one hand, but recorded growing concerns about overwork and professionalism, on the other.  ECF Nos. 78-6, 75-8.

*In October 2017, two Mayo anesthesiologists complained of unwelcome advances by Dr. Said.* One anesthesiologist reported that Dr. Said "persistently pursued a personal relationship with her knowing she was in a relationship with someone else" and sent many text messages declaring his love for her. Guidinger Decl. ¶¶ 4–5 [ECF No. 67]; *see* ECF No. 67-1 at 64–67; Said Dep. 89–94. A second anesthesiologist described receiving "an increasing number" of lunch and dinner invitations and text messages outside of work, including late at night, from Dr. Said. *See* Guidinger Decl. ¶¶ 4–5; ECF No. 67-1 at 58–67; Said Dep. 89–98. As part of Mayo's investigation of these complaints, Dr. Said met with Human Resources Director Steffany Guidinger on October 20. Guidinger Decl. ¶ 5; ECF No. 67-1 at 53–54; Said Dep. 79–82, 85–86; ECF No. 73-3. The next day, Dr. Said was injured in a car accident, and his injuries required surgery on one of his hands and a temporary absence from work. Said Dep. 101.

*In December 2017, Mayo warned Dr. Said regarding his behavior and delayed consideration of his promotion to Consultant.* Dr. Said returned to Mayo on December 4 and met with Dr. Dearani and Renee Jones, the Department of Cardiovascular Surgery's Operations Manager. Said Dep. 118; Jones Decl. ¶ 2 [ECF No. 68]. At the meeting, Dr. Dearani, Jones, and Dr. Said discussed the contents of a document entitled "Coaching Memo." Said Decl. ¶ 22; *see* ECF No. 73-4. In the document, Dr. Dearani described three overarching concerns with Dr. Said's performance. First, Dr. Dearani noted a "[l]ack of mutual respect and teamwork" with colleagues. Citing feedback from Dr. Said's 360 review, Dr. Dearani wrote that Dr. Said could be "accusatory of peers," "angry," and "unilateral and dictating rather than collaborative." ECF No. 73-4. Second, Dr. Dearani

4

wrote that Dr. Said had crossed "[p]rofessional boundaries" with the anesthesiologists who had filed complaints. *Id.* Finally, Dr. Dearani noted that Dr. Said's work habits had grown "[u]nsustainable" for his colleagues. *Id.* A "Remediation and Expectations" section followed those concerns, instructing Dr. Said to, among other things, "[c]ease pursuing female colleagues by sending text messages and/or inquiries for lunch/dinner or personal outings," keep interactions with co-workers "professional and work related," and "[e]ngage with Dr. Dearani regularly as a mentor." *Id.* Last, the Coaching Memo included a "Consequences" section that read:

> At this time, due to the nature of these concerns, we will delay in your promotion to Consultant to allow sufficient time for improved 360 evaluations. It is important for you to know that any lack of adherence to these expectations, or further instances of unacceptable behavior will result in lack of promotion to Consultant status at Mayo Clinic.

*Id.* Dr. Said signed the Coaching Memo. *Id.* According to Dr. Said, Dr. Dearani verbally promised during the meeting that Mayo would begin his "formal consideration for promotion to Consultant" in three months. Said Decl. ¶ 22.

*In May 2018, Dr. Said's consideration for promotion to Consultant was again delayed, this time to late December 2018.* In March 2018, Dr. Said asked Dr. Dearani about the status of his consideration for promotion to Consultant. In response, Dr. Dearani denied having promised to consider Dr. Said's promotion within three months of their December 2017 meeting. Said Dep. 115–20. In May, Dr. Dearani proposed extending Dr. Said's appointment as a Senior Associate Consultant and deferring a decision on his promotion:

> I would like to propose an extension of Dr. Sameh Said's SAC appointment with the possibility of promotion for advancement to a permanent staff position in six months.  While Dr. Said's clinical outcomes are strong and he has been productive from a research standpoint, as you are aware, he has received coaching related to his interpersonal skills, professional relationships and communication in the workplace.  Dr. Said has shown some improvement in this area and I am optimistic that this additional time will better position him to be successful as a Consultant.

ECF No. 78-3.  Consistent with Dr. Dearani's proposal, Mayo extended Dr. Said's appointment as Senior Associate Consultant to December 25, 2018.  ECF No. 78-4.

*Larger concerns prompt Mayo to review the Department of Cardiovascular Surgery.*  During the spring and summer of 2018, "higher than normal turnover" and "concerns related to collaboration, mutual respect, and professionalism" prompted Mayo to perform a "workplace assessment" within the Department.  ECF No. 82 at 3.  As part of that assessment, a human resources team interviewed 43 "stakeholders"—including Dr. Said—about interactions between the Department and Intensive Care Unit.  *Id.*  In August, Mayo provided Dr. Said and other surgeons in the Department with written responses and criticisms received during the assessment.  On August 14, Dr. Said met with Dr. Dearani and Jones to discuss information specific to him.  ECF Nos. 76-14, 76-15; *see* ECF Nos. 76-11, 76-12.  Dr. Said's review included concerns regarding unprofessional behavior with staff and overbooking elective cases during "off hours," which contributed to staff burnout.  ECF No. 82 at 22–23.  Information obtained in the assessment also indicated that Dr. Said's pursuit of relationships with the anesthesiologists continued to have a "perceived impact to the work unit due to lingering discussions amongst employees."  *Id.* at 23.  Based on this

information, Mayo again extended Dr. Said's Senior Associate Consultant appointment—delaying consideration of his promotion to Consultant—this time to June 2019. Said Dep. 145–47; ECF No. 76-15.

*In October 2018, a physician assistant reported that Dr. Said persistently had pursued an unwelcome relationship, prompting Mayo to place Dr. Said on administrative leave and investigate.* Said Dep. 149, 194–95. The physician assistant, "R.R.," reported that Dr. Said had sent personal text messages expressing his love and desire for a romantic relationship despite knowing R.R. was in a relationship. *See, e.g.*, ECF No. 79 at 46–49. Dr. Said bought R.R. gifts, including perfume, a keychain with an engraved picture of her dog, and a ring. Said Dep. 149, 194–95. R.R. met with Department Operations Manager Jones on October 8 to discuss her complaint. Dr. Said called R.R.'s cell phone five times during that meeting. ECF No. 73-6; Said Dep. 166–67. The next day, Dr. Said met with Jones, Guidinger, and Dr. Dearani, who informed Dr. Said that he was being placed on administrative leave. *Id.*; ECF No. 73-5. Mayo convened an investigative team consisting of legal counsel, a human resources investigation specialist, and Jones. Dearani Decl. ¶ 7. The team interviewed R.R., Dr. Said, and four other Mayo employees during its investigation. C. Johnson Decl. ¶¶ 6, 15 [ECF No. 70]; Said Decl. ¶ 30.

*The investigation resulted in a November 2018 recommendation that Dr. Said's employment be terminated.* Dr. Said was informed of the recommendation in a letter dated November 19. ECF No. 73-9. The letter explained that the recommendation would be considered by a Termination Review Committee that would convene on December 4 and would "review all relevant evidence" to decide whether termination was appropriate. *Id.*

7

at 2.  The letter described investigative findings in detail and determined that Dr. Said's

"conduct and overall performance" violated a series of Mayo policies.  *Id.* at 6.  The letter

described Dr. Said's pursuit of relationships with the anesthesiologists as "persistent, not

reciprocated, and unwelcome."  *Id.* at 2.  The letter also summarized Dr. Said's behavior

toward R.R.:

> Examples of your conduct included, but were not limited to the
> following: (1) Increasing frequency of text messages of a
> personal nature; (2) the receipt of an expensive ring that the
> complainant did not solicit; (3) daily purchasing of coffee and
> other breakfast items that were not requested; (4) pressing the
> complainant to attend [a] conference with your [sic] and
> offering to pay for her attendance ("nobody will find out"); (5)
> receipt of text messages that made the complainant feel
> uncomfortable; (6) professing your love for the complainant in
> between patient rooms on rounds; (7) pressing the complainant
> to make a decision between you and her significant other; (8)
> stating that you would marry the complainant tomorrow and
> leave everything for her; and (9) your inability to cease
> communications when asked, and the failure to recognize that
> your conduct was making her uncomfortable.

*Id.* at 4.  The letter described how Dr. Said's desire to have a relationship with R.R. "spilled

over into direct patient care" when he arranged for her presence during a complex surgery

to be "in close physical proximity to her" without any medical need.  *Id*.  The letter further

reported that Dr. Said showed a "retaliatory motive" toward R.R.  *Id.* at 5.  Specifically,

after R.R. asked Dr. Said to stop and returned his gifts, Dr. Said made demands on her

time, described her performance more negatively than he had before, and authored a

document that "evinced this dynamic."  *Id.*  Finally, the letter identified other conduct

warranting termination, including a demonstrated lack of respect and awareness of

misconduct in emails and interactions with colleagues, dishonesty throughout the

investigation, downloading sexually explicit material to a Mayo computer, repeated misuse of a Mayo travel card and a secretary's time for personal expenses, and feedback from the July 2018 climate assessment showing a negative perception of Dr. Said among his colleagues.  *Id.* at 2–6; *see* ECF Nos. 70, 70-1.

*Dr. Said resigned his employment on December 3, 2018.*  On November 21, Dr. Said emailed Dr. Charanjit Rihal, Mayo Clinic Personnel Committee chair, acknowledging receipt of the November 19 letter, explaining that he was considering resigning, and asking whether, if he did, Mayo would make any disclosures to the Minnesota Board of Medical Practice.  ECF No. 73-10.  Dr. Rihal responded that, resignation or not, Mayo would be "obligated . . . under the law to file a report to the state boards in which [Dr. Said was] licensed."  *Id.*  Dr. Rihal volunteered that Mayo would "clarify that there were no clinical care[] or patient-related issues."  *Id.*  On December 3, a day before the Termination Review Committee was to convene, Dr. Said resigned.  ECF No. 77-3.

*Roughly two weeks later, Dr. Said accepted employment with the University of Minnesota.*  On December 19, Dr. Said was offered dual employment with the Department of Surgery at the University of Minnesota Medical School and University of Minnesota Physicians.  ECF Nos. 74-6, 74-7.  Dr. Said accepted that offer and began this employment on or around March 31, 2019.  Said Dep. 247.

*Dr. Said brought this suit in May 2019.*  Dr. Said filed a discrimination charge with the Equal Employment Opportunity Commission on December 17, 2018, that was cross-filed with the Minnesota Department of Human Rights.  ECF No. 78-20.  Dr. Said received a Notice of Right to Sue from the EEOC in April 2019.  ECF No. 74-8.  The Minnesota

9

Department of Human Rights dismissed Dr. Said's charge of discrimination. *Id.* at 4. Dr. Said brought this case originally in Minnesota district court, and served Defendants on May 1 and 2, 2019. Defs.' Not. of Removal ¶ 1 [ECF No. 1]. Defendants timely removed after Dr. Said amended his state-court complaint to include federal claims. *See id.* ¶ 2. Together, Counts I through VI of Dr. Said's Amended Complaint assert claims that Mayo discriminated against Dr. Said based on his race, religion, and national origin under Title VII of the Civil Rights Acts, 42 U.S.C. § 2000e, and the Minnesota Human Rights Act, Minn. Stat. § 363A, *et seq.* ("MHRA"). Count VII alleges reprisal against Mayo under the MHRA, § 363A.15. Count VIII alleges that Mayo retaliated against Said in violation of the Minnesota Whistleblower Act, Minn. Stat. § 181.392. Counts IX through XII assert claims for tortious interference with future employment, defamation, invasion of privacy, and conversion against Mayo and Dr. Dearani. Am. Compl. ¶¶ 135–220.

*In May 2020, the Minnesota Board of Medical Practice reprimanded Dr. Said.* ECF No. 78-19. Dr. Said entered a Stipulation and Order with the Board's Complaint Review Committee in which he agreed that he had resigned after Mayo recommended his termination in part for "sexually harassing female staff and portraying unprofessional and disrespectful behaviors." ECF No. 78-18 ¶ 3(c)(ii). Dr. Said "acknowledged that he pursued romantic relationships with colleagues in 2016 and 2018." *Id.* ¶ 3(d). The Board ordered Dr. Said to pay a fine, complete pre-approved coursework, and to meet monthly with a supervising physician. *Id.* ¶ 5(a)–(d). Dr. Said entered the Stipulation and Order voluntarily and "without threat or promise by the Board or any of its members, employees, or agents." *Id.* at 6.

II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255 (citation omitted).

A

The Parties agree, and the law is clear, that Dr. Said's Title VII and MHRA claims (appearing in Counts I through VI of his Amended Complaint) are analyzed "under the same standards."  Mem. in Opp'n at 26 n.9 [ECF No. 90]; Mem. in Supp. at 16–22 [ECF No. 65]; *see Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 972 (8th Cir. 2012) ("The same analysis applies to both Title VII and MHRA claims.") (collecting cases).  Dr. Said alleges that Mayo discriminated against him based on his African American race, his Muslim religion, and his Egyptian national origin.  Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, . . . religion, . . . or national origin."  42 U.S.C. § 2000e-2(a)(1).  The MHRA also makes it "an unfair employment practice for an employer, because of race, . . . religion, [or] national origin, . . . to discharge an employee"

11

or "discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment."  Minn. Stat. § 363A.08, subd. 2.  "An employer is entitled to summary judgment on an employee's discrimination claim unless the employee (1) presents direct evidence of discrimination, or (2) creates a sufficient inference of discrimination under the *McDonnell Douglas* framework." *Findlator v. Allina Health Clinics*, 960 F.3d 512, 514 (8th Cir. 2020).

Dr. Said has not identified direct evidence of discrimination.  "Direct evidence consists of a specific link between a challenged decision and discriminatory animus."  *Id.* "Direct evidence is distinguished from 'stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process.'" *Elam v. Regions Fin. Corp.*, 601 F.3d 873, 878 (8th Cir. 2010) (citation omitted).  "Direct evidence does not include statements by decisionmakers that are facially and contextually neutral."  *Aulick v. Skybridge Americas, Inc.*, 860 F.3d 613, 620 (8th Cir. 2017) (citation omitted).  Nor does it include statements made years before any adverse action occurred. *Muor v. U.S. Bank Nat'l Ass'n*, 716 F.3d 1072, 1077 (8th Cir. 2013).  Here, the only possibly direct evidence Dr. Said identifies is a statement reportedly made by Dr. Dearani describing Dr. Said as "not Mayo material."[2]  Dr. Said testified that a third person told him that Dr. Dearani uttered this statement when discussing Dr. Said's candidacy for a Senior Associate Consultant position during a 2015 hiring meeting.  Said Decl. ¶ 11.  Dr. Said

---

[2]     Dr. Said identified this statement in his declaration.  Said Decl. ¶ 11.  In his brief opposing summary judgment, Dr. Said did not advance a "direct evidence" argument or characterize this statement as direct evidence of discrimination.  *See* Mem. in Opp'n at 26–33.

understood the statement as a "derogatory reference to [his] status as a Muslim minority physician." *Id.* The statement is not direct evidence of discrimination for at least two reasons. First, no reasonable fact finder could conclude that the statement is not facially and contextually neutral. Dr. Said identifies no facts that might permit a finding that the statement reflected discriminatory animus; how he might have understood the statement does not matter. *Aulick*, 860 F.3d at 620. Second, Dr. Said has shown no link between the remark and adverse action. The remark occurred in a context that had no relationship to any subsequent adverse action taken against Dr. Said.

Because Dr. Said has not identified direct evidence of discrimination, his claims are analyzed under the burden-shifting framework set forth originally in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). Dr. Said must establish a prima facie case of race, religion, or national origin discrimination by showing: (1) he belongs to a protected class; (2) he met Mayo's legitimate expectations; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *Guimaraes*, 674 F.3d at 973–74 (citation omitted). If Dr. Said meets this burden, then the burden of production shifts to Mayo to articulate a legitimate, nondiscriminatory reason for adverse treatment. *Id.* If Mayo meets that burden, then the ultimate burden falls on Dr. Said "to produce evidence sufficient to create a genuine issue of material fact regarding whether [Mayo]'s proffered nondiscriminatory justifications are mere pretext for intentional discrimination." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1046 (8th Cir. 2011) (en banc) (citation omitted). Dr. Said "retain[s], at all times, the ultimate burden of proof and persuasion" that Mayo discriminated against him. *Id.*

Dr. Said attempts to show the prima facie case's fourth element with a disparate-treatment theory. To survive summary judgment on this theory, Dr. Said must identify at least one other employee who was "similarly situated in all relevant aspects." *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000); *Philip v. Ford Motor Co.*, 413 F.3d 766, 768 (8th Cir. 2005). "[I]ndividuals used as comparators 'must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Gilmore v. AT & T*, 319 F.3d 1042, 1046 (8th Cir. 2005) (quoting *Clark*, 218 F.3d at 918). "[V]iolations treated differently need only be of 'comparable seriousness' and not the 'exact same offense.'" *McKey v. U.S. Bank Nat'l Ass'n*, 978 F.3d 594, 600 (8th Cir. 2020) (quoting *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013)). "Where evidence demonstrates that a comparator engaged in acts of 'comparable seriousness' but was disciplined differently, a factfinder may decide whether the differential treatment is attributable to discrimination or some other cause." *Ridout*, 716 F.3d at 1085.

Dr. Said has not identified evidence justifying a reasonable inference that he suffered disparate treatment. Dr. Said argues that the adverse employment actions he suffered—which he identifies as "delays in [his] promotion to Consultant, and the harsh responses to the two internal complaints made against [him], culminating in the recommendation for termination"—stand "in inexplicable contrast to" Mayo's treatment of another physician, cardiac surgeon Simon Maltais, M.D. Mem. in Opp'n at 30. Dr. Maltais is white, of Canadian descent, and, though he was "raised Catholic," now identifies as an atheist. Maltais Dep. 13 [ECF No. 78-8].

14

The evidence of Mayo's treatment of Dr. Maltais, viewed in Dr. Said's favor, does not give rise to an inference of discrimination.  Mayo hired Dr. Maltais as a Senior Associate Consultant in August or September 2015.  Maltais Dep. 13–15.  The record shows these reports of misconduct by Dr. Maltais:

- An internal complaint criticized Dr. Maltais's decision not to take a patient off life support in April 2017.  ECF No. 76-28.

- Two August 2017 complaints described Dr. Maltais as rude, disrespectful, and frightening with staff during incidents that took place in the presence of patients.  ECF Nos. 77-10, 77-11.

- Several complaints reported one incident in which Dr. Maltais grew angry with a nurse practitioner and bumped into her with his shoulder as he stormed out of a room.  ECF Nos. 77-9, 77-14, 77-16.

- One complainant reported sporadic episodes of "inappropriate, disrespectful, unethical, and bully[ing] behavior."  ECF No. 77-12, 77-15.

- An internal complaint stated that Dr. Maltais "behaved and spoke very disrespectfully" to a medical device representative in August 2017.  ECF No. 77-13.

- A complainant reported overhearing that when Dr. Maltais asked a nurse to take a call during a surgical procedure, the nurse saw a pornographic image on his personal cell phone.  ECF No. 77-17.

- A Mayo doctor reported learning from colleagues that Dr. Maltais became inebriated at a symposium and needed to be escorted out of a bar.  ECF No. 76-8.

Like Dr. Said, Dr. Maltais's performance was reviewed through the 2018 Department-wide assessment.  As to Dr. Maltais, the assessment report noted performance problems, including his unavailability, a perception that he "pushed to get rid of" another doctor for

15

personal reasons, an ineffective communication style, that he "rub[bed] people the wrong way," and an erosion of trust caused by the incident in which he bumped into a nurse practitioner.  ECF No. 82 at 23.  Dr. Maltais's 360 review revealed concerns about his "interpersonal and communication skills," including that he could be "abrasive," "retaliatory," "disrespectful," and prone to "outbursts of anger."  ECF No. 91-2 at 7–9.

No reasonable fact finder could conclude that Dr. Maltais's conduct was of "comparable seriousness" to Dr. Said's.  It is true that Dr. Said and Dr. Maltais share similar documented criticisms centering around their disrespectful, abrasive, and unprofessional behaviors.  But Dr. Said's misconduct was different in a dispositive respect: three different colleagues reported Dr. Said for pursuing unwelcome romantic relationships with them, and he persisted in this behavior after those colleagues and Mayo told him to stop.  It is undisputed that this dissimilar aspect of Dr. Said's behavior was the primary reason justifying the recommendation that he be terminated.  *See* ECF No. 73-9.  Without other circumstances giving rise to an inference of discrimination, the lack of a legally sufficient comparator warrants summary judgment in Mayo's favor.  *See Mervine v. Plant Eng'g Servs., LLC*, No. 14-cv-3080 (ADM/TNL), 2016 WL 1273195, at *10 (D. Minn. Mar. 31, 2016).

If Dr. Maltais were a legally sufficient comparator, no reasonable juror could infer discrimination because Mayo's response to Dr. Maltais's misconduct was not materially different from its response to Dr. Said's misconduct.  Dr. Dearani met with Dr. Maltais in July 2018 to discuss his 360 review, and informed Dr. Maltais that he would be "terminally extended" until the end of 2018.  ECF No. 76-9.  In other words, Dr. Maltais could remain

16

a Senior Associate Consultant with Mayo for the rest of 2018, when he would be terminated without the possibility of promotion to Consultant.  ECF No. 77-7; Dearani Dep. 32 [ECF No. 77-6].  At the same time, Mayo was extending Dr. Said's Senior Associate Consultant appointment and deferring his promotion eligibility (a second time) to June 2019.  Dr. Said's Senior Associate Consultant appointment would continue longer than Dr. Maltais's, and Mayo would still consider Dr. Said for the Consultant position.  It was only after a third complaint of unwanted advances in October 2018 and an investigation that found a flagrant (and substantiated) pattern of misconduct that the recommendation was made to terminate Dr. Said's employment.

For these same (and other) reasons, if Dr. Said had shown a prima facie case, he hasn't shown that Mayo's asserted justification is pretext.  Mayo met its burden of production with evidence showing that it delayed consideration of Dr. Said's promotion and later recommended his termination because of three separate complaints of unwelcome advances by other employees and other misconduct.  *See* ECF No. 76-15 (summarizing reasons for deferring Said's promotion); ECF No. 73-9 (summarizing reasons for Said's recommended termination).

After an employer asserts a legitimate basis for acting, a discrimination plaintiff shows pretext either by showing an employer's explanation is "unworthy of credence . . . because it has no basis in fact" or "by persuading the court that a [prohibited] reason more likely motivated the employer."  *Torgerson*, 643 F.3d at 1047 (citation omitted). Here, Dr. Said's pretext arguments are not persuasive.  Dr. Said cites his "excellent annual reviews," "exceptional[] productivity," "uniformly excellent surgical and clinical care

outcomes, and extensive publications" as evidence that he deserved a promotion. Mem. in Opp'n at 30. No doubt there are cases where an employee's strong employment history can be compelling evidence of pretext, and Dr. Said's surgical skills seem not in dispute. But "evidence of a strong employment history will not alone create a genuine issue of fact regarding pretext and discrimination." *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1020 (8th Cir. 2005). Dr. Said's misconduct was distinct from his surgical abilities, pervasive, and "not inconsistent with the reason[s] offered" by Mayo for delaying Dr. Said's promotion. *Main v. Ozark Health, Inc.*, 959 F.3d 319, 326 (8th Cir. 2020). Nor is Dr. Said's strong performance as a surgeon indicative of pretext as to the ultimate recommendation that he be terminated, especially given the "culminating event" in October 2018, when R.R. reported him. *See Canning v. Creighton Univ.*, 995 F.3d 603, 613 (8th Cir. 2021). Dr. Said also argues that Mayo's failure to provide him sufficient performance reviews throughout his employment, including by not conducting a 360 review for 2017, contravened its own policies and shows pretext. Dr. Said points specifically to evidence showing that Dr. Maltais received multiple 360 reviews. *See* Maltais Dep. 29–31. "[I]n some circumstances, an employer's violation of its own policies may be indicative of pretext." *Dixon v. Pulaski Cnty. Special Sch. Dist.*, 578 F.3d 862, 871 (8th Cir. 2009). But disparate policy enforcement does not show pretext when the record is "replete with documentation that [the plaintiff] was advised of his poor performance and that failure to improve may result in an adverse employment action." *Elsherif v. Mayo Clinic*, 18-cv-2998 (DWF/KMM), 2021 WL 1634797, at *7–8 (D. Min. Apr. 27, 2021). Here, if Mayo required an "annual review" of Senior Associate Consultants, its departure from that

policy was legally insignificant. Dr. Said received critiques regarding his performance and conduct in at least September 2017, December 2017, and during multiple meetings in August 2018. ECF Nos. 75-8, 73-4, 76-11, 76-14. Mayo warned Dr. Said that "further instances of unacceptable behavior w[ould] result in lack of promotion to Consultant status," ECF No. 73-4, and later that consequences for failure to correct his behavior could "include the end of [his] appointment at Mayo," ECF No. 76-14.

To summarize, viewing the evidence and all reasonable inferences in his favor, Dr. Said has not shown a prima facie case that Mayo discriminated against him based on his race, religion, or national origin. Dr. Said also has not shown a genuine dispute that Mayo's identified nondiscriminatory reasons for taking any adverse action were pretext. As a result, Mayo's summary-judgment motion will be granted as to Counts I through VI.[3]

---

[3]     Mayo argues that summary judgment also is appropriate against Dr. Said's Title VII claims because they are untimely under Title VII's 90-day limitations period. 42 U.S.C. § 2000e-5(f)(1). Dr. Said brought suit in Minnesota state district court within 90 days of receiving a Notice of Rights from the EEOC, though his original Complaint did not include the Title VII claims he now asserts. *See* ECF No. 1-4. Dr. Said added his Title VII claims in his Amended Complaint, which he filed outside Title VII's 90-day limitations period. Dr. Said's original Complaint included MHRA claims for race, religion, and national origin discrimination, and those claims depended on the same facts alleged in Dr. Said's Amended Complaint. *See* ECF No. 1-4 at 106–147. As a result, there really isn't any question that Dr. Said's Title VII claims relate back to the date of his original Complaint and are, therefore, timely. Fed. R. Civ. P. 15(c)(1)(B); *see Maegdlin v. Int'l Ass'n of Machinists and Aerospace Workers, Dist. 949*, 309 F.3d 1051, 1052–53 (8th Cir. 2002) (Title VII and MHRA gender discrimination claims related back when original complaint stated the lawsuit was generally one "for discrimination on the basis of gender"). Mayo also argues that Dr. Said's MHRA claims are time-barred insofar as they are premised on acts before December 17, 2017 (365 days before his charge-filing). Mem. in Supp. at 16. Resolving this argument would require deciding a seemingly complex and fact-intensive state-law issue: whether discriminatory acts occurring outside the limitations period were part of a "series of related acts" that extended into it. *See Abel v. Abbott Nw. Hosp.*, 947 N.W. 2d 58, 70–71 (Minn. 2020). It is not necessary to decide this question in view of the

B

In Count VII of his Amended Complaint, Dr. Said asserts a reprisal claim under § 363A.15(1) of the MHRA. Section 363A.15(1) prohibits "reprisal against any person because that person: . . . opposed a practice forbidden under [the MHRA] or has filed a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing[.]" The theory underlying this claim is straightforward: Dr. Said alleges that Mayo took adverse action against him because he objected to Mayo's discrimination against him. Dr. Said first raised a claim of discrimination in a letter from his counsel to Mayo dated October 15, 2018, after Mayo had placed him on administrative leave. ECF No. 76-1; Said Dep. 135–38. Dr. Said claims that Mayo retaliated by recommending his termination and by reporting his resignation to the Minnesota Board of Medical Practice. Said Dep. 217–19; Am. Compl. ¶ 175.[4]

Dr. Said has not identified evidence reasonably showing a causal link between protected activity and an adverse employment action. Dr. Said first attempts to identify direct evidence. This is obviously appropriate, *Liles v. C.S. McCrossan*, 851 F.3d 810, 818 (8th Cir. 2017), but none of the evidence Dr. Said identifies qualifies as direct. Dr. Said cites a "derogatory description" of his discrimination complaint in the letter recommending

---

determination that summary judgment is appropriate against Dr. Said's MHRA discrimination claims on their merits.

[4]    In his Amended Complaint, Dr. Said also alleges that Mayo retaliated by placing him on involuntary administrative leave. Am. Compl. ¶ 175. This theory is not viable. There is no genuine dispute that Dr. Said's counsel sent the letter *after* Mayo placed Dr. Said on administrative leave. Said Dep. 135–38.

his termination and in an email from Dr. Rihal declining Dr. Said's requests to discuss the investigation. Mem. in Opp'n at 34–35. Dr. Said argues that these communications show that Mayo cited his lawyer's letter as "justification" for adverse employment action, *id.* at 35, but this argument mischaracterizes the evidence on which it relies. The letter recommending his termination and Dr. Rihal's email merely mention that Dr. Said's complaint of discrimination was found to be false, not that an adverse action would be taken because of his complaint. ECF Nos. 73-8, 73-9. Neither is direct evidence of retaliation. *See McCullough v. Univ. of Ark. for Med. Sci.*, 559 F.3d 855, 864–65 (8th Cir. 2009) (holding that a termination letter stating plaintiff was fired for sexual harassment and "*not* for 'filing a complaint in general,' but rather for filing *untruthful* complaints," was not direct evidence of retaliation). Dr. Said also cites an anonymous complaint filed with Mayo in October 2018 regarding the behavior of another doctor. Mem. in Opp'n at 34. In it, the complainant "wonder[s] if something happened to [] Said because of his race" and whether the subject of the complaint "[got] away with things because he is a white man." ECF No. 91-28 at 3. The complaint alludes to the possibility of discrimination; it does not mention retaliation or that Dr. Said engaged in any protected activity. In any case, the complaint is patently speculative and does not approach "the causal strength of . . . proof" to be direct evidence. *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). Dr. Said also points to a November 2018 email—apparently not in the record—in which Dr. Rihal wrote of Mayo's investigation into R.R.'s complaint: "The investigation report will be presented to us next week. I don't think this will end well." Rihal Dep. 141–42 [ECF No. 76-30]. Though the email does not mention Dr. Said's claim of discrimination, Dr. Said argues it

must be "inferred" to.  Mem. in Opp'n at 35 n.11.  That inference would be improper.

Direct evidence usually "comprises remarks by decisionmakers that reflect, *without*

*inference*, a discriminatory bias." *McCullough*, 559 F.3d at 861 (emphasis added); *see,*

*e.g.*, *Thompson v. Kanabec Cnty.*, 958 F.3d 698, 706–07 (8th Cir. 2020) (noting that direct

evidence of retaliation is usually "more blatant" than equivocal email).

Without direct evidence, Dr. Said's MHRA retaliation claim requires a prima facie

showing that (1) Dr. Said engaged in protected activity; (2) Mayo took adverse action

against him; and (3) there is a causal connection between the two.  *Chivers v. Wal-Mart*

*Stores, Inc.*, 641 F.3d 927, 932 (8th Cir. 2011); *Bahr v. Capella Univ.*, 788 N.W.2d 76, 81

(Minn. 2010).  "Generally, more than a temporal connection between the protected conduct

and the adverse employment action is required to present a genuine factual issue on

retaliation." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc).

"Evidence that the employer had been concerned about a problem before the employee

engaged in the protected activity undercuts the significance of the temporal proximity."

*Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002).  "Insubordinate

employees may not insulate themselves from discipline by announcing an intention to

claim discrimination just before the employer takes action."  *Hervey v. Cnty. of*

*Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008).  These rules determine the outcome here.

Mayo began its investigation and placed Dr. Said on leave *before* he lodged any claim of

discrimination.  The evidence supporting the investigation's findings is overwhelming and

not genuinely disputed.  In this situation, the temporal connection alone—*i.e.*, that the

termination recommendation followed Mayo's receipt of the letter from Dr. Said's counsel—does not permit an inference of retaliation.

Minnesota law immunizes Mayo from Dr. Said's § 363A.15(1) claim insofar as Dr. Said complains about Mayo's report to the Minnesota Board of Medical Practice. Start with Mayo's statutory reporting obligation:

> Any hospital, clinic, prepaid medical plan, or other health care institution or organization located in this state shall report to the board any action taken by the institution or organization or any of its administrators or medical or other committees to revoke, suspend, restrict, or condition a physician's privilege to practice or treat patients in the institution, or as part of the organization, any denial of privileges, or any other disciplinary action. The institution or organization shall also report the resignation of any physicians prior to the conclusion of any disciplinary proceeding, or prior to the commencement of formal charges but after the physician had knowledge that formal charges were contemplated or in preparation. Each report made under this subdivision must state the nature of the action taken, state in detail the reasons for the action, and identify the specific patient medical records upon which the action was based.

Minn. Stat. § 147.111, subd. 2. Minnesota immunizes health-care institutions from civil liability for these duties. Minn. Stat. § 147.121, subd. 1 ("Any person, health care facility, business, or organization is immune from civil liability . . . for submitting a report to the board pursuant to section 147.111 or for otherwise reporting to the board violations or alleged violations of section 147.091."). Here, Dr. Said alleges only that Mayo reported his resignation, which occurred during an investigation into allegations of misconduct. Am. Compl. ¶¶ 126, 175. Dr. Said's summary-judgment brief neither expands on this

theory nor offers any reason why Mayo's report does not fall within § 147.121's grant of immunity.

C

In Count VIII of his Amended Complaint, Dr. Said asserts a retaliation claim under the Minnesota Whistleblower Act, Minn. Stat. § 181.392. "An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because: . . . the employee, . . . in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer . . . ." Minn. Stat. § 181.932, subd. 1. Courts analyze Whistleblower Act retaliation claims as they analyze MHRA claims. *See Wood v. SatCom Mktg., LLC*, 705 F.3d 823, 828–29 (8th Cir. 2013). Absent direct evidence of retaliatory animus, a prima facie case of retaliation under § 181.392 requires showing "(1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two." *Cokley v. City of Otsego*, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001) (quoting *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 444 (Minn. 1983)).

Dr. Said asserts two theories of retaliation under the Minnesota Whistleblower Act, but neither theory is trial worthy. Dr. Said's first theory repeats his MHRA reprisal theory—*i.e.,* that Mayo retaliated against him for the discrimination reported in his lawyer's October 2018 letter. Mem. in Opp'n at 37. This theory fails for the same reasons

Dr. Said's MHRA reprisal claim fails.[5]  *See supra* Part II(B); *see also Miller v. Bd. of Regents of Univ. of Minn.*, No. A18-2140, 2019 WL 4164898, at *3–4 (Minn. Ct. App. Sept. 3, 2019).

Dr. Said's second theory is that Mayo retaliated against him for a complaint lodged by Rachael Johnson, Dr. Said's medical secretary and scheduler, that Dr. Dearani violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") when Dr. Dearani discussed Dr. Said's "prognosis" and "timeline for recovery" with the surgeon who performed surgery on Dr. Said's hand following his October 2017 auto accident.  Said Decl. ¶¶ 17–18; Dearani Dep. 146.  Dr. Said posits that Mayo retaliated when he returned to work by (1) forcing him to sign the Coaching Memo on December 4, and (2) taking "adverse retaliatory actions throughout 2018, culminating in the unjustifiable recommendation to terminate [his] employment and not provide him the 'termination extension' granted to [Dr.] Maltais."  Mem. in Opp'n at 37–38.

Though circumstantial evidence may suffice, an inference of causation "must be reasonably supported by the available evidence; sheer speculation is not enough." *Salscheider v. Allina Health Sys.*, No. A13-2218, 2014 WL 3024290, at *4 (Minn. Ct. App. July 7, 2014) (quoting *Cokley*, 623 N.W.2d at 632).  As in the MHRA context, something more than temporal proximity is usually necessary.  *See, e.g., Chavez-Lavagnino v.*

---

[5]    This theory also fails because a Whistleblower Act claim based on "the same allegedly discriminatory practice and [] on identical factual statements and alleging the same injury or damages" as an MHRA reprisal claim is preempted by Minn. Stat. § 363A.04, the MHRA's exclusive-remedy provision.  *See Williams v. St. Paul Ramsey Med. Ctr., Inc.*, 551 N.W.2d 483, 484–86 (Minn. 1996); *accord Jung v. City of Minneapolis*, 187 F. Supp. 3d 1034, 1052 (D. Minn. 2016).

*Motivation Educ. Training, Inc.*, 767 F.3d 744, 750 (8th Cir. 2014) (employers' statements, along with temporal proximity, were sufficient evidence for causal link).   Intervening events that establish nondiscriminatory reasons for employer action may "undermine[] any causal inference that a reasonable person might otherwise have drawn from temporal proximity." *Freeman v. Ace Tel. Ass'n*, 467 F.3d 695, 698 (8th Cir. 2006) (affirming summary judgment where employee continued sexual relationship with colleague after promising not to, lied to employer, and misused company credit card between protected activity and adverse action); *Kiel*, 169 F.3d at 1136.

If Johnson's complaint of a purported HIPAA violation is protected activity attributable to Dr. Said, no reasonable juror could find a causal link between that complaint and Mayo's coaching or other adverse employment actions.   Mayo planned to implement coaching for Dr. Said in September 2017, months before the December HIPAA complaint. *See* ECF No. 75-8.   Responsible human resources personnel discussed coaching with Dr. Said again in October.   ECF No. 76-16.   Mayo also investigated complaints into Dr. Said's unwelcome advances toward the anesthesiologists in October.   As part of the investigation of those complaints, Dr. Said met with Mayo human resources personnel on October 20. Guidinger Decl. ¶ 5.   Three days before meeting with Dr. Said regarding the Coaching Memo, Dr. Dearani fielded unsolicited concerns about Dr. Said (and another doctor) from another Department physician, John Stulak, M.D.   Dr. Stulak relayed that "several fellows" had "voiced growing anxiety" over Dr. Said's return because of "intimidation and feeling uncomfortable" working with him.   ECF No. 91-40.   Dr. Stulak mentioned that one fellow was "seeking guidance and representation" about reporting Dr. Said for a discrete incident.

26

*Id.*; Stulak Dep. 53–62 [ECF No. 77-5].  Dr. Dearani responded that "multiple issues" had placed Dr. Said "in the doghouse."  ECF No. 91-40.  But he then expressed confidence in Dr. Said, noting that he was "packed with talent," that a "a side of him . . . is a very good teacher," and that Dr. Said "w[ould] get better because he must get better and he understands the consequences if he doesn't."  *Id.*  Dr. Dearani closed by saying he would raise Dr. Stulak's concerns in his meeting with Dr. Said.  *Id.*  Finally, Dr. Said's unwelcome advances toward R.R. seems like just the sort of intervening event that undermines the reasonableness of a finding that subsequent adverse actions were caused by the HIPAA complaint lodged by Johnson.  Dr. Said's only causation evidence is his testimony that Dr. Dearani "got angry" and called him to say that, as Department chair, he had a right to know "anything" about physicians under his supervision.  Said Dep. 106; Said Decl. ¶ 19.  Considered against the chronology of events concerning Mayo's investigation and coaching of Dr. Said, this testimony would not permit a reasonable juror to infer causality.

### D

It makes sense to address Dr. Said's defamation claim, Count X, next.  Under Minnesota law, a defamation plaintiff "must prove that the defendant made: (a) a false and defamatory statement about the plaintiff; (b) in [an] unprivileged publication to a third party; (c) that harmed the plaintiff's reputation in the community." *Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868, 873 (Minn. 2019) (citation omitted).  "Minnesota law has generally required that in defamation suits, the defamatory matter be set out verbatim." *Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 326 (Minn. 2000).  "Federal courts [also] favor specific pleading of defamation claims because 'knowledge of the exact

language used is necessary to form responsive pleadings.'" *Unity Healthcare, Inc. v. Cnty. of Hennepin*, No. 14-cv-114 (JNE/JJK), 2014 WL 6775293, at *10 (D. Minn. Dec. 2, 2014) (quoting *Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 699 (8th Cir. 1979)). "While plaintiffs may not have to directly quote the allegedly defamatory words, . . . their complaints generally must identify 'who made the allegedly [defamatory] statements, to whom they were made, and where.'" *Sherr v. HealthEast Care Sys.*, 999 F.3d 589, 597–98 (8th Cir. 2021) (quoting *Pinto v. Internationale Set Inc.*, 650 F. Supp. 306, 309 (D. Minn. 1986) (Murphy, J.)), *rehearing and rehearing en banc denied*, (8th Cir. July 15, 2021). Assertedly defamatory "statements not so identified *in the complaint* are beyond the scope of a plaintiff's defamation claim." *Sherr*, 999 F.3d at 598 (emphasis added).

Defendants are entitled to summary judgment on Dr. Said's defamation claim for each statement he identifies in the Amended Complaint, though the grounds differ somewhat depending on the statement alleged. Summary judgment is appropriate with respect to some statements because here, as in *Sherr*, the assertedly defamatory statements are not identified in the Amended Complaint in compliance with Minnesota law. For example, in the Amended Complaint, Dr. Said alleges that Dr. Dearani defamed him "by spreading false statements that the Minnesota Medical Association is currently investigating Dr. Said's medical license, which Dr. Dearani has claimed 'may be revoked.'" Am. Compl. ¶ 134. This allegation identifies neither to whom nor where these statements were made. To fill in some of the missing pieces, Dr. Said introduced a declaration from Johnson, who testifies that "sometime in the first quarter of 2019," Dr. Dearani told her that the Medical Board would "come after" Dr. Said and that he would

"lose his license" and "all his medical certifications."  R. Johnson Decl. ¶¶ 9–10 [ECF No. 93].  Under *Sherr*, these added details cannot properly be considered.[6]  The same can be said of several other statements or details that Dr. Said identifies in his summary-judgment submission.  *See* Mem. in Opp'n at 39–41.

Summary judgment is appropriate with respect to some statements because they are inadmissible hearsay and Dr. Said has not shown how the statements might be presented in an admissible form.  "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  "And when such an objection is made, the burden is on the proponent of the evidence to show that the material is admissible as presented or to explain the admissible form that is anticipated."  *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) (internal citations omitted).  Here, because Defendants object to some allegedly defamatory statements as hearsay, it is Dr. Said's burden to show that he can present those statements in an admissible form.  *Smith v. Kilgore*, 926 F.3d 479, 485 (8th Cir. 2019) (disregarding evidence where plaintiff "failed to obtain deposition testimony or affidavits from [those] who gave . . . unsworn accounts").

---

[6]     If it could be considered in this regard, Johnson's testimony still would not create a trial-worthy issue.  As Defendants point out, the truth of these statements is to some extent undisputed: the Board of Medical Practice possesses authority to revoke medical licenses, investigated Dr. Said's conduct, and placed several conditions on his license based on its findings.  *See* ECF No. 78-18.  To the extent the statement describes Dr. Said's loss of his license and certifications, the statement offers a "prediction of future events" that is "not actionable in defamation because it is not capable of being proven true or false." *Alexander v. Strong*, A20-1614, 2021 WL 2645516, at *5 (Minn. Ct. App. June 28, 2015); *accord Cenveo Corp v. CelumSolutions Software GMBH & Co KG*, 504 F. Supp. 2d 574, 578–79 (D. Minn. 2007); *Bebo v. Delander*, 632 N.W.2d 732, 740 (Minn. Ct. App. 2001).

Summary judgment is appropriate with respect to two statements on this basis. First, Dr. Said alleges that Dr. Dearani or Dr. Stulak told Carlos Miranda, M.D., a pediatric cardiologist who referred patients to Dr. Said, that Dr. Said "was placed on involuntary administrative leave[7] and unlikely to return to Mayo." Am. Compl. ¶ 104. Dr. Said has identified no evidence supporting this allegation. Mayo has filed a sworn declaration in which Dr. Miranda attests that Dr. Dearani informed him Dr. Said "was no longer available" in October 2018, but that Mayo did "not provide[] any detail as to the reason for the abrupt pause in service or the likelihood of Dr. Said's return." ECF No. 78-15 ¶ 3. Second, Dr. Said alleges that, in November 2018, Dr. Dearani told Dr. Michael Monge, a surgeon at Northwestern University, that Dr. Said would "soon be terminated" and that "Mayo was seeking candidates to replace him." Am. Compl. ¶ 106. Dr. Said testified that he learned of these statements from a third party, Lyle Joyce, M.D. Said Dep. 281–83. Dr. Joyce has not filed a declaration and, though he was deposed, did not testify about this statement. *See* Joyce Dep. [ECF No. 78-7]. Dr. Monge has testified that he spoke with Dr. Dearani about a position at Mayo, but that Dr. Dearani did not say that Dr. Said would be leaving Mayo, did not say that Mayo was looking to replace Dr. Said, and did not tell him "any specific information about Dr. Said's employment status at Mayo." ECF No. 78-16. The bottom line with respect to these statements, then, is that Dr. Said has not shown how

---

[7]     The statement that Dr. Said was on involuntary administrative leave fails because there is no genuine dispute that the statement is true. *See* Said Dep. 278; *see Lewis v. Equitable Life Assur. Soc. of the U.S.*, 389 N.W.2d 876, 888 (Minn. 1986) ("True statements, however disparaging, are not actionable.").

his evidence might possibly be presented in an admissible form, meaning his evidence of these statements can't get past summary judgment.

E

Dr. Said asserts a claim for tortious interference with future employment in Count IX of his Amended Complaint. Am. Compl. ¶¶ 187–91. The elements of a claim for tortious interference are: (1) the existence of a reasonable expectation of economic advantage; (2) Defendants' knowledge of that expectation of economic advantage; (3) Defendants' intentional interference (with Dr. Said's reasonable expectation of economic advantage) that is either independently tortious or in violation of a state or federal statute or regulation; (4) a reasonable probability that, absent Defendants' wrongful act, Dr. Said would have realized his economic advantage or benefit; and (5) damages. *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014). Dr. Said's theory of this claim is that "Defendants' conduct and statements relating to both [Dr.] Said's prospective employment at the University of Minnesota and his candidacy for the University of Detroit CVSD Chief role could establish tortious interference." Mem. in Opp'n at 41–42.

For at least two reasons, Defendants are entitled to summary judgment on this claim. First, Dr. Said has not shown evidence of damages (*i.e.*, the deprivation of any prospective economic advantage). Dr. Said concedes that he was offered employment at the University of Minnesota, that he accepted the position, and that he started working on March 31, 2019. Said Dep. 239–48; *see* ECF Nos. 80, 81. In other words, Dr. Said was offered the job he applied for, and he accepted that job. Notwithstanding these admissions, Dr. Said seems

31

to theorize that he lost an economic advantage because his start date was delayed.  Dr. Said claims the University of Minnesota informed him he could start "as soon as possible in December 2018" because there would be "no issue" securing him "emergency privileges." Said Decl. ¶ 41.  But Dr. Said relies only on inadmissible hearsay evidence for this assertion.  According to Dr. Said, a University of Minnesota doctor told him that Dr. Rihal disclosed the existence of a letter recommending his termination, and Dr. Said claims this disclosure commenced a "long process" that "delayed [his] start date at UMP for many months."  *Id.* ¶ 43.  But the same University of Minnesota doctor submitted a declaration in which he attests to never speaking with Dr. Rihal, Dr. Dearani, "or anyone else at Mayo about Dr. Said's employment status or any investigations at Mayo," and that Dr. Said's "start date with the UMPhysicians was not delayed due to any issues or investigations at Mayo."  Ikramuddin Decl. ¶¶ 3–4 [ECF No. 78-14].  Second, Dr. Said identifies no "tortious" or unlawful act.  At most, Dr. Said seems to say that Dr. Rihal or other Mayo employees disclosed the investigation and his resignation to Dr. Said's prospective employers.  Said Decl. ¶ 43.  It also appears that Dr. Dearani told a doctor from the University of Detroit that he could not talk about Dr. Said because Dr. Said was suing him. Zehr Dep. 23–25 [ECF No. 78-10].  Dr. Said identifies no law or regulation that these communications might have violated.

F

In Count XI, Dr. Said asserts two variations of the invasion-of-privacy tort: intrusion upon seclusion and publication of private facts.  "Intrusion upon seclusion occurs when one 'intentionally intrudes, physically or otherwise, upon the solitude or seclusion of

another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 233 (Minn. 1998) (citation omitted).  To recover, a plaintiff must show "(a) an intrusion; (b) that is highly offensive, and (c) into some matter in which a person has a legitimate expectation of privacy." *Myers v. Aitkin Cnty.*, No. 14-cv-473 (JRT/LIB), 2014 WL 7399182, at *20 (D. Minn. Dec. 29, 2014) (quoting *Swarthout v. Mut. Serv. Life Ins. Co.*, 632 N.W.2d 741, 744 (Minn. Ct. App. 2001)).  "[T]o state a claim for publication of private facts, a plaintiff must demonstrate that one gives publicity to a matter concerning the private life of another" and that "the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." *Bodah v. Lakeville Motor Express, Inc.*, 663 N.W.2d 550, 553 (Minn. 2003) (cleaned up).

Dr. Said grounds both claims on the same facts.  He claims that, during Mayo's investigation into R.R.'s complaint, Dr. Dearani and Jones retrieved a notebook from his desk, took pictures of his journal, and shared those pictures with "others."  Mem. in Opp'n at 43–44.  As to the intrusion-upon-seclusion claim, Defendants argue that obtaining Dr. Said's journal from his desk cannot be considered "highly offensive."  Mem. in Supp. at 35.  As to the publication-of-private-facts claim, Defendants argue that the journal images were "highly relevant" and "viewed only by the limited group" of people who investigated R.R.'s complaints, meaning the disclosure was neither "public" nor "highly offensive to a reasonable person."  *Id.* at 35–36.

In assessing whether an intrusion is highly offensive, courts have considered "the degree of intrusion, the context, conduct and circumstances surrounding the intrusion as

well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded, and the number and frequency of the intrusive contacts." *Kennedy v. City of Braham*, 67 F. Supp. 3d 1020, 1035 (D. Minn. 2014) (citation omitted). "The use of improper methods to obtain information . . . does not necessarily make the acquisition of information highly offensive, if the information could just as well have been obtained by proper means." *Phillips v. Grendahl*, 312 F.3d 357, 373 (8th Cir. 2002), *abrogated on other grounds*, *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007). "Generally, what is 'highly offensive' is a question of fact for the jury, and becomes a question of law only 'if reasonable persons can draw only one conclusion from the evidence.'" *Kennedy*, 67 F. Supp. 3d at 1035 (quoting *Swarthout*, 632 N.W.2d at 745). Intrusion claims require "a preliminary determination of offensiveness which must be made by the court in discerning the existence of a cause of action." *Bass v. Anoka Cnty.*, 998 F. Supp. 2d 813, 824 (D. Minn. 2014) (citation omitted).

Viewing the evidence in Dr. Said's favor, no reasonable jury could find that Defendants' retrieval of his notebook for their investigation was "highly offensive." To begin with, the intrusion was into a desk and on property that Mayo owned, Said Dep. 289, and it occurred in the workplace, where "courts have recognized that there is a diminished expectation of privacy." *Med. Lab'y Mgmt. Consultants v. Am. Broad. Cos.*, 30 F. Supp. 2d 1182, 1188 (D. Ariz. 1998) (collecting cases), *aff'd*, 306 F.3d 806 (9th Cir. 2002). There is no evidence that Dr. Said's office or desk were locked. Defendants' objective in retrieving the notebook was to gather evidence for their investigation of reports that Dr. Said persisted in unwelcome conduct toward another employee. Defendants limited their

34

search to retrieving the notebook, which was relevant to its investigation: R.R. reported that Dr. Said was journaling about her in the notebook; that he showed her the notebook, including one page that described her with adjectives like "beautiful," "classy," and "smart" in the shape of a heart; and that he invited her to read the notebook while he was away.  ECF No. 79 at 52.  Dr. Said admits to showing R.R. the notebook and inviting her to read it.  Said Dep. 193–94, 223–25, 289–90.  Dr. Dearani retrieved Dr. Said's notebook from his desk, and Jones photographed entries in the journal that substantiated R.R.'s claims.  ECF Nos. 74-2, 74-3.  Either Dr. Dearani or Jones then returned the journal to Dr. Said's desk.  Jones Dep. 50–51 [ECF No. 75-9]; Dearani Dep. 106–07; Said Dep. 294–95.  Although the notebook was personal, the photographed pages contained musings, movie quotes, song lyrics, poems, sketches, and passages expressing affection for another person.  ECF Nos. 74-2, 74-3.  Dr. Said later produced the journal to Mayo for examination as part of its investigation, Said Dep. 290–91, and Dr. Said has not asserted that Mayo misused the images or disclosed them outside its investigation, *see Potocnik v. Carlson*, 9 F. Supp. 3d 981, 1001–02 (D. Minn. 2014).  Given these undisputed facts, no reasonable juror could conclude that Defendants' retrieval and examination of the notebook was "highly offensive."

Defendants also are entitled to summary judgment on Dr. Said's publication-of-private-facts claim.  In assessing this tort, the Minnesota Supreme Court has adopted the definition of "publicity" used in the Restatement (Second) of Torts.  To be actionable, a disclosure of private facts must be "made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become

one of public knowledge." *Bodah*, 663 N.W.2d at 557 (quoting Restatement (Second) of Torts § 652D cmt. a). This limitation is apt, the court explained, because "the tort of publication of private facts [focuses] on a very narrow gap in tort law—to provide a remedy for the truthful but damaging dissemination of private facts, which is nonactionable under defamation rules." *Id.* Applying these principals in *Bodah*, the court held that an employer faxing 204 employees' social security numbers to 16 managers across six states "d[id] not constitute publication to the public or to so large a number of persons that the matter must be regarded as substantially certain to become public." *Id.* at 557–58; *see also Sherr v. HealthEast Care Sys.*, 262 F. Supp. 3d 869, 881 (D. Minn. 2017) (doctor's allegation of dissemination to "35-40 active practitioners in Minnesota" did not sufficiently allege publicity); *Johnson v. Mithun*, 401 F. Supp. 2d 964, 973 (D. Minn. 2005) (entering summary judgment where employer disclosed employee's private matter only "to a number of her former colleagues and client contacts"). It follows necessarily from this law that Dr. Said has no trial-worthy publication-of-private-facts claim. Dr. Said admitted during his deposition that he does not know who has seen the images from his journal or whether Defendants shared them with anyone who did not participate in the investigation. Said Dep. 291–92, 294–95.

G

Dr. Said's conversion claim concerns an article that he co-authored with a fellow Mayo physician.[8] After Dr. Said resigned, Mayo published the article without crediting an

---

[8]       The Amended Complaint includes allegations suggesting that Dr. Said's conversion claim also concerns "documents, videos, and presentations stored in his former H: drive"

36

author in a recurring newsletter that "advertise[s] Mayo's cardiovascular surgery practice." ECF No. 66-1; Dearani Decl. ¶ 12.   Dr. Said acknowledges that the newsletter and its contents advertise Mayo's cardiovascular surgery practice, Said Dep. 300, but claims he expected "professional recognition" for his authorship, Mem. in Opp'n at 43.

"Conversion occurs where one willfully interferes with the personal property of another 'without lawful justification,'" thereby "depriving the lawful possessor of 'use and possession.'"   *Williamson v. Prasciunas*, 661 N.W.2d 645, 649 (Minn. Ct. App. 2003) (quoting *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997)).   The elements of conversion under Minnesota law are "(1) plaintiff holds a property interest; and (2) defendant deprives plaintiff of that interest."   *Id.*   "A plaintiff's lack of an enforceable interest in the subject property is a complete defense against conversion."   *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 986 (8th Cir. 2008) (citation omitted); *see also Colsen v. Bright Birch, Inc.*, A20-0974, 2021 WL 1082339, at *13 (Minn. Ct. App. Mar. 22, 2021).

Here, the evidence does not permit a reasonable juror to conclude that Dr. Said was deprived of any property interest in the article.   Dr. Said does not describe the deprivation of a property interest.   He does not claim, for example, that Mayo kept him from using or possessing the article.   Instead, Dr. Said cites an interest in "the publishing" of the article and posits that Mayo deprived him of "credit for his contributions to the department." Mem. in Opp'n at 43.   In other words, Dr. Said claims Mayo misused or misappropriated the article by not crediting his contributions.   Dr. Said cites no binding or persuasive

---

and a notebook.   Am. Compl. ¶ 212.   At the hearing on Defendants' motion, Dr. Said confirmed that he is no longer pursuing a conversion claim concerning these items.

authority suggesting that the publication of a non-academic newsletter article without proper attribution might deprive an author or contributor of a property interest.  If it could, a reasonable juror still could not find that Dr. Said had a property interest in this article. Dr. Said admits to signing a document titled "Intellectual Property Agreement" at the beginning of his employment.  Said Dep. 308.  In that document, he assigned to Mayo "all right, title and interest in" all "works of authorship" that: relate directly to the business of Mayo; relate to Mayo's actual or anticipated research or development; result from any work performed for Mayo; are developed using Mayo's equipment, supplies, facility, know-how, or confidential information; or are "developed on any Mayo time."  ECF No. 74-10.  Dr. Said identifies no authority or evidence showing that this Agreement isn't controlling here.

## ORDER

Based on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.     Defendants' Motion for Summary Judgment [ECF No. 63] is **GRANTED.**

2.     This action is **DISMISSED WITH PREJUDICE**.

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  November 18, 2021                          s/ Eric C. Tostrud
                                                   Eric C. Tostrud
                                                   United States District Court