UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---------------------------------------------------------
                             )   COURT FILE
Sameh Mahmoud Mohamed Said, MD  )   NO. 20-CV-927 (ECT/JFD)
                             )
        vs.                  )
                             )   Courtroom 3B
Mayo Clinic and Joseph Albert )   Monday, August 2, 2021
Dearani, MD                  )   St. Paul, Minnesota
                             )   11:00 A.M.
---------------------------------------------------------

**HEARING ON**

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

BEFORE THE HONORABLE ERIC C. TOSTRUD
UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S :**

**For the Plaintiff:**   **SCHAEFER HALLEEN, LLC**
                         By:  LAWRENCE P. SCHAEFER, ESQUIRE
                              MAKENZIE L. KRAUSE, ESQUIRE
                         412 South Fourth Street - Suite 1050
                         Minneapolis, Minnesota  55415

**For the Defendants:**  **LITTLER MENDELSON, P.C.**
                         By:  KATHRYN MRKONICH WILSON, ESQUIRE
                              EMILY A. McNEE, ESQUIRE
                         80 South Eighth Street - Suite 1300
                         Minneapolis, Minnesota  55402-2136

**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224

1          (11:00 a.m.)

2                          **P R O C E E D I N G S**

3                          **IN OPEN COURT**

4          THE COURT:  Good morning, everyone.  Please be

5     seated.

6          This is Said versus Mayo Clinic and others, Civil

7     File Number 20-927.  I'll invite counsel to note their

8     appearances for the record, please, starting with the

9     plaintiff.

10         MR. SCHAEFER:  Thank you, Your Honor.  Larry

11    Schaefer appearing on behalf of the plaintiff, Dr. Sameh

12    Said.  I have Dr. Said with me and I also have Makenzie

13    Krause, an associate from our office, as well.

14         THE COURT:  Good morning.

15         MS. WILSON:  Good morning, Your Honor.  Kathryn

16    Mrkonich Wilson for the defendants Mayo Clinic and

17    Dr. Joseph Dearani, and I have with me today Emily McNee.

18    She's a colleague from my office.

19         THE COURT:  Good morning.

20         All right.  I've read everything and here's how

21    I'd like to handle this today, if we could, to stay on track

22    and I think be most productive.  If you've got an objection

23    to approaching it this way, please feel free to tell me

24    that.

25         I think we ought to devote separate attention to

1    some of the counts separately, so together I think we should

2    deal with Counts I through VI, so those are the race,

3    religion, national origin discrimination counts under Title

4    VII and the Minnesota Human Rights Act.  I think it makes

5    sense.  I have some questions regarding those counts.  I

6    think it makes sense to devote roughly 20 minutes per side

7    to those counts.

8            Then let's deal with the Minnesota Whistleblower

9    Act count and I don't think that that should take very long,

10   perhaps five minutes per side, and then I'd like to devote

11   five minutes each per side to the torts.  So we've got

12   tortious interference with future employment, defamation,

13   invasion of privacy, and conversion.

14           And what we'll do when I say we'll deal with them

15   separately, I'll start with you, Ms. Mrkonich Wilson, on

16   each of these and then, Mr. Schaefer, give you an

17   opportunity to respond and if necessary brief rebuttal.  But

18   if we can try to stay to those time limits, I think it would

19   be helpful.

20           Does that make sense, or does anybody -- let me

21   just ask it this way:  Does anybody have an objection or

22   concern with approaching the argument that way?

23           Mr. Schaefer?

24           MR. SCHAEFER:  No objection, Your Honor.

25           THE COURT:  Okay.

 1          MS. WILSON:  No objection.

 2          THE COURT:  All right.  Great.  If at the end of

 3     that you think that we've missed something or want to get

 4     something additional on the record, I'll give you a few

 5     minutes to do that.  I don't mean to shortcut anybody's

 6     ability to do that.

 7          All right.  Ms. Mrkonich Wilson, I assume you're

 8     doing the argument today, right?

 9          MS. WILSON:  I am.

10          THE COURT:  Okay, just because of where you're

11     seated.  Let's take the discrimination counts first here.

12          MS. WILSON:  Thank you, Your Honor.

13          As I noted at the outset, I represent both

14     defendants, the individual, Dr. Dearani, as well as Mayo

15     Clinic, and I may refer to them as Mayo throughout.  And I

16     am representing both of them and I'm proud to be

17     representing them today, because Mayo Clinic feels strongly

18     about its policies against workplace harassment.

19          And Counts I through VI are specifically tailored

20     toward Dr. Said's claims of discrimination in connection

21     with his delayed promotional opportunities and being placed

22     on an administrative leave of absence at the time of his

23     last HR investigation, and then finally as to the

24     termination recommendation.  Those I think are the three job

25     decisions that are being challenged.

1          Dr. Said with respect to each claim cannot state a

2     *prima facie* case and will rest in large part on the factual

3     record, which is significant as Your Honor has noted and has

4     already reviewed.

5          And we'd point out a few highlights.  And that is,

6     it is undisputed that Dr. Said at the time of the decisions

7     being made here was not meeting the legitimate expectations

8     of the employer.

9          THE COURT:  How, if at all, do I analyze that

10    issue, that *prima facie* element, versus a legitimate

11    nondiscriminatory reason for his termination?

12         MS. WILSON:  Well, I think it's fair to say it's a

13    threshold to even get to the fact that we would need to

14    articulate a legitimate reason and the burden remains at all

15    times with Dr. Said, so it is -- it remains a threshold

16    element to not just show that he is in the protected class.

17         THE COURT:  I get that.  I'm just sort of

18    wondering how is it different than -- how do I analyze that

19    problem differently from analyzing, if we got there -- and

20    I'm not saying we do, but if we do get there -- a legitimate

21    non-discriminatory reason?

22         MS. WILSON:  I think you analyze it similarly.  I

23    think there would be an argument that perhaps it's a

24    lighter -- there are cases that will say it's perhaps --

25    more courts will allow the *prima facie* assumption and go

1    further into the analysis, but frequently what we'll see in

2    the opinions is the court will say there isn't a *prima facie*

3    case in that he was not meeting his performance expectations

4    at the time, and furthermore, we will then look at the

5    pretext arguments as well, and I believe they're analyzed

6    similarly.

7         So, I'm not arguing that Dr. Said's performance

8    was sufficient enough to get himself to the pretext, but I

9    would argue in the alternative that either way his

10   performance is a legitimate business reason for the actions

11   taken and it also disqualifies him from even going there.

12        THE COURT:  I just didn't see any analytical

13   distinction between the two, thus the question, other

14   than -- apart from where they fall in the framework, I

15   didn't see an analytical distinction between the two.

16        MS. WILSON:  Right.  And I will agree with you on

17   that.  I think that that is why we do argue this strongly on

18   the *prima facie* case because it's not being met.

19        This is not a case about Dr. Said's surgical

20   skills.  I think that is not what's at issue, but what is at

21   issue is his failure to accept a counseling message that was

22   clearly and loudly given to him in December of 2017.  He was

23   counseled about sexual harassment, about his pursuit of

24   women in the workplace being offensive and unwelcome, and he

25   was told to stop.  He couldn't.  He didn't.

1          So, we move into 2018 when the next complaint

2     surfaces, and by that time he is clearly in writing on

3     notice of the need to check his appropriateness and his

4     unwelcome gestures to women in the workplace, but he does

5     not stop.

6          And in October of 2018, a physician's assistant

7     who works with him closely comes forward and, afraid of her

8     job, afraid of retaliation, lays out for HR in an

9     investigation more crude, inappropriate, vulgar conduct and

10    text messages and communications than anyone could believe,

11    quite frankly.  So after having been warned and counseled,

12    it continued.  I don't know why, I'm not a psychologist, but

13    I am a lawyer, and I know it completely violated the

14    policies that he had been admonished to follow.

15         So, by the fall of 2018 he is placed on

16    administrative leave, a deeper investigation ensues, more

17    information is uncovered, and at this point in time Dr. Said

18    has been given two opportunities to prolong his advancement.

19    So, it's like being in a law firm.  You know, you're not

20    going to be elevated to partner this June, but we're going

21    to kick that decision down the road and give you time to

22    shape up and we'll reconsider you at that time.  You're

23    going to have a better chance if you can demonstrate a track

24    record of behavior.  And he couldn't.  He didn't.  So he

25    gets a couple times where he's told, "We're going to extend

1    your consideration.  You're not meeting our expectations."

2    So, this is a clear case of somebody not meeting

3    expectations, and notwithstanding the warnings,

4    notwithstanding the admonitions, he continued to engage in

5    this conduct.

6           So, we get to the fall of 2018 and the Personnel

7    Committee makes a recommendation and gives him a five-page

8    letter that is quite detailed saying:  Here are the

9    conclusions of a very thorough investigation in which Mayo

10   in good faith concluded that his employment needed to end

11   and the recommendation was being made to the Termination

12   Review Committee.

13          Those are all legitimate nondiscriminatory reasons

14   for the conduct, for the decisions that were made with

15   respect to his promotions, with respect to his being placed

16   on leave in the first place, and with respect to the

17   decision to terminate or to recommend his termination.

18          He had a choice at that point in time.  He could

19   choose to resign, which he did, he quit, but in so doing he

20   asked -- specifically asked would he be reported to the

21   Board, could he avoid some form of Board reporting, and the

22   discussion is, you know, in the record, it's quite clear, he

23   was told regardless of quitting or being terminated, this

24   will be reported to the Board.  So, he was reported to the

25   Board.  He signed that stipulation in the spring of 2018

1    while he was gainfully employed with the University of

2    Minnesota, where he continues to work.

3              So, this is a case about -- this is a case where I

4    think it was Dr. Said was on leave and himself said to the

5    Personnel Committee chair:  Look, I realize I've done some

6    things wrong.  Some of my communications were inappropriate.

7    I was hoping for a less severe penalty.  So, this is a

8    decisionmaker's choice.  This is an employer's prerogative

9    to enforce its policies and there's nothing unlawful about

10   that decision.

11             To try to create something where I believe there's

12   nothing, Dr. Said spends a great deal of time pointing to

13   somebody that he identifies as a comparator, who is

14   Dr. Simon Maltais.  He's Canadian-born, white.  He was also

15   a Senior Associate Consultant cardiovascular surgeon, as was

16   Dr. Said.

17             THE COURT:  Maltais.

18             MS. WILSON:  Maltais.

19             THE COURT:  We were wondering how to pronounce

20   that, so --

21             MS. WILSON:  I'm not French, but I think in his

22   French-Canadian accent we heard Maltais.

23             And so, sure, he was the subject of complaints

24   made to a hotline and there were numerous complaints, but

25   the legal analysis is whether or not this is a person

 1    similarly situated in all relevant respects, and he was not.

 2    He was not found by Doctors -- it's undisputed that

 3    Dr. Dearani and Dr. Rihal were extensively reviewing

 4    Dr. Said's investigation and the kind of conduct, the

 5    sexually harassing nature of the conduct and the

 6    relationship engendering that he was engaged in, was very

 7    different than the complaints that were received about

 8    Dr. Maltais.

 9          So, we can go on and on, but the record is quite

10    clear and I think one -- I'm sorry.  Were you going to ask a

11    question?

12          THE COURT:  Yes.  Apart from the one instance in

13    which Dr. Maltais gets his cell phone out and inappropriate

14    content is allegedly displayed, is there anything about the

15    complaints against him that could be construed as sexual

16    harassment?

17          MS. WILSON:  No.  I think that Counsel argues that

18    because it was a woman, that Emily Coldiron is the person

19    that you'll see referred to several times I think in five or

20    six of the complaints, it's the same issue being raised

21    again and again and again.

22          And the testimony around that was that he was

23    leaving a room, a hospital room, and he -- you know, you can

24    see in the record there were issues about his -- the way he

25    talked to people, being abrupt, kind of gruff.  And in that

1      instance, whatever happened, he pushed his way out is the

2      claim and shoved her and somehow hit her in the shoulder.

3             So, they have made much argument about the fact

4      that that is a physical touching and Dr. Said undisputedly

5      did not physically sexually assault the women who

6      complained, and that is an apple and an orange.  We're not

7      talking about the same kind of sexually harassing conduct

8      and that is what Dr. Dearani was quite adamant about in his

9      deposition, as was Dr. Rihal.

10            So, I think we have to -- also, it's important to

11     look at the record and what the record says about those

12     things.  There's a reference made that caught my eyes.  I

13     was reading the briefing -- I don't want to say at what time

14     last night because I was well-prepared, of course, last week

15     for this argument.

16            But in looking at it one more time, at page 13 of

17     Plaintiff's memorandum in opposition to summary judgment

18     there's a reference to Dr. Maltais and calling him a

19     comparator, and there's this argument that Dr. Maltais was

20     given six months of a runway as opposed to being terminated

21     the way Dr. Said was.  Well, right, again, very different

22     conduct and there was a discussion of this isn't a fit.

23     They never gave Dr. Maltais extensions of his promotional

24     consideration.  It was:  "This is not a fit.  You are going

25     to leave."  So his employment at Mayo was definitively

 1    ending and he was told that.

 2            And one of the arguments Counsel makes is that he

 3    was given some type of glowing references by Dr. Dearani or

 4    Rihal and that helped him in his future.  And the specific

 5    quote says:  "These positive references were instrumental in

 6    Maltais finding subsequent employment at the University of

 7    Montreal, and later finding another position in the HCA

 8    Healthcare System in California."  Then there's a cite to

 9    two deposition pages.

10            And so I went -- I thought that just isn't what I

11    heard and I went back and sure enough the cite to

12    Dr. Dearani's deposition is that he doesn't remember if he

13    gave this specific reference, but that would be -- you know,

14    it would be consistent that he responded to requests for

15    references, and Dr. Maltais similarly did not say anything

16    about whether this is a positive reference that was

17    instrumental in him finding subsequent employment.

18            So, we have to leave aside argument to counsel and

19    facts to the record, and I think when you take the facts to

20    the record it's undisputed that Dr. Maltais is not similarly

21    situated.  And in fact, what we have pointed out and what

22    came out in the discovery record is that, in fact,

23    Dr. Dearani had delayed promotional consideration for

24    Dr. Lyle Joyce, somebody who testified in Dr. Said's favor

25    and supports his claims.  He likewise was sidelined for

1    awhile by Dr. Dearani and not pleased about it.  He

2    ultimately did testify in this case.

3          And the record also reflected that there were two

4    individuals who were much more similar to the types of

5    conduct that Dr. Said was investigated for and the subject

6    of this lawsuit, and both of those individuals, Drs. Grothey

7    and Sarano -- apologies -- they did not testify in the case,

8    so they're not as top of mind, but they are two other

9    individuals who were subject to similar types of complaints,

10   and this was consistent with Mayo's response and

11   Dr. Dearani's response and Dr. Rihal's response as the chair

12   of the Personnel Committee and likewise reported to the

13   Board.

14         So I think the record is clear in showing that

15   there isn't a *prima facie* case to support the claims of

16   discrimination in Counts I, II, III -- let's see.  It's

17   race, religion, national origin discrimination under both

18   state and federal law.

19         THE COURT:  I think I through VI, right?

20         MS. WILSON:  That's what I'm just confirming, the

21   counts.  Yes, I through VI.

22         So, I don't want to take more time than we need to

23   take.  If you have a question.

24         THE COURT:  Let me wrap up just one fact question

25   that I should remember and don't.

1          One of the two physicians who Mayo says are more

2     reasonable comparators, if I can use that word, one retired.

3     What happened to the other one?

4          MS. WILSON:  That was Dr. Grothey.  He was accused

5     of harassment and the PC made a recommendation to terminate

6     him.  He chose to resign and he was reported to the Board,

7     as was Dr. Said.  But Dr. Sarano, the one who retired, was

8     also reported to the Board.

9          THE COURT:  Correct, right.  He had to be.

10         MS. WILSON:  Right.

11         THE COURT:  Okay.  So the stipulation that

12    Dr. Said entered with the Board of Medical Practice, I don't

13    understand Mayo to be relying on that to suggest that it

14    establishes in some legal sense, some *per se* legal sense,

15    the reasonableness of -- the fact that he did not meet your

16    legitimate expectations; is that fair?

17         MS. WILSON:  Well, we aren't relying on it because

18    we don't need to, right?  We reached our good-faith -- after

19    a good-faith investigation we reached -- Mayo reached

20    conclusions and acted upon them.  So I don't think whether

21    or not Dr. Said agrees or disagrees with the decisions is

22    material to Mayo's -- legitimacy of Mayo's decisions, so

23    it's not -- but I think it's telling --

24         THE COURT:  He owns up to some of the conduct,

25    right?

1          MS. WILSON:  Right, right.  And he said to

2     Dr. Rihal, "I wish the penalty were less severe," right.  He

3     admitted to lots of inappropriateness in his texting

4     messages and communications.

5          The problem is that what came out in the

6     investigation wasn't just a little bit of something, but if

7     you read -- I think it's most significant is Chad Johnson

8     was the lead investigator and to his declaration are

9     attached things that are grotesque in nature and continuing.

10          And even after she told him, for example, that --

11     she met with him outside of work in August of 2018 and said,

12     "This" -- you know, "I'm not interested in a relationship.

13     I have a relationship."  And in September, in that

14     conversation he says he's -- he expresses suicidal thoughts

15     and comments, she reports, and then subsequently,

16     undisputedly, he gives her a video of them in a surgical

17     procedure where their hands are on a patient's heart that he

18     set to music.  I mean, she is understandably completely

19     beside herself.

20          So, these are the types of things that were coming

21     to them, so whether or not he agreed with the conclusion and

22     he agreed with the recommendation is not material.  It is

23     noteworthy that he did stipulate to the Board.

24          THE COURT:  Okay.  Thank you.

25          Mr. Schaefer.

1           MR. SCHAEFER:  Thank you, Your Honor.  I'm just

2     going to grab a water that's in front of me here.

3           THE COURT:  That's great, and then if you could

4     make sure that that microphone's turned on too.

5           MR. SCHAEFER:  I will.

6           THE COURT:  Thanks.

7           MR. SCHAEFER:  Had to get used to a lot of

8     technology over the last year and a half.

9           THE COURT:  Yes.

10          MR. SCHAEFER:  Your Honor, I appreciate the

11    opportunity to respond and I'll try to do it within the

12    framework that you mentioned, sort of 20 minutes to reply,

13    because we have presented in great detail in our memo why

14    the record that we have cited extensively establishes that

15    Dr. Said's discrimination claims require trial.

16          THE COURT:  Give me the three best pieces of

17    evidence you've got that show that.

18          MR. SCHAEFER:  First, the treatment -- the

19    inexplicable contrast in the treatment between Dr. Said and

20    Dr. Maltais.

21          THE COURT:  Okay.  That's one.

22          MR. SCHAEFER:  That standing alone requires trial

23    and Maltais is similarly situated, and I want to point out

24    an additional argument why that is the case.

25          Second, there is a violation, a clear violation of

1    company policy that Dearani engaged in throughout Said's

2    employment, in particular in relation to the most critical

3    evaluative process that Senior Associate Consultants go

4    through, and that's the 360 Review, Your Honor.

5            The 360 Review is intended to occur annually,

6    although there is no requirement that it occur annually, but

7    it is a tool where everybody chimes in on how a Senior

8    Associate Consultant is doing on a whole variety of factors.

9    And it is an absolute requirement for a 360 Review to be

10   conducted in order to be considered for promotion from SAC

11   to Consultant.  That never happened and the record is

12   inexplicable of terms of why that never happened.

13           And Dr. Dearani also cannot explain why the

14   favorable -- extremely favorable review for Dr. Said in

15   December of 2016, which I believe is Jones Exhibit 38, Your

16   Honor, why that extremely favorable review was never

17   provided to Dr. Said until a year and a half later, almost,

18   till March of 2018.

19           THE COURT:  So is that the third piece?

20           MR. SCHAEFER:  No, that's the 360 Review.

21           And the third important piece is we have presented

22   evidence that throughout Said's employment at Mayo,

23   Dr. Dearani treated him differently, disparaged him.  In

24   fact, he did oppose his hire.  He said that he was not Mayo

25   material and his treatment of Dr. Said throughout his

1      employment reflected that.

2              Now, to argue that Dr. Said has not established a

3      *prima facie* case in the face of not only that incredibly

4      favorable 360 Review, but all of his annual reviews, which

5      were exceptional, and the fact that he met and exceeded and

6      in fact was the most productive cardiovascular surgeon in

7      the department is absurd.  He has clearly overwhelmingly

8      established his *prima facie* case.  The adverse action

9      against him that we are attacking is not only the process of

10     delaying his promotion to SAC -- or to Consultant, excuse

11     me, Your Honor -- but the recommendation to terminate him

12     when the treatment of Said was remarkably different.

13             Now, when the Court has before it two

14     extraordinarily different --

15             THE COURT:  Are you suggesting that the

16     allegations -- that the harassment investigation is

17     unrelated to the showing of a *prima facie* case?

18             MR. SCHAEFER:  I'm sorry, Your Honor.  That the

19     investigation into my client's --

20             THE COURT:  Are you suggesting that Mayo's

21     expectations that its physicians not sexually harass its

22     employees or others, are you suggesting that that policy and

23     the investigation into your client and the reason for the

24     termination is not relevant to the *prima facie* case?

25             MR. SCHAEFER:  Absolutely not, Your Honor.  All

1    I'm asking is that Dr. Said be treated like others, treated

2    like other comparable employees in similar circumstances.

3           When the Court is faced with disparate treatment

4    between two employees, the critical factor for the Court to

5    determine, particularly in summary judgment, as a matter of

6    law is whether those two employees are similarly situated.

7    The parties have devoted a lot of the briefing to that

8    issue, but it's a simple concept.

9           THE COURT:  You disagree on the legal standard

10   that applies to determining whether someone is or is not

11   similarly situated.

12          MR. SCHAEFER:  I think the briefing is -- we've

13   all cited many of the same cases.  I want to highlight

14   three, Your Honor, because I think there's no way to apply

15   the law on similarly situated and conclude that Maltais is

16   isn't similarly situated, that his treatment is not

17   something a jury could rely on in finding discrimination,

18   and at the summary judgment stage, that's the inquiry that

19   the Court has to focus on, is there evidence that a jury

20   could rely on that is admissible that could support

21   discrimination.  Maltais' treatment is exactly that.

22          Now, the similarly situated standard, the three

23   cases that are the most, from our perspective, useful for

24   the Court in looking into that, is the *Rideout* case, where

25   the court, among other things, says that you don't have to

1    look for an exact clone, the treatment doesn't have to be

2    exactly the same, only of comparable seriousness.  That's

3    715 F.3d 1079, and the analysis begins at 1085, Your Honor.

4         The *Lynn vs. Deaconess Medical Center* is discussed

5    by the *Rideout* court, the Eighth Circuit, extensively.

6    That's at 160 F.3d 484, 487-489.  That's two nurses and

7    whether they are similarly situated when the offenses

8    committed were different, clearly different.

9         And then *Burton vs. Arkansas Secretary of State*,

10   737 F.3d 1219, and the analysis is extensive.  It's at

11   1231-35, and that involves two police officers.

12        What the courts look at is not -- there doesn't

13   have to be the identical conduct, doesn't have to be the

14   same conduct.  It just has to be a violation of policy of

15   comparable seriousness.

16        THE COURT:  Let me see if I can test this a bit

17   with some hypotheticals.

18        So, let's say you've got Dr. A who's accused of

19   sexual harassment and you've got Dr. B who's accused of

20   being a scalpel thrower.  Comparable?

21        MR. SCHAEFER:  One accused of sexual harassment,

22   Your Honor, the other accused of throwing scalpels?

23        THE COURT:  Well, displaying an extreme temper in

24   the operating room.

25        MR. SCHAEFER:  Yeah, I would say those are of

1    comparable seriousness, so the obligation of the employer to

2    treatment both similarly would apply and evidence of

3    disparate treatment like we have here would be relevant.

4         Your Honor, let me talk about the violations of

5    policy.

6         THE COURT:  What's the best case for that

7    proposition, because to me they seem different under the

8    law.

9         MR. SCHAEFER:  I would say the *Lynn vs. Deaconess*

10   *Medical Center* is the case where one nurse was accused of

11   sleeping on the job, the one who the plaintiff pointed to as

12   a comparable.  The plaintiff was accused of various

13   unprofessional conduct, not sleeping on the job, but of

14   conduct that the court ultimately reversed summary judgment

15   and said no, sleeping on the job's of comparable and maybe

16   even more seriousness than the plaintiff was accused of.

17   It's relevant.  You got to let trial on the discrimination

18   case.  So, *Lynn vs. Deaconess*, but *Rideout* and *Burton*, all

19   those cases are very instructive on this issue.

20        Let me talk a little bit, Your Honor, about the

21   violations at issue here.

22        My client was accused twice of expressing his

23   feelings of love for women in the workplace, the first by a

24   doctor named Ashikhmina, an anesthesiologist, in October of

25   2017.

1          The accusations by Dr. Fritock are nonsensical in

2     terms of that raising anything relating to sexual

3     harassment.

4          But Ashikhmina pointed to dated texts over a year

5     old where Said, Dr. Said, had expressed his love for her.

6     What wasn't involved in that investigation but should have

7     been is their entire text communications.  These were

8     incredibly close friends over many years and they both

9     expressed their love for each other.  They both decided

10    never to pursue a relationship.  Ashikhmina had a boyfriend

11    and got pregnant by that boyfriend.  And that was the extent

12    of Dr. Said's supposed transgressions relating to

13    Ashikhmina.  That's it.

14         Your Honor, the Reid accusation, the PA Reid

15    accusation, that arose in October of 2018, again is

16    Dr. Said -- it's indisputably no touching of any kind, no

17    sexual advances of any kind, physical sexual advances of any

18    kind, but again, it's Dr. Said expressing his love for Reid

19    and exploring for a very brief time in October of 2018

20    whether she might be interested in developing a relationship

21    with him which was while he was contemplating divorce from

22    his wife and separated from his wife.  It didn't go

23    anywhere.

24         If you review all the evidence of that complaint,

25    all of it, under the summary judgment standard where you are

1    to construe inferences in Dr. Said's favor, there's plenty

2    that a jury could find that Dr. Said understood -- maybe

3    mistakenly, but understood, had a basis for understanding --

4    that that expression of love might be reciprocated, it

5    wasn't, and he never pursued it further than that.

6           And this evidence, supposedly damning evidence, of

7    this video set to music, look at the evidence of that, Your

8    Honor, because it's a nothing.  It is simply a surgery that

9    Reid worked with Dr. Said on, that he sent her a video of

10   and that the music came with -- it was sort of preprogrammed

11   into the video.  And it was an incredibly complex surgery

12   and he wanted her to have a memento of it, as is his giving

13   her gifts, no different than the way he treated all of the

14   people that he worked closely with.  Dr. Said is in a

15   demanding practice.  He's doing heart surgery on children.

16   That's his focus.  He gives gifts to the people that he

17   works with and he acknowledges that in relation to Reid, his

18   expression of interest to her was a lapse in judgment.  He

19   acknowledges that, Your Honor, and he so stipulated to that

20   in the Board complaint.

21          Look, however, at the record regarding

22   Dr. Maltais, who like Dr. Said is a Senior Associate

23   Consultant, hired a month later, like Dr. Said is subject to

24   the supervision of Dearani and the Personnel Committee.

25   Maltais is Christian, Caucasian, and of a different national

1   origin, so differing treatment of him is relevant on all the

2   discrimination scores.  They are in same position, subject

3   to the same supervision.

4        In contrast to the two complaints about Dr. Said

5   regarding his -- expressing these feelings towards women in

6   the workplace, there is a record of over ten serious

7   complaints raised about Dr. Simon Maltais, and those are all

8   cited in the record and discussed at our memo at page 6 to 7

9   and 10 to 12.

10        Those complaints include a very serious complaint

11   raised on October 24th or 22nd, '16 by Drs. David Joyce and

12   Lyle Joyce in which Maltais' clinical care problems,

13   Dearani's inexplicable favoritism, had caused 14 physicians

14   to leave the CVSD, the surgery department, 13 of whom were

15   minorities.

16        The other complaints that arose in 2017 and 2018

17   all talk to a pattern of behavior by Maltais, for over a

18   year, Your Honor, where he is directing abusive conduct

19   toward women in the workplace, including an assault of one

20   of the nurses, Emily Coldiron, and that his conduct over

21   that period of time, in addition to what Your Honor cited as

22   his -- the pornography on his phone that was apparent to a

23   subordinate in the workplace.  This caused -- this pattern

24   of conduct caused two individuals to leave, Coldiron and

25   Julie Holst, a nurse supervisor.  And you will see as you

1    review the record that in every instance these hotline

2    complaints basically say:  Referred to the human resources

3    department for further investigation and counseling.

4    Nothing was ever done.

5            Maltais testified that throughout his entire

6    tenure he had a grand total of one meeting with human

7    resources.  Maltais, contrary to Said, received a 360 Review

8    to facilitate his promotion to Consultant in the summer of

9    2018.  That review was not surprisingly uniformly negative.

10   And that led Mayo and Dearani with Rihal's approval to go to

11   Said -- or go to -- excuse me -- Maltais and say, "You're

12   never going to be promoted to Consultant.  This isn't a good

13   fit.  We're going to give you six months of continued

14   employment.  We're not going to report you to anywhere.

15   We're going to let you resign."  And they gave him

16   references to jobs that he subsequently found.  This all

17   occurred within two months, Your Honor, of the

18   recommendation -- two to three months of the recommendation

19   to summarily terminate my client.

20           That disparate treatment and the impact of that,

21   the impact of -- all Said was asking for through counsel and

22   through himself is just to be permitted that same kind of

23   treatment.  "Just give me six months.  I'll find something

24   else.  Just don't" -- you know, that is exactly what he was

25   looking for.  And that disparate treatment, the jury could

1    readily find, readily find, sounds in discrimination, Your

2    Honor, and could predicate liability on the discrimination

3    counts on that evidence alone.

4         THE COURT:  Let me ask you the same question I

5    asked your colleague.

6         The legal-standards analysis that would apply to

7    analyzing whether Dr. Said met Mayo's legitimate

8    expectations as part of a *prima facie* case, how is that

9    different under the law -- not factually, under the law --

10   from analyzing whether Mayo had a legitimate reason for

11   taking the adverse actions it did?

12        MR. SCHAEFER:  Well, Your Honor, the legitimate

13   reason is -- we have the burden of proving that it's

14   pretextual if we've established our *prima facie* case, and

15   Mayo's reason for recommending termination of Said was, is,

16   has been, that he committed these violations of policy.

17        The *prima facie* case is not an onerous standard at

18   all, Your Honor, and if a plaintiff demonstrates that work

19   performance met expectations, which Said's unquestionably

20   did throughout his tenure as exhibited by not only the one

21   360 Review he got, but all the other reviews he's got as

22   well, to say that because he was accused of expressing his

23   feelings towards two women in the workplace -- they call it

24   harassment, we -- you know, the disparity in how those were

25   investigated between Maltais versus Said is just striking,

1    Your Honor.  But to say that that renders him not able to

2    prove a *prima facie* case would mean that anyone coming

3    before this Court, anyone coming before any court attempting

4    to prove discrimination who was accused of something in the

5    workplace couldn't meet a *prima facie* case.  The devil is in

6    the details and the rubber hits the road, Your Honor, when

7    you look at how the violations of policy were handled

8    between Said and Maltais, and the disparity couldn't be more

9    great, and we would submit that they are clearly,

10   particularly at the summary judgment stage, similarly

11   situated for the purpose of that evidence, giving a jury a

12   basis to find discrimination.

13           You also mentioned, Your Honor, that you want to

14   talk about the MWA claim.  I assume that also includes the

15   reprisal claim, which is Count VII.  There's two retaliation

16   claims, reprisal under MHRA and then the Minnesota

17   Whistleblower Protection Act.

18           THE COURT:  I was less interested in hearing about

19   the reprisal claim today.  I think I understand that.  I'm

20   certainly willing to hear anything you think I need to know

21   about that that's not in the briefs, but I was thinking more

22   importantly about the Whistleblower Act claim and I just

23   want to be sure I understand that claim.

24           MR. SCHAEFER:  No, and, Your Honor, the format you

25   had suggested was five minutes for --

1            THE COURT:  But I'm going to start with you on

2       that one.

3            MR. SCHAEFER:  Okay.

4            THE COURT:  Give me the nutshell version of the

5       Whistleblower Act claim.

6            MR. SCHAEFER:  Dr. Said suffered an accident on

7       October 21st, 2017.

8            THE COURT:  Let me -- maybe I should ask it just

9       this way:  Is it just related to the HIPAA issue?

10            MR. SCHAEFER:  No.

11            THE COURT:  Okay.

12            MR. SCHAEFER:  No.  Your Honor, there's two HIPAA

13       complaints, one that occurred shortly after October 21st

14       where Dr. Said through his secretary had complained about

15       Dearani's violation of HIPAA by contacting a surgeon and

16       getting patient information regarding Said that he needed a

17       release to get, and Said complained about that and Dearani

18       erupted at him.

19            And the second was I believe it's April 3rd of

20       2018 where Dr. Said, in the midst of just begging Dearani

21       and Rihal to let him be considered for the promotion that he

22       had felt he had earned by that time, mentioned to Rihal very

23       clearly, complained to Rihal on October 8th, that:

24       Everything has gone south for me since I raised this

25       complaint to Said about his HIPAA violation, and there was

1    further retaliation against Said after that.

2             There is no explanation, Your Honor, for why

3    Said -- why no 360 Review was conducted for Said in 2018.

4    In fact, there's exhibits in the record, in fact that

5    coaching memo that they point to most prominently.  The

6    coaching memo was basically Dearani telling Said:  We're

7    going to delay your promotion for three months to allow you

8    to get better, you know, a 360 evaluation for your

9    consideration for promotion.  Never happened after that,

10   never happened at all in the next nine, ten months while he

11   was there, 11 months while he was there.

12            And in fact, there's a document in August of 2018

13   which says that Said is to be issued a final written warning

14   and given this long-awaited, much sort of requested 360

15   Review for his promotion to Consultant.  It never happened.

16            THE COURT:  Okay.

17            MR. SCHAEFER:  And finally, Your Honor, within six

18   days after he was placed on leave for this investigation to

19   ensue relating to his conduct toward PA Reid, I raised on

20   his behalf and said, "I'm raising this on Dr. Said's behalf

21   because he wasn't permitted to communicate with anyone at

22   Mayo."  I said, "This is discriminatory, what my client is

23   being subjected to," and specifically raised with them the

24   treatment of Maltais in correspondence throughout that time.

25   That's another protected report for which retaliation cannot

1     occur.

2              THE COURT:  So the question I asked at the start,

3     Mr. Schaefer, was whether the Whistleblower Act claim

4     related just to the HIPAA violations, and I think you said

5     no, but then what I heard you talking about were two

6     separate instances where the HIPAA violation was at the

7     center of it.

8              MR. SCHAEFER:  There's two, yeah, and I'm happy to

9     clarify, Your Honor.

10             THE COURT:  But it's the one HIPAA violation,

11    right?

12             MR. SCHAEFER:  Right, right.  There was one HIPAA

13    violation that Dr. Said complained of twice and then through

14    counsel on October 15th, Your Honor, and there's a number of

15    correspondence where this is fleshed out where the differing

16    treatment between Said and Maltais is raised.

17             THE COURT:  And those are the letters from you.

18             MR. SCHAEFER:  That's right.

19             THE COURT:  Right.  Okay.

20             Ms. Mrkonich Wilson, let me hear from you on the

21    Whistleblower Act claim.

22             MS. WILSON:  (Microphone muted).

23             THE COURT:  Oh, microphone.  Sorry.  You're on

24    mute.

25             MS. WILSON:  Right?  The line of 2020, right?

1      Your Honor, as to Count VIII, the Whistleblower

2   Act claim, as I hear it, Dr. Said's complaint is that

3   related to Dr. Dearani's conversation with his hand surgeon.

4      And it's undisputed that on October 20th, Dr. Said

5   had a meeting with Renee Jones and was counseled regarding

6   the conduct that had been investigated as raised by the

7   anesthesiologists Drs. Fritock and Ashikhmina.

8      And then the next day he's in a car accident.

9   There's an email in the record -- I think it's at Jones

10  Exhibit 36 -- that shows by October 27th the decision had

11  been made to give him a coaching memo.

12      His surgery then happens.  The conversation

13  happens after the coaching has happened and the

14  documentation has been decided upon.  It's not delivered

15  until he returns to work after he's recovered from his

16  injury.  So the idea that there was even timing on that

17  first element.

18      The second issue I'm not -- this issue that he's

19  saying he reiterated a concern with Dr. Rihal, it's

20  undisputed that in December of 2017 he was told about the

21  promotion being extended.  He's now saying that there was

22  something retaliatory about it being extended to Christmas

23  of 2018 because of the HIPAA concerns he allegedly raised,

24  and I think we have both the issue of timing on the first

25  one and then there is no causation and there is no pretext.

1    This is just the carrying out of decisions that were made

2    based upon conduct that was investigated before he had a car

3    accident, conduct that he engaged in before he had a car

4    accident as well.

5            And I don't think -- any other claim that is

6    raised under the Human Rights Act for a reprisal theory

7    would be preempted and could not be brought under the

8    Minnesota Whistleblower Act as well, by the Minnesota

9    Supreme Court ruling some 20 years ago in *Williams vs.*

10   *St. Paul Ramsey Medical Center*, so it would be limited to

11   the alleged HIPAA complaint.

12           THE COURT:  Okay.  Let me stay with you,

13   Ms. Mrkonich Wilson.  Let's go to the common-law tort claims

14   here.

15           Tortious interference.  Let's start with that and

16   we're just going to sort of bounce back and forth on each of

17   these, if that's all right.

18           MS. WILSON:  Right.  Yes, Your Honor.

19           As to all of the remainder of the briefing, I

20   think it's important to note and we've cited to the *Horner*

21   decision out of the -- that was an unreported decision from

22   the late Judge Kyle, but really got to the point of saying

23   it's plaintiff's obligation to designate specific facts with

24   record citations.  And I just note that in the briefing we

25   fall off there, or Plaintiff falls off there, from this

1    Count IX, X, XI, and XII.  There isn't record citation to

2    support or respond to the specific facts and arguments set

3    forth in our moving papers, and so I think that's a

4    fundamental flaw in the briefing as to the -- so there

5    aren't record cites for me to respond to from that briefing

6    because they're not there.

7              When I look at the tortious interference claim, I

8    see an interference with -- I think with the ability to be

9    reemployed, that's sort of the first component.  He's got a

10   two-part claim.  And here, the chair of the University of

11   Minnesota denies the allegations, so you can't create a

12   genuine issue of material fact out of thin air.  There is no

13   admissible evidence to support the notion that his

14   reemployment was in any way delayed or affected by Mayo.

15   The declaration in the record supports the notion that when

16   he was hired the University of Minnesota envisioned a

17   three-month onboarding process.

18             The second component to the tortious interference

19   claim is I believe the report to the Board, and again,

20   there, in addition to there being civil immunity for such

21   reporting, that there is also an authorization and release

22   that Dr. Said executed.  So, there's no intent to interfere.

23   No tortious interference has been established under any of

24   the elements of the claim.

25             THE COURT:  I'm not sure this is the best time to

1    ask this question, but it's something I'm curious about.

2          We have a declaration from Dr. Said that's been

3    submitted in connection with this motion, correct?

4          MS. WILSON:  That Dr. Said submitted a

5    declaration?

6          THE COURT:  Yes.

7          MS. WILSON:  Yes.

8          THE COURT:  Okay.  Any conflict between anything

9    in that declaration and his testimony in his deposition?

10         MS. WILSON:  I think it was more of an elaboration

11   and I think it was more hearsay and argumentative and I

12   think the facts in the record are there.  We'll accept it

13   for what it is.  So, we didn't make it the subject of motion

14   practice for the purpose of saying -- there is this piece.

15   I mean, he quit, I should add, as well, which also takes

16   away from his ability to bring a tortious interference

17   claim, but he kind of wants it both ways.

18         On the one hand he says yes -- he first is

19   addressed about his conduct and the claims in October of

20   2017 and says, you know, no, it didn't happen -- October

21   2018, I apologize -- with Rebecca Reid.  And he says no, it

22   wasn't like that, but then when he -- that there wasn't a

23   journal.  He's asked about a journal that he had told her

24   about.  No, there's no journal.  Then he comes in a month

25   later and he says, oh, it was.  This is all just -- you

1    know, I think I just heard Counsel say he was expressing

2    feelings of love, and if that's expressing feelings of love,

3    that's not welcome in the Mayo Clinic workplace, because

4    that's a really different way to express feelings of love

5    when you've been told not to.  So that happens.  I think his

6    declaration is consistent with that where we get a story and

7    then we take another angle.

8             And I think this is a kitchen-sink lawsuit.

9    That's what I think when I'm getting to Count XII.  And we

10   can have 32 counts, but there's not a count that survives.

11   There's just not a case.  I like being on this side of

12   this -- if these facts were going to be in court, this is

13   the side I want to be on.

14            So, that's the tortious interference claim.  I

15   don't know if you want me to stop now.

16            THE COURT:  Yeah, let's ping-pong here on this if

17   we could.

18            MS. WILSON:  Okay.

19            THE COURT:  Mr. Schaefer, let me hear from you on

20   tortious interference.

21            MR. SCHAEFER:  Two bases for -- not what she

22   described.  First is the delay in the hire --

23            THE COURT:  Get a little closer to your

24   microphone.

25            MR. SCHAEFER:  I'm sorry, Your Honor.

1           First is the delay in the hire to the University

2     of Minnesota position.  There was a clear plan that we've

3     laid out in the record that Dr. Said also testified to for

4     him to begin on an emergency-privilege basis at the

5     University of Minnesota Physicians in December of 2018 that

6     all got derailed because of communications that Dearani had

7     with Griselli that alerted the University of Minnesota to

8     the November 19th or -- I think it's 19th -- 2018

9     termination recommendation letter, and the consequences of

10    that delayed Dr. Said's start at the University of Minnesota

11    until about April of 2019, Your Honor.

12          And then second is the University of Detroit

13    opportunity where both -- where Dr. Zeyer was clear at his

14    deposition testimony that when he asked Said about Dr. -- or

15    asked Dr. Dearani about Dr. Said, Dr. Dearani told him --

16    and I quote -- "I can't talk about him.  He's suing me."

17    And then Dr. Walters also had similar testimony in support

18    of that, so that there was a tortious interference with that

19    opportunity as well.

20          Those are the bases for that claim, Your Honor.

21    It has nothing to do with the Board report.

22          THE COURT:  What do I do with the UMPhysicians

23    affidavit, or testimony, I guess --

24          MR. SCHAEFER:  I think that was from

25    Ikramuddin that said that he had had no communications that

1    he could recall with Dearani.  It was Griselli that the

2    communications were with.  Dearani admitted in his

3    deposition -- I don't know why he would communicate with

4    Griselli, but he claimed his communication with Griselli was

5    only after Said started working at the University of

6    Minnesota.  I don't think that's accurate at all, because

7    Dr. Said was told by Griselli and Ikramuddin that we can't

8    give you emergency privileges until we get to the bottom of

9    this November 19th, 2017 letter.

10              So that's that interference, Your Honor.

11              THE COURT:  Let's leave defamation for last here.

12   Let's go to invasion of privacy next, which as I understand

13   it is the journal.

14              Ms. Mrkonich Wilson, let me hear from you on that.

15   And if it goes beyond the journal, I guess I need to be

16   reminded of that too.

17              MS. WILSON:  I just -- I will move on to that.  I

18   would just close on the tortious interference with contract

19   claim.  I just heard reference to testimony from

20   Dr. Walters.  There was no testimony from Dr. Walters, so

21   that didn't happen.  And the Detroit testimony, the record

22   will reflect what it reflects.  We've cited to the

23   testimony.

24              THE COURT:  I thought it was just in Dr. Said's

25   declaration.

1          MS. WILSON:  Okay.  That's hearsay, right.  So do

2     we have an objection to relying on -- yes, hearsay?

3          THE COURT:  That's sort of why I'm saving

4     defamation for last.

5          MS. WILSON:  Right.  Thank you.

6          And as for the privacy claims, as I see those,

7     again, not trying to state his claims for him, but trying to

8     see what I've understood from the briefing.

9          He's got the publication.  I guess the first one

10    would be intrusion on seclusion.  For that he has to show an

11    intentional intrusion that's highly offensive and in some

12    matter in which a person has a legitimate expectation of

13    privacy.  And this really was rooted in a case against

14    Walmart where there were nude photos circulated and it's

15    become kind of a -- that's the seminal case on the issue in

16    Minnesota.  This is very different.

17         Here, Dr. Said claims his privacy was invaded by

18    publicizing private facts by the fact that the Mayo

19    investigators acquired his journal.  He testified and

20    admitted that he doesn't believe it was shared with anyone

21    inappropriately.  Those pages of his deposition are cited

22    to.  He has no record cites in response in his brief.  And

23    the argument made there is, of course, what we reiterate

24    here, is that acquiring the journal from Mayo's property

25    when he had told Rebecca Reid it was there in his desk and

1    and she should look at it was perfectly reasonable for the

2    investigators to do, especially then when he denied the

3    journal's existence.  I mean, the journal was a relevant

4    piece to their investigation.  It was not highly offensive

5    in the investigative context.  It was kept on Mayo's

6    property, so there isn't a legitimate expectation of

7    privacy.  It wasn't -- unlike the photos that were published

8    where people were informed that one or more copies had been

9    circulated in the community, I believe.

10          So, the intrusion on seclusion theory fails as

11   does, I think -- the second effort is the publication of

12   private facts and for that he must establish that there's

13   public disclosure of facts concerning his private life, the

14   matter disclosed would be highly offensive and objectionable

15   to a reasonable person, disclosure was intentional, and the

16   matter publicized is not of legitimate concern to the

17   public.

18          So, publicity is different than publication, it's

19   not a privacy invasion for communication of a fact to a

20   person, and we have cited to some case law in Minnesota that

21   supports our argument, but again, our arguments in

22   opposition to the claim are this was not a journal that was

23   reviewed and then disclosed in any way to the public, it

24   wasn't published, it was highly relevant to the

25   investigation.  He ultimately brought it to the

1    investigators when he came to his interview on

2    November 2nd or 2018, so it wasn't reasonably likely to

3    become public for the way it was used in the kind of

4    privileged investigative context it was used, so there isn't

5    a privacy claim.

6              THE COURT:  Mr. Schaefer?

7              MR. SCHAEFER:  Your Honor, I have little to add

8    beyond what we have in our briefing.  I mean, the journal

9    was intensely private and was kept in his desk in the

10   workplace and that was violated.

11             That's all I have to add on that, Your Honor.

12             THE COURT:  All right.  How about conversion?

13             Mr. Schaefer, let me stay with you on conversion.

14   I have a question for you on conversion.

15             In the complaint there are two subjects of the

16   conversion claim, Dr. Said's property rights in this

17   published article and then also items stored on an H drive

18   in a notebook.  The H drive and notebook don't get any

19   attention in the briefing and I'm wondering if that's

20   deliberate.  In other words, are those aspects of this

21   claim, have those dropped out?

22             MR. SCHAEFER:  Your Honor, I think they have and I

23   think the focus is on the article that Dr. Said drafted and

24   then was cropped out of and it was published following his

25   termination without any attribution whatsoever to him.

 1          THE COURT:  Was anyone else attributed?

 2          MR. SCHAEFER:  I believe there was attribution to

 3  an author in the publication of it.

 4          THE COURT:  Okay.  Ms. Mrkonich Wilson, let me

 5  turn to you on that one just to give you an opportunity to

 6  rebut.

 7          MS. WILSON:  Well, conversion is willful

 8  interference with the personal property of another without

 9  lawful justification, and here I think the claim that

10  Dr. Said was removed as a co-author of an article that was

11  published in an internal Mayo cardiovascular update

12  publication reflects a claim where there is not a property

13  interest.  He doesn't have a property interest in his name

14  on a newsletter that he helped draft when he was employed,

15  was publicized after he resigned and intended to advertise

16  and promote the practice that he had left.  There are

17  photographs near the article.  There is no one identified as

18  an author on the article, just some pictures.

19          Then he also -- I think we've pointed out and

20  cited to our brief and attached -- he signed an intellectual

21  property -- to the extent there even were, he had signed an

22  intellectual property agreement at the time that he began

23  his employment, so there couldn't be conversion for various

24  reasons, all outlined in the brief.

25          THE COURT:  Let's get to defamation now.  I think

1    I've worked through everything.

2              Ms. Mrkonich Wilson, if you want to sort of

3    summarize.  I think what you're doing is you're sort of

4    grouping each of these alleged false statements into

5    different categories and sort of knocking them out for one

6    wholesale reason or another.  I understand that.

7              Anything beyond the briefing that I need to know

8    there?

9              MS. WILSON:  I don't think so.  In getting ready

10   for this argument, I had so many lists of reasons and things

11   and trying to kind of summarize them.  I don't need to argue

12   their case for them, but there are tons of after-the-fact

13   claims being made.  Every day we were getting -- a new

14   statement was being called defamatory.

15             And I think it is worth noting that the *Sherr*

16   decision that we cited in our briefing was just recently,

17   you know, affirmed by the Sixth Circuit on -- I mean the

18   Eighth Circuit, pardon me -- on June 2nd, and a recent

19   request for reconsideration review was denied on I think

20   July 15th.  So that's good law in the Eighth Circuit and I

21   would rely on the *Sherr* decision to say we've got to look

22   first at the statements that are pleaded in the complaint.

23   Those are the statements at issue.  And then, yes, we've set

24   forth the reasons that the claims fail.

25             THE COURT:  Okay.  Mr. Schaefer?

1           MR. SCHAEFER:  Your Honor, we've previously

2     presented the case law that we think applies and should

3     apply to determining whether statements at issue are capable

4     of a defamatory meaning and therefore should be submitted to

5     a jury to determine whether or not they are in fact

6     defamatory and imply false facts, so we've laid that out.

7     We haven't -- I mean, space didn't permit in the briefing

8     for us to go through statement by statement.

9           But to address the **Sherr** issue and the decision

10    related to **Sherr**, what we did in the complaint is we alleged

11    the defamatory statements that we were aware of that we

12    alleged Dearani and Stulak had been involved in.  We have

13    supplemented that through discovery with some additional

14    statements, such as Dearani declaring Dr. Said to be a

15    predator when he became aware of PA Reid's accusation.  We

16    think that's a defamatory statement that should survive

17    summary judgment and clearly implies false facts about him.

18          We think the statements even to Dr. Zeyer and

19    others imply very serious negative factual implications

20    about Dr. Dearani that a jury ought to be able to consider

21    whether or not those in fact were false and permit a

22    recovery to Dr. Said on defamation.

23          THE COURT:  At the start of this I think I

24    indicated -- if I didn't, I should have -- that I'd give

25    both of you an opportunity to get anything else on the

1    record that my questions or the format of the argument here

2    today didn't permit you to get on, so let me give you that

3    opportunity at this point.

4            Ms. Mrkonich Wilson, anything from you?

5            MS. WILSON:  Well, I would just go back to the

6    fact that the decisionmakers here and the alleged bad actors

7    in Dr. Said's world are Dr. Rihal and Dr. Dearani, and they

8    both stand by their decision, the knowledge that they had

9    and the assessment that they made of the complaints received

10   regarding Dr. Said were severe and had consequences.

11           And I think it's noteworthy to point out that in

12   Mr. Said's own declaration, he says -- at paragraphs 38 and

13   39:

14           "I also accepted the reprimand associated with

15   this because I have learned with the S & O" -- the

16   stipulation and order -- "since the events at Mayo that my

17   expression of my love for PA Reid and interest in developing

18   more than a professional relationship, however brief it was,

19   was a serious lapse in judgment for which I bear

20   responsibility."

21           He goes on to say he would have gladly accepted a

22   reprimand.  And here the decision is distinctly in Mayo's

23   hands and Mayo made a decision that we stand by and it has

24   not been shown in any way to be anything other than a

25   legitimate and appropriate decision under the circumstances.

1           So, we believe the case should be dismissed on all

2    counts, however many of them there are, and however many

3    statements of defamation are alleged.  There was a deadline.

4    Plaintiff sought to move the punitive damages deadline to

5    amend the pleadings and did obtain an extension, a deadline

6    was extended, and we've never seen an amended complaint to

7    match the pleadings, and I do believe the ***Sherr*** decision is

8    governing here and those claims should not be considered.

9           Thank you.

10          THE COURT:  Thank you.  Mr. Schaefer, anything

11   further?

12          MR. SCHAEFER:  Just to close, Your Honor, all

13   Dr. Said is asking and will ask a jury, if permitted to try

14   the discrimination and reprisal and other claims, is to be

15   treated in a manner that is consistent with what the law

16   requires, and that is individuals are treated similarly and

17   that there isn't favorable treatment for a protected

18   class -- or, you know, for nonprotected class physicians

19   like there clearly was here for Dr. Said, or for --

20   Dr. Maltais was treated far more favorably.  All he asks is

21   that Mayo be held to the standard that they apply equal

22   employment opportunity under the law, treat like infractions

23   similarly or at least ones of comparable seriousness

24   similarly.  They utterly failed to do that here and that's

25   actionable and that could -- it doesn't demand that a jury

1    find liability, but it could support liability and that's

2    why trial is required.

3                 THE COURT:  Thank you.

4                 All right.  Well, as I said, I've read everything.

5    The briefing and argument today are helpful in trying to

6    understand everything that's going on and the work that we

7    have to do to issue a decision on this motion.

8                 We will take the matter under advisement.  We will

9    get a decision out as quickly as we can, recognizing the

10   importance of a speedy decision to all concerned here.

11                So, thank you very much.  We're adjourned.

12                MR. SCHAEFER:  Thank you, Your Honor.

13                MS. WILSON:  Thank you.

14                (Proceedings concluded at 12:06 p.m.)

15                           *     *     *     *

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


I, **TIMOTHY J. WILLETTE**, Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of my shorthand notes,

taken in the aforementioned matter, to the best

of my skill and ability.



*/s/ Timothy J. Willette*


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224